**2013-1311**

# United States Court of Appeals
## for the Federal Circuit
_____

GENERAC POWER SYSTEMS, INC.,

*Plaintiff-Appellant,*

v.

KOHLER COMPANY,

*Defendant-Appellee,*

and

TOTAL ENERGY SYSTEMS, LLC,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin in Case No. 11-CV-1120,
Judge J.P. Stadtmueller.

════════════════════════════

**BRIEF OF PLAINTIFF-APPELLANT
GENERAC POWER SYSTEMS, INC.**

════════════════════════════

H. Michael Hartmann
Eley O. Thompson
John K. Winn
Michael J. Brandt
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
180 N. Stetson Ave.
Chicago, IL 60601
(312) 616-5600 (telephone)
(312) 616-5700 (facsimile)

*Counsel for Plaintiff-Appellant,*
*Generac Power Systems, Inc.*

## CERTIFICATE OF INTEREST

I, H. Michael Hartmann, counsel for Plaintiff-Appellant Generac Power

Systems, Inc., certify the following:

1.      The full name of every party or amicus represented by me is:

Generac Power Systems, Inc.

2.      The name of the real party in interest (if the party named in the

caption is not the real party in interest) represented by me is:

Generac Power Systems, Inc.

3.      All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party or amicus curiae represented by me

are:

> Generac Holdings Inc. is the parent company of Generac Power
> Systems, Inc.; affiliates of CCMP Capital Advisors, LLC collectively
> beneficially own more than 10 percent of the outstanding common
> stock of Generac Holdings Inc.

4.      The names of all law firms and the partners or associates that

appeared for the party or amicus now represented by me in the trial court or

agency or are expected to appear in this Court are:

> H. Michael Hartmann
> Eley O. Thompson
> John K. Winn
> Michael J. Brandt
> LEYDIG, VOIT & MAYER, LTD.

i

Dated:  August 6, 2013                    Respectfully submitted,

                                          /s/ H. Michael Hartmann
                                          H. Michael Hartmann
                                          LEYDIG, VOIT & MAYER, LTD.
                                          Two Prudential Plaza, Suite 4900
                                          180 N. Stetson Avenue
                                          Chicago, IL 60601-6731
                                          (312) 616-5600 (telephone)
                                          (312) 616-5700 (facsimile)

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF CONTENTS .................................................................... iii

TABLE OF AUTHORITIES ................................................................ v

STATEMENT REQUESTING ORAL ARGUMENT ........................................... vii

STATEMENT OF RELATED CASES ............................................... viii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ............................................................. 2

I.     STATEMENT OF THE CASE ................................................... 3

II.    STATEMENT OF THE FACTS ................................................. 7

III.   SUMMARY OF THE ARGUMENT .......................................... 12

       A.    "predetermined operating parameters" ............................ 12

       B.    "interconnecting at least one generator set" ..................... 14

       C.    The Existence of the Cummins-Onan PowerCommand System ........ 15

IV.    ARGUMENT ...................................................................... 16

       A.    Standard of Review ................................................. 16

       B.    The District Court Erred in Its Construction of "predetermined
             operating parameters" .............................................. 17

       C.    The District Court Erred in Its Construction of "at least one" in the
             Full Context of Claim 23 ........................................... 24

       D.    The District Court Erred in Holding That a Single Cummins-Onan
             PowerCommand System Existed and Anticipated Claim 19 ........... 27

             1.    A Single, Identifiable PowerCommand "System" Was Not on
                   Sale Prior to the Critical Date ............................... 27

             2.    Even Assuming a PowerCommand "System" Was on Sale Prior
                   to the Critical Date, Such "System" Would Still Fail to
                   Anticipate Claim 19 .......................................... 33

V.     CONCLUSION .................................................................. 37

Addendum

       November 20, 2012 Order

November 29, 2012 Amended Order

December 5, 2012 Order

December 19, 2012 Judgment

March 7, 2013 Order

United States Patent No. 6,653,821

October 13, 2010 Order, *IP Innovation L.L.C. v. Red Hat, Inc.*

Certificate of Service

Certificate of Compliance

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
    *477 U.S. 242, 255 (1986)* ...................................................................27

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.,*
    672 F.3d 1335 (Fed. Cir. 2012)............................................................19

*Black & Decker Inc. v. Robert Bosch Tool Corp.,*
    476 F. Supp. 2d 887 (N.D. Ill. 2007) ..................................................36

*Cybor Corp. v. FAS Techs., Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998)............................................................16

*Green Edge Enters., LLC v. Rubber Mulch Etc., LLC,*
    620 F.3d 1287 (Fed. Cir. 2010)............................................................17

*Helifix Ltd. v. Blok-Lok, Ltd.,*
    208 F.3d 1339 (Fed. Cir. 2000)............................................................33

*IGT v. Bally Gaming Int'l, Inc.,*
    659 F.3d 1109 (Fed. Cir. 2011)............................................................25

*IP Innovation LLC v. Red Hat, Inc.,*
    No. 2:07-cv-447 (RRR) (E.D. Tex. Oct. 13, 2010) ............................34

*Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc.,*
    367 F.3d 1381 (Fed. Cir. 2004)............................................................28

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.,*
    500 F. App'x 951 (Fed. Cir. Mar. 15, 2013).......................................16

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996) .............................................................................16

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995)...............................................................18

*Minn. Mining and Mfg. Co. v. Chemque, Inc.,*
    303 F.3d 1294 (Fed. Cir. 2002).....................................................16, 33

*O2 Micro Int'l Ltd. v. Samsung Electronics Co., Ltd.*,
  No. Civ. A. 2:04-CV-323, 2006 WL 1804616
  (E.D. Tex. June 28, 2006) ...................................................................23

*Oney v. Ratliff*,
  182 F.3d 893 (Fed. Cir. 1999).............................................................36

*Panduit Corp. v. Dennison Mfg. Co.*,
  810 F.2d 1561 (Fed. Cir. 1987)...........................................................19

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
  566 F.3d 989 (Fed. Cir. 2009).............................................................33

*Respironics, Inc. v. Invacare Corp.*,
  719 F. Supp. 2d 577 (W.D. Pa. 2010)..................................................23

*Rockwell Int'l Corp. v. U.S.*,
  147 F.3d 1358 (Fed. Cir. 1998)...........................................................30

*Studiengesellschaft Köhle, m.b.H. v. Dart Indus., Inc.*,
  726 F.2d 724 (Fed. Cir. 1984).............................................................34

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997)..............................................................................18

*Woodland Trust v. Flowertree Nursery, Inc.*,
  148 F.3d 1368 (Fed. Cir. 1998)...........................................................31

**Statutes**

28 U.S.C. § 1295(a)(1)..............................................................................1

28 U.S.C. § 1331 .......................................................................................1

28 U.S.C. § 1338(a) ..................................................................................1

**Rules**

Fed. R. App. P. 4(a)(1)(A) ........................................................................1

Fed. R. App. P. 4(a)(4)(A) ........................................................................1

Fed. R. Civ. P. 56....................................................................................27

## **STATEMENT REQUESTING ORAL ARGUMENT**

Plaintiff-Appellant Generac Power Systems, Inc. requests oral argument.

## <u>STATEMENT OF RELATED CASES</u>

No appeal in or from the same civil action in the lower court was previously

before this Court or any other appellate court.

## JURISDICTIONAL STATEMENT

This appeal is from a judgment entered in a patent infringement case before District Judge J.P. Stadtmueller in the United States District Court for the Eastern District of Wisconsin.  The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

The district court issued memorandum orders addressing summary judgment motions and claim construction on November 20, November 29, and December 5, 2012.  A1-A44; A45-A88; A89-A96.  Final judgment was entered on December 19, 2012.  A97.  The district court issued a memorandum order relating to various post-trial motions on March 7, 2013.  A98-A114.  Plaintiff Generac Power Systems, Inc. timely filed its Notice of Appeal on April 5, 2013 in accordance with Fed. R. App. P. 4(a)(1)(A) and 4(a)(4)(A).  A11260-A11261.

This appeal is from, *inter alia*, the final judgment entered by the district court that disposed of all of the parties' claims.  This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

1

## <u>STATEMENT OF THE ISSUES</u>

1.     Whether the district court erred in construing "predetermined operating parameters" in claims 19 and 23 of U.S. Patent 6,653,821 to include real-time commands that are not stored at the generator set and are not preconfigured for use by the generator set to establish how it operates in the system.

2.     Whether the district court erred in construing "at least one" in the phrase "interconnecting at least one generator set to a load and to a network" in claim 23 of U.S. Patent 6,653,821 to include a single generator set of any type, even if not capable of linking to additional generator sets.

3.     Whether the district court erred in holding on summary judgment, as a matter of fact, that: (1) a Cummins-Onan system had been on sale and hence constituted prior art to claims 19 and 23 of U.S. Patent 6,653,821, and (2) its characteristics were described in certain documents.

## I.    STATEMENT OF THE CASE

Plaintiff-Appellant Generac Power Systems, Inc. ("Generac") filed suit against Defendants-Appellees Kohler Company ("Kohler") and Total Energy Systems, LLC ("TES") for willful infringement of U.S. Patent 6,653,821 ("the '821 patent").  A2343-A2344 at ¶¶ 17-21.  Claim 19 of the '821 patent covers a method of managing the distribution of electrical power, and reads as follows:

> 19.  A method of managing the distribution of electrical power, comprising the steps of:
>
> interconnecting a plurality of generator sets to a load and to a network, each generator set having the ability to be started and stopped;
>
> selecting each generator set and setting various predetermined operating parameters for each selected generator set; and
>
> transmitting the settings of the predetermined operating parameters over the network to each selected generator set.

A133 at col. 14 ll. 43-53.  Claim 23 of the '821 patent is similar to claim 19 but refers to a system with "at least one generator set" capable of accommodating additional generator sets:

> 23.  A method of managing the distribution of electrical power, comprising the steps of:
>
> interconnecting at least one generator set to a load and to a network, each generator set having the ability to be started and stopped;

> selecting a generator set and setting various
> predetermined operating parameters for the selected
> generator set;
>
> transmitting the settings of the predetermined operating
> parameters over the network to the selected generator set;
>
> starting the selected generator set at a first predetermined
> time; and
>
> stopping the selected generator set at a second
> predetermined time.

A134 at col. 15 l. 6 – col. 16 l. 8.

On September 12, 2012, Kohler and TES moved for summary judgment (1) that claims 19 and 23 of the '821 patent were invalid due to anticipation, and (2) of non-willfulness. A2408; A2417; A2437. The same day, Generac moved for summary judgment that (1) Kohler and TES infringed claims 19 and 23, (2) claims 19 and 23 were not invalid due to obviousness, and (3) claims 19 and 23 were not invalid due to anticipation by certain prior art. A5122; A5136; A5144; A5148.

The district court decided the cross-motions in an order entered on November 20, 2012. A42-A43. As part of that ruling, the district court construed the elements of claims 19 and 23. The term "predetermined operating parameter" was given the meaning "a parameter that when varied changes the operation of the system," while the term "at least one," which appears in claim 23 of the '821 patent, was construed to mean any "one or more than one" without the ability to join more generator sets. A13 at ¶ 4; A16 at ¶ 4.

4

The district court then analyzed whether one or more of five separate items of alleged prior art anticipated claims 19 and 23. It denied Defendants' motion for summary judgment of anticipation of claims 19 and 23 with respect to four of the alleged prior art items. A25 at ¶ 2 (U.S. Patent 5,734,255 to Thompson); A26 at ¶ 3 (U.S. Patent 5,323,328 to Tanaka); A28 at ¶ 4 (the alleged Encorp system); A34 at ¶ 2 (Generac's Utility 50 product). The court further held that an alleged sale of a purported "Cummins-Onan PowerCommand" system (hereafter "Cummins-Onan system") anticipated claim 19 but not claim 23, and entered summary judgments accordingly. A32 at ¶ 1; A33 at ¶¶ 1-2. On November 20, 2012 the district court amended its summary judgment order, further clarifying its judgment that the purported Cummins-Onan system did not anticipate claim 23. A86-A87.

In response to the district court's amended summary judgment order, Kohler and TES filed a motion seeking clarification of the court's findings with respect to the purported Cummins-Onan system. Kohler and TES asserted that under the court's claim construction, that supposed system must also have anticipated claim 23. A7510-A7511. Generac filed a response to the motion in which it asserted that evidence newly produced by Kohler demonstrated that a Cummins-Onan system was incapable of setting predetermined operating parameters over a network. A8285 at ¶¶ 2-3. In light of the new evidence, Generac requested that

the court reconsider its ruling of anticipation with respect to claim 19.  A8284 at ¶ 2.

The court issued an order on December 5, 2012 in which it confirmed its finding of anticipation of claim 19.  A93 at ¶ 1.  The court also maintained its finding that the purported Cummins-Onan system failed to anticipate claim 23.  A95 at ¶ 1.  In the order, the court *sua sponte* expanded on its construction of the phrase "predetermined operating parameters."  A91-A93.  It noted that its previous construction did not construe the term "predetermined."  A91 at ¶ 5 (noting that the court's earlier construction "does not include a separate explanation of the term 'predetermined'").  The court found that a "predetermined operating parameter" is a "parameter that [is] set prior to [its] transmission and when varied change[s] the operation of the system."  A92 at ¶ 1.

With the issues narrowed, a five-day jury trial was held on the validity and infringement of claim 23.  The jury found that neither Kohler nor TES infringed claim 23, and that claim 23 was invalid as anticipated and obvious.  A10511; A10513.  The district court entered judgment on December 19, 2012.  A97.

On January 16, 2013, Generac moved for judgment as a matter of law and for a new trial on the issues of the infringement and validity of claim 23.  A10515-A10516.  Both motions were denied in an order issued on March 7, 2013.  A113-A114.  Generac timely appealed.  A11260-A11261.

## II.    STATEMENT OF THE FACTS

The '821 patent relates to backup electrical generators that are combined to provide greater and more flexible electrical power.  Traditional engineering approaches called for a single generator driven by a single engine (together, a "generator set").  Applications that used a single large-engine generator set included hospitals, data centers, plants, and factories.  As the demand for electricity increased in these commercial applications, manufacturers had to respond with ever larger machines.

When electricity requirements exceeded the capacity of a single generator set, multiple generator sets traditionally were employed through the use of complicated and expensive auxiliary paralleling switchgear.  A3771 at ¶ 3.  The switchgear, commonly housed in large cabinets in a separate control room, coordinated the operation of the various generator sets that had to be harmonized to work together.  Combining the electrical outputs of multiple generator sets in this fashion is called paralleling.

Paralleling multiple generator sets is no simple task.  If the generator sets are not properly synchronized before they are connected together, serious mechanical damage or even explosions may result.  A3770 at ¶ 3; A3771 at ¶ 1.  Furthermore, the amount of electricity each paralleled generator set provides must be equally

7

balanced in proportion to the varying capacities of each generator set within the system. A3770 at ¶ 3. As a result, paralleling switchgear was complex, difficult to operate, expensive to build and maintain, and had to be custom programmed for each installation configuration. A3772 at ¶ 4.

Even when optimally designed and programmed, single and multiple generator set systems with paralleling switchgear suffered from inherent limitations. A3772 at ¶ 4; A3773 at ¶ 2. In the case of a single generator set configuration, a malfunction in the generator set shut down the supply of electrical power. In a multiple generator set configuration, even though each generator set provided redundancy, the paralleling switchgear could still fail causing the entire system to cease operation (such deficiencies are sometimes referred to as a single point of failure).

In light of such problems in the prior art, Generac developed a novel approach for providing backup electrical power. Generac's engineers turned away from the prior approaches of utilizing either a larger generator set or custom-programmed and -designed switchgear. *See* A3776 at ¶ 1. They instead created an entirely new system of joining multiple generator sets of varying capacities to provide a modular and expandable backup electrical power solution with unencumbered redundancy and flexibility. A3776 at ¶ 1. Generac created such systems by decentralizing control through preconfiguring the generator sets. The

desired operating parameter settings are transmitted to each generator set within a system in advance of normal operation.  *See* A3776 at ¶ 2.  The parameters are stored at the generator sets and are used by the generator sets to govern their operation.  The generator sets become independently "intelligent" and cooperate as a system without the need for centralized single-point-of-failure switchgear.  A3776 at ¶ 2.  Additional sets can readily be added to the system in modular fashion.

The United States Patent and Trademark Office ("USPTO") granted Generac the '821 patent covering this concept.  A115-A134.  Figure 3 of the '821 patent shown below illustrates the generator sets (highlighted in yellow), including generator panels 16 and generators 20a and 20b.  A128 at col. 4 ll. 60-62.



FIG. 3

A118 (emphases added).  The generator sets are interconnected to load 74

(highlighted in red).  A129 at col. 6 ll. 17-20.  A "load" is a user of electricity, such

as an emergency lighting system in a hospital.  A6612-A6613 at ¶ 59.  The

generator sets are also interconnected to a network through communications link

18.  A128 at col. 4 ll. 57-60.

Claims 19 and 23 of the '821 patent both describe methods for managing the

distribution of electrical power by properly interconnecting generator sets to a load

and to a network.  A133 at col. 14 ll. 43-53; A134 at col. 15 l. 6 – col. 16 l. 8.  The

phrase "interconnecting a plurality of generators sets [at least one generator set] to

a load and to a network, each generator set having the ability to be started and

stopped" refers to interconnecting a plurality of generator sets [at least one
generator set] to a load by establishing an electrical power circuit among the
plurality of generator sets [at least one generator set] and a common load.  A3788
at ¶ 1.  The generator sets [at least one generator set] are also linked into a
communications network.  A3788 at ¶ 1.  The predetermined operating parameter
settings for each generator set, such as when or under what conditions to start and
stop each generator set, for example, are transmitted to each generator set via the
network.  A133 at col. 14 ll. 51-53; A134 at col. 16 ll. 1-3.

Generac's patented method provides for interconnected generator sets that
are centrally configured over a communication network by setting operating
parameters for each selected generator.  A3776 at ¶¶ 1-2.  The operating
parameters are predetermined to establish the desired operational characteristics of
the system.  A technician enters the settings using centralized screens shown, for
example, in Figure 7 of the '821 patent.  A123.  The settings are then pushed down
through the network to each individually-selectable generator set where they are
stored for future use to control the operation of the system as a whole.  A128 at col.
3 ll. 5-8; A6603 at ¶ 38.  Once the predetermined operating parameters are
established, the network over which the settings of the predetermined operating
parameters were transmitted is no longer necessary for the normal operation of the
system.  A6603 at ¶ 38.

11

The transmission of the settings of the predetermined operating parameters to each selected generator sets enables the interconnecting of the generator sets so that they are able to synchronize and parallel as a system.  A6604.  The system obviates the need for paralleling switchgear, A6604, and the danger of global failure inherent in centrally-controlled devices.  Intelligence residing at the generator sets (rather than in the switchgear) enables the system to be fully modular, redundant, and configurable for virtually any power requirement.  *See* A3776 at ¶ 1.  If more power is required, another generator set may be added to the existing interconnected network of generator sets without the need to rebuild the separate switchgear.  In the event one generator set fails, other sets in the system continue to function.  These technical features combined with the cost advantages resulting from the ability to use smaller engines and generators led to remarkable commercial success.  During 2010 to 2012 alone, Generac realized almost $50 million in sales of the patented systems.  A9795 at ll. 12-15.

## III.   SUMMARY OF THE ARGUMENT

### A.    "predetermined operating parameters"

The district court erred in its construction of the phrase "predetermined operating parameters" in claims 19 and 23.  In its clarification order, the court construed "predetermined operating parameters" to mean "parameters that are set *prior to their transmission* and when varied change the operation of the system."

12

A92 at ¶ 1 (emphasis added). The construction, which equates the existence of a parameter with it being predetermined, effectively reads the term "predetermined" out of the claims.

Under proper construction, predetermined operating parameters are settings that have been chosen in advance to bring about the operating characteristics of the generator set in the system as a whole. This construction is fully consistent with the plain meaning of the terms "predetermined," "operating" and "parameters," as well as the other language of the claims, which in part calls for "transmitting the settings of the predetermined operating parameters over the network to each [the] selected generator set." A133 at col. 14 ll. 51-53; A134 at col. 16 ll. 1-3. This construction is also fully consistent with the specification of the '821 patent. For example, a user of the claimed invention can input the settings of the predetermined operating parameters during an initial configuration of a generator set: "Initially, a user inputs a plurality of settings for generators **20***a* and **20***b* on generator settings screen **90** and the various parameters for starting and stopping generators **20***a* and **20***b* on command settings screen **106** of system controller **14**, as heretofore described." A131 at col. 9 ll. 26-31.

"Predetermined operating parameters" require preselection as well as an impact on the operating behavior of the selected generator set. The day and time at which a generator is configured to turn itself on and off is a "predetermined

13

operating parameter." A130 at col. 8 ll. 45-52. An operator's instantaneous, real-time command turning a generator set "on" or "off" is not a predetermined operating parameter, contrary to the trial court's holding.

### B.    "interconnecting at least one generator set"

The district court also erred in its construction of the phrase "at least one generator set" in claim 23. In its summary judgment and claim construction order, the district court construed this language to mean "one or more than one." A16 at ¶ 4. This construction divorces the phrase from the remainder of the claim and ignores the teachings of the specification. It improperly sweeps in *any* single generator set, whether it can be modularly incorporated into the multi-generator set system of the Generac invention or not.

The correct construction of the phrase and claim 23 as a whole must cover a system containing a generator set that is capable of interconnecting to additional generator sets. This construction is fully consistent with the plain language of claim 23 as well as the specification. For example, the claim contains a large number of additional elements that require a system that is expandable to include additional generator sets: "each generator set," "selecting a generator set," "setting . . . for the selected generator set," "transmitting . . . to the selected generator set," "starting the selected generator set," and "stopping the selected generator set." A134 at col. 15 ll. 9-13; col. 16 ll. 1-7.

14

The district court accepted that claim 23 requires "the capability to start and stop *less than all*" generator sets.  A95 at ¶ 1 (emphasis added).  If the construction is to be consistent, the method of claim 23 must encompass an expandable system with "the capability to start and stop *less than all*" generator sets, rather than, as suggested by the trial court, systems containing a single generator set of any type, whether modularly expandable with other generator sets or not.

### C.    The Existence of the Cummins-Onan PowerCommand System

The district court held that claim 19 was anticipated by an offer for sale of a Cummins-Onan PowerCommand "system."  A76 at ¶ 1; A93 at ¶ 1.  However, no particular "system" was identified by Kohler or TES or by the court.  The court simply made impermissible findings of fact that "the PowerCommand system was offered for sale prior to June 15, 2000," A72-A73, and that it had certain characteristics set forth in various documents.  Neither the court nor Defendants ever produced a receipt, specification, or any other documentation showing an actual, particular product was offered for sale or sold in the United States prior to the critical date of June 15, 2000.  Rather, the court apparently relied on a number of marketing documents for various Cummins-Onan products that used "PowerCommand" as an umbrella trade name to cover a broad family of systems.  This does not constitute the required clear and convincing evidence, which must also be undisputed between the parties and taken with inferences drawn against the

15

Defendants, that there was an offer for sale or sale of a particular PowerCommand "system" and what the properties of such a system were. *Minn. Mining and Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002) (clear and convincing evidence of a definite sale or offer to sell is required to invalidate a patent under 35 U.S.C. § 102(b)), *reh'g and reh'g en banc denied*, Nov. 4, 2002, *cert. denied*, 538 U.S. 972 (2003).

The district court's summary judgment decision and claim construction rulings regarding claims 19 and 23 should be reversed and the case remanded for further proceedings.

## IV.    ARGUMENT

### A.    Standard of Review

Claim construction is a question of law reviewed *de novo* by this Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).  We acknowledge that this Court plans to reconsider whether the standard of review for a district court's claim construction should be altered.  *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 500 F. App'x 951, 951-52 (Fed. Cir. Mar. 15, 2013) (order granting petition for rehearing en banc).  Nothing in this appeal turns on whether the standard of review is *de novo* or deferential.

16

The district court's grant of summary judgment based upon its claim construction is likewise subject to *de novo* review by this Court—while believing Generac's evidence and "drawing all reasonable inferences in favor of [Generac]." *Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1295 (Fed. Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## B.    The District Court Erred in Its Construction of "predetermined operating parameters"

The '821 patent describes power systems with constituent generator sets of varying numbers and capacities that are easily configurable to suit the needs of a particular installation. The flexibility of such power systems derives from the decentralized and modular nature of the generator sets programmed with predetermined operating parameters. The predetermined operating parameters establish the operation of the selected generator set within the system as a whole. The operating parameters are predetermined because they configure each generator set and the system as a whole for ultimate operation. "Predetermined operating parameters" as used in claims 19 and 23 are settings that have been transmitted to and used by each generator set to configure the operating characteristics of the generator set in the power system. "Predetermined operating parameters" require preselection as well as an impact on the operating behavior of the generator set in the system.

The district court usurped the meaning of the claims by nullifying "predetermined" and thereby reading the term out of the claims. The court found that "predetermined operating parameters" are the same thing as real-time commands. A93 at ¶ 1. Such construction was essential to support the court's earlier decision invalidating claim 19 on summary judgment because that decision had failed to address "predetermined" and thereby did not account for its meaning. *See* A91 at ¶ 5. The court therefore construed "predetermined operating parameters" to mean "parameters that are set prior to their transmission and when varied change the operation of the system," which strips any meaning from the limitation. A92 at ¶ 1. By reading the limitation out of the claim, the court held the claims to cover instantaneous, real-time commands, such as "on" and "off", in contradiction of the intrinsic evidence.

Claims are to be understood in the context of the patent as a whole including the claim language, the specification, and the drawings. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc) ("The patent is a fully integrated written instrument."), *aff'd*, 517 U.S. 370 (1996). "Each element contained in a patent claim is deemed material to defining the scope of the patented invention . . . ." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). This Court has stated that "[a] disregard of claim limitations, as here, would render claim examination in the PTO meaningless. If, without basis in

18

the record, courts may so rewrite claims, the entire statutory-regulatory structure that governs the drafting, submission, examination, allowance, and enforceability of claims would crumble." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1576 (Fed. Cir. 1987) (reversing finding of obviousness of claim because district court erred in ignoring structural limitations of the claim that defined over the prior art) *cert. denied*, 481 U.S. 1052 (1987); *see also Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1348 (Fed. Cir. 2012) (finding the district court erred in reading a limitation out of the claims).

The second step of claim 19 requires "selecting each generator set and setting various predetermined operating parameters for each selected generator set." A133 at col. 14 ll. 48-50. Similarly, the second step of claim 23 requires "selecting a generator set and setting various predetermined operating parameters for the selected generator set." A134 at col. 15 ll. 11-13. The '821 patent refers to the time a generator set is programmed to turn on as an example of an operating parameter: "A first of the various operating parameters is a starting time for starting the selected generator set . . . ." A127 at col. 2 ll. 37-40. In association with Figure 7, shown below, the '821 patent further explains that

> [i]nputs are also provided for an hour 124 and a minute 126 for starting the generators on each day for which the generators are intended to operate and an hour 128 and a minute 130 for stopping the generators on each day for which the generators are intended to operate.

A130 at col. 8 ll. 45-52.



FIG. 7

A123.

Additional screens, such as Figure 6 below, are provided for entering other operating parameters: "System controller **14** further includes generator settings screen **90**, FIG. **6**, for allowing a user to input a plurality of settings for generators **20***a* and **20***b*." A130 at col. 8 ll. 7-9.



FIG. 6

A122.

The specification lists various example parameters that must be set before proper operation, for example: "number-of-generators input **92** for allowing a user to input the number of generators connected to communications link **18**"; "recommended minimum kilowatts for efficient operation of the identified generator **98**"; "priority of operation of the identified generator as compared to the other generators of the power generation system **102**"; and "a slave address for the generator control **42** of generator panel **16** for the identified generator **104**." A130 at col. 8 ll. 10-12, 16-18, 20-21, 22-23.

21

Predetermined operating parameters are fundamentally distinct from real-time commands that are immediately executed upon receipt by the generator set because predetermined operating parameters are input to establish and configure operation of the generator set for the system as a whole.  In contrast, instantaneous, real-time commands affect a system that has already been configured and is in operation.

In its clarification order, the district court construed the phrase as "parameters that are set prior to their transmission and when varied change the operation of the system," thereby rendering the term "predetermined" superfluous in the context of the claim and the patent as a whole.  A92 at ¶ 1.  The plain language of claim 19 requires "setting various predetermined operating parameters" and "transmitting the settings of the predetermined operating parameters over the network to each selected generator set."  A133 at col. 14 ll. 48-49, 51-53.  Under the court's construction, every operating parameter ever transmitted to a generator set must be predetermined.  For example, an operator's unplanned, spontaneous, real-time command to stop a generator set over a network becomes a predetermined operating parameter.  Under the court's interpretation, the inadvertent press of a button would be "predetermined" because it exists before transmission.  Courts that have construed the term "predetermined" have held the term implies that something was "chosen in advance" or "determined beforehand."

22

*Respironics, Inc. v. Invacare Corp.*, 719 F. Supp. 2d 577, 578-79 (W.D. Pa. 2010) *rev'd in part on other grounds*, 437 F. App'x 917, 927 (Fed. Cir. July 8, 2011), *reh'g denied*, Aug. 23, 2011; *02 Micro Int'l Ltd. v. Samsung Electronics Co., Ltd.*, No. Civ. A. 2:04-CV-323, 2006 WL 1804616, at *5 (E.D. Tex. June 28, 2006).  A real-time command does not comport with these common understandings of the term "predetermined".

Setting various predetermined operating parameters is analogous to configuring an iPad and a computer to connect to your e-mail.  Several parameters must be entered so the devices can operate in a predetermined manner.  For example, there are parameters that determine the connection to the e-mail account, how to handle updates, and how often synchronization will occur.  Once established, the devices operate in unison to provide a customized e-mail system across multiple devices, all in accordance with the settings.  In contrast, operating an e-mail account without such settings requires manual access of the account in real time, usually by accessing a website.  The real-time input changes the content of the e-mail account in a manner much different than the configuring parameters.

When the correct construction of predetermined operating parameters is taken into consideration, it is clear the district court improperly granted summary judgment that an alleged Cummins-Onan PowerCommand system anticipated claim 19.  As further explained below, no specific Cummins-Onan

23

PowerCommand system was ever identified by the Defendants or the district court. However, even the phantom Cummins-Onan system relied on by Kohler and TES did not have predetermined operating parameters because it did not have settings that were transmitted to and used by each generator set to configure operating characteristics of the generator set in forming the power system as a whole. Rather, Kohler and TES's phantom system merely used real-time commands to perform certain functions, such as starting and stopping generators in real time. A8470-A8471 at ¶ 2; A8291-A8292 at ¶ 5. Unlike predetermined operating parameters, real-time commands are not chosen in advance and then transmitted to and used by each generator set to configure the operating characteristics of the generator set in forming the power system as a whole, but are instead implemented by the generator set immediately upon the receipt of the command. The judgment entered by the district court should therefore be reversed and the case remanded for further proceedings regarding Kohler and TES's infringement of the claim.

### C.    The District Court Erred in Its Construction of "at least one" in the Full Context of Claim 23

The first step of claim 23 requires "interconnecting at least one generator set to a load and to a network, each generator set having the ability to be started and stopped." A134 at col. 15 ll. 8-10. Claim 23 covers a system that is capable of expanding by incorporating one or more additional generator sets. A3788 at ¶ 2.

24

In essence, the system as contemplated from the outset is ready for the addition of subsequent generator sets.

The remaining steps of claim 23 confirm the claim is directed to an expandable generator set system. This Court has "caution[ed] that claim language must be construed in the context of the claim in which it appears. Extracting a single word from a claim divorced from the surrounding limitations can lead construction astray." *IGT v. Bally Gaming Int'l, Inc.,* 659 F.3d 1109, 1116-17 (Fed. Cir. 2011) (finding that the word "one" does not mean "one and only one" based on the use of the term "one" within the asserted claim).[1]

For example, claim 23 contains a large number of additional limitations that require a system that is expandable to include additional generator sets. The claim requires "*each* generator set having the ability to be started and stopped." A134 at col. 15 ll. 9-10 (emphasis added). The claim further requires "*selecting a generator set* and setting various predetermined operating parameters for *the selected generator set*." A134 at col. 15 ll. 11-13 (emphases added). Additionally, the claim requires "transmitting . . . to *the selected generator set*" and starting and stopping "*the selected generator set*." A134 at col. 16 ll. 1-7 (emphases added). Each of these claim elements assumes an expandable system of at least one

_____

[1] The Federal Circuit's opinion in *IGT* acknowledged that in another district court case the term "one" was construed to mean one and only one command. 659 F.3d at 1117 n.1 (citing *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, No CV-S-97-1383-EJW (LRL) (D. Nev.).

25

generator set.  There is no need to select a generator set if the system contains only a single generator set.

Even the district court recognized that at least some elements of claim 23 require an expandable system.  In its clarification order, the court stated that "the fourth and fifth process elements of claim 23, which require the ability to *actually* start and stop *selected* (implying the capability to start and stop less than all) generator sets at predetermined times and events."  A95 at ¶ 1.  Thus, even the district court acknowledged that claim 23 required an expandable system that had to allow for more than one generator set so that "less than all" generator sets could be started and stopped.  The court's construction of claim 23 was therefore internally inconsistent and confusing.

When the correct construction of "at least one" is taken into consideration, it is clear the district court provided the jury with incorrect instructions.  *See* A10393 at 1.  Based on the incorrect instructions, the jury found that claim 23 was anticipated by a number of references including the Generac Utility 50 Product, the Encorp Virtual Power Plant, U.S. Patent No. 6,697,951 to Sinha, and Kohler's Decision Maker 340.  A10513.  The jury also improperly found that claim 23 was invalid as obvious and not infringed.  A10513.  Thus, based on the proper construction of "at least one," the judgment should be reversed and the case

remanded for further proceedings regarding Kohler and TES's infringement of

claim 23.

**D.    The District Court Erred in Holding That a Single Cummins-Onan PowerCommand System Existed and Anticipated Claim 19**

**1.    A Single, Identifiable PowerCommand "System" Was Not on Sale Prior to the Critical Date**

On summary judgment, the district court found that "the [Cummins-Onan]

PowerCommand *system* was offered for sale prior to June 15, 2000." A72-A73

(emphasis added). This finding not only flouted the requirement that all inferences

should be drawn in favor of the non-moving party (i.e., Generac), but also ignored

testimony that in the 1990s Cummins-Onan used "PowerCommand" as an

umbrella trade name, not as a single, identifiable "system" as suggested by the

court. *See* A72-A77 (repeatedly referring to a PowerCommand "system"). The

district court's grant of summary judgment of anticipation with respect to claim 19

should therefore be reversed.

Summary judgment is proper only when there exists no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a). The central issue is whether admissible "evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law," taking into account the appropriate

burden of proof. *Anderson*, 477 U.S. at 251-52. On a motion for summary

judgment of invalidity, all inferences must be drawn in a light most favorable to the non-moving patentee. *Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1384-85 (Fed. Cir. 2004) (reversing summary judgment of invalidity in part because district court erred in not viewing evidence in patentee's favor).

Generac employee Allen Gillette was questioned during his deposition regarding a particular PowerCommand document:

> Q:  I'd like to hand you a document labeled Exhibit 121. This document is titled "Cummins Onan PowerCommand Paralleling Generator Set Control." Do you see that?
>
> A:  Yes, I do.
>
> Q:  And we discussed this earlier, correct?
>
> A:  I believe we did, yes.
>
> Q:  And at the bottom this document is dated January 1996, correct?
>
> A:  That's correct.
>
> Q:  Is this consistent with your testimony that Cummins sold a PowerCommand product in the late 1990s?
>
> A:  Yes.

A3010 at p. 349 ll. 7-19 (the "Cummins Onan Power Command Paralleling Generator Set Control" document (Exhibit 121) may be found at A3658-A3663).

Kohler and TES asserted that the preceding testimony constituted an admission by Generac that Cummins-Onan sold in 1996 a system as described in the document.

28

A2461 at Kohler Proposed Material Fact 95.[2]  This assertion formed the basis for the district court's determination that a PowerCommand "system" was sold prior to the critical date.  *See* A73 at ¶ 1.  Importantly, the court found that Generac "fail[ed] to dispute [Kohler and TES's assertion] that PowerCommand systems were offered for sale prior to June 15, 2000."  A73 at ¶ 1.

The district court's findings are plainly incorrect.  Generac clearly disputed the existence of a single, identifiable PowerCommand "system" prior to the critical date.  In its response to Kohler and TES's assertion, Generac explained that Kohler and TES's technical expert did "not accurately describe *any* system sold by Cummins."  A5468 at Generac's Response to Kohler Proposed Material Fact 95 (emphasis added).  In support, Generac cited additional deposition testimony by Mr. Gillette demonstrating that Cummins-Onan used "PowerCommand" as a trade name to market a number of *different* products:

> Q:  How about in the late 1990s when you were more familiar with the Cummins PowerCommand product? What was its functionality at that point in time if it was different at all from what you just described?
>
> A:    I mentioned earlier in this deposition that PowerCommand itself is a very broad, umbrella type of a trade name that Cummins uses, so when you ask me about PowerCommand, I think you have to be more specific.

---

[2] Mr. Whitham was Kohler and TES's technical expert.

> Q:  What were the different types of PowerCommand systems available in the late 1990s?
>
> A:  I think they were utilizing that nomenclature for their engine control panel, for their traditional switch gear type panel and their PLC system monitoring control panel, so I think they all fell under the PowerCommand nomenclature.

A5468.  As Mr. Gillette stated, PowerCommand included at least three separate components: an engine control panel, a traditional switchgear-type panel, and a PLC (programmable logic controller) system monitoring control panel.  *Id.*; A6524 at ll. 21-25.  Mr. Gillette's testimony did not constitute an admission of the existence of a PowerCommand "system" prior to the critical date, but rather "explained that it is unclear what functionality *any* particular PowerCommand systems actually had."  A5468 at Generac's Response to Kohler Proposed Material Fact 95 (emphasis added).  The court's contention otherwise was an impermissible finding in favor of the movant and legal error.  *Rockwell Int'l Corp. v. U.S.*, 147 F.3d 1358, 1366 (Fed. Cir. 1998) (vacating summary judgment of invalidity because the district court made an adverse inference against the nonmovant patentee).

Even Kohler and TES's own witnesses failed to establish a single, identifiable PowerCommand "system" on sale prior to the critical date.  Kohler and TES relied in their summary judgment papers on two declarations by John Ronza, a former sales person for a distributor of Cummins-Onan products.  *See* A3657;

30

A7311-A7312.  Mr. Ronza was "a Kohler distributor principal" at the time of his

declarations.  A3657 at ¶ 1.  As a threshold matter, the conclusory statements of an

interested party do not meet the high clear and convincing evidence standard

required in a validity analysis.  *Woodland Trust v. Flowertree Nursery, Inc.*, 148

F.3d 1368, 1371 (Fed. Cir. 1998) (reversing judgment of invalidity under § 102(b)

after finding that oral testimony of several witnesses regarding allegedly observed

prior use was uncorroborated by any physical or documentary evidence and stating

that "there is a very heavy burden to be met by one challenging validity when the

only evidence is the oral testimony of interested persons and their friends,

particularly as to long-past events.  Corroboration of oral evidence of prior

invention is the general rule in patent disputes."), *reh'g denied*, *suggestion for

reh'g en banc declined*, Sept. 1, 1998.

But Mr. Ronza's statements fail to establish that a PowerCommand "system"

was on sale prior to the critical date even ignoring the fact that he was not a neutral

declarant.  In his first declaration, Mr. Ronza stated only that "Cummins/Onan sold

*systems* in accordance with these bulletins, and I sold these types of *systems*."

A3657 at ¶ 7 (referring to the bulletins at A3658-A3677 ("Exhibits A – D"))

(emphases added).  Mr. Ronza did not refer to any particular systems that were

actually on sale before the critical date or to the specific functionality of any

systems that were actually known, used, sold, and/or commercially operated before

31

the critical date. Mr. Ronza again failed to identify any such system in his second declaration, where he asserted only that he "personally sold PowerCommand *systems* that included the components and functionality described in Exhibits A-D to [his] September 7, 2012 declaration as early as 1995." A7311 at ¶ 3. He went on to summarily state that his "first PowerCommand sale was to the University of Arkansas for Medical Sciences in 1995. That *system* included three paralleled generators, each with an integrated controller as described in Exhibits A–D." A7311 at ¶ 4 (emphasis added). Notably, Mr. Ronza provided no specific product names or numbers in connection with his "first PowerCommand sale."

Mr. Ronza submitted yet a third declaration, this time in connection with Kohler and TES's motion for clarification. *See* A9053-A9054. The third declaration again described PowerCommand as a name used in connection with multiple systems rather than with a tangible, individual model. A9053 at ¶ 1 ("I am familiar with the Cummins PowerCommand *systems* . . . ." (emphasis added)).

The evidence from both Generac and Kohler and TES shows that no such PowerCommand "system" was on sale prior to the critical date. On this basis alone, genuine issues of material fact clearly should have precluded summary judgment regarding the anticipation of claim 19 by an alleged PowerCommand "system."

## 2. Even Assuming a PowerCommand "System" Was on Sale Prior to the Critical Date, Such "System" Would Still Fail to Anticipate Claim 19

After determining "the PowerCommand system appear[ed] to have been an actual product with intended parallel use," the court looked to multiple documents to ascertain whether such "system" anticipated claim 19.  A73 at n.5.  There was no proof that this collection of documents related to a single, distinct "system."

The invalidity of a patent must be proved by clear and convincing evidence. *See Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (affirming district court's finding that the accused infringer failed to present clear and convincing evidence that the claimed subject matter was obvious in view of the prior art); *see also Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1348 (Fed. Cir. 2000) (vacating district court's summary judgment of anticipation because the accused infringer failed to provide clear and convincing evidence that the asserted reference enabled a person of ordinary skill in the art to practice the claimed method).  "In order to invalidate a patent under the on-sale bar of 35 U.S.C. § 102(b), an accused infringer must demonstrate by clear and convincing evidence that there was a definite sale or offer to sell more than one year before the application for the patent and that the product sold or offered for sale anticipated the claimed invention or rendered it obvious."  *Minn. Mining*, 303 F.3d at 1301. Furthermore, "[i]t is hornbook law that anticipation must be found in a single

33

reference, device, or process." *Studiengesellschaft Köhle, m.b.H. v. Dart Indus., Inc.*, 726 F.2d 724, 726-27 (Fed. Cir. 1984).

Kohler and TES presented no evidence, such as an invoice, requisition, specification, or even a purchase order, reflecting any actual PowerCommand "system" sold, offered for sale, or used prior to the critical date.  Nor did Kohler or TES present any evidence of how a particular PowerCommand "system" operated. There is no such evidence, and the district court relied on none in its summary judgment decision.  Instead, the district court found it was "proper to examine all of the documents suggested by Kohler in determining whether the PowerCommand system anticipates" because "the PowerCommand system appears to have been an actual product . . . ."  A73 at n.5 (citing *IP Innovation LLC v. Red Hat, Inc.*, No. 2:07-cv-447 (RRR) (E.D. Tex. Oct. 13, 2010) (order denying plaintiff patentee's post-trial motions) (A6699-A6708)).  While the legal authority relied on by the trial court found "no error in using multiple references to describe a single prior art system for the purpose of showing anticipation," A6707 at ¶ 2, the trial court nonetheless recognized that such finding was applied only after a single device was found to exist.  A73 at n.5.  Ironically, the trial court's summary judgment decision failed to point to a single PowerCommand "system" on sale before the critical date.

Kohler and TES never attempted to argue that any of the PowerCommand documents individually anticipated claim 19 or rendered it obvious, and

34

consequently the district court relied in its summary judgment decision only on a phantom PowerCommand "system." However, even after combining their disclosures, the PowerCommand documents relied on by the court do not show or describe at least the second and third claim steps relating to selecting a generator set, setting predetermined operating parameters for that generator set, and transmitting the settings to the generator set.

With regard to both the second and third steps of claim 19, the court cited a document entitled "PowerCommand Paralleling Generator Set Control." *See* A74-A75 (the document, A3658-A3663, is the same document as was introduced in Mr. Gillette's deposition). The portion cited by the court states: "Adjustment Menu – Allows the operator to set basic generator set operating parameters." A3661 at "Adjustment Menu"; *see* A75. The document actually shows that control of a particular generator set can only be accomplished through the control panel attached to that specific generator set, not to a network as required by the claim. Discussing the control panel of a generator, the document states: "Control arrows on the screen lead the operator to information. The system control switches provide the operator with a positive indication that the switch is operated." A3659 at "System Control".

The court also cited a second document, which merely states that "[t]he PowerCommand's integrated platform enables monitoring and control of all

35

paralleling system components from a remote location via modem, PC and PowerCommand Network Software." A3667 at "Networking capability." (the second document ranges from A3664-A3667); *see* A75. This is a far cry from disclosing the steps in the patent claims.

In its cross-motion for clarification of the court's summary judgment order, Generac discussed an internal PowerCommand network installation and operation manual. *See* A8285-A8286 (referred to as the "Network Manual"). The Network Manual itself is clearly marked "preliminary," indicating it was an internal document and not publically available. A8297. There is also no testimony that the document was prior art and it should not be treated as such. *See, e.g.*, *Oney v. Ratliff*, 182 F.3d 893, 896 (Fed. Cir. 1999) (reversing summary judgment finding of anticipation when documents did not sufficiently corroborate interested witness's testimony regarding prior invention and sale); *Black & Decker Inc. v. Robert Bosch Tool Corp.*, 476 F. Supp. 2d 887, 894 (N.D. Ill. 2007) (finding insufficient evidence of anticipation when the alleged prior art device was not admitted into evidence and the only evidence of its functionality was through piecing together testimony and documents). To the extent that the Network Manual even mentions generator sets, the preliminary document refers only to real-time commands and not to predetermined operating parameters. A8470-A8472 at ¶¶ 2, 4.

When all inferences are drawn in Generac's favor, which is required on summary judgment, Kohler and TES failed to meet their burden of proving invalidity by clear and convincing evidence. The summary judgment decision should therefore be reversed and the case remanded for further proceedings regarding Kohler and TES's infringement of claim 19.

## V.    CONCLUSION

For the foregoing reasons, Generac respectfully requests this Court to reverse the District Court's grant of summary judgment of invalidity, vacate the judgment, and remand for further proceedings.

Dated:  August 6, 2013                    Respectfully submitted,

                                          /s/ H. Michael Hartmann
                                          H. Michael Hartmann
                                          Eley O. Thompson
                                          John K. Winn
                                          Michael J. Brandt
                                          LEYDIG, VOIT & MAYER, LTD.
                                          Two Prudential Plaza, Suite 4900
                                          180 N. Stetson Avenue
                                          Chicago, IL 60601-6731
                                          (312) 616-5600 (telephone)
                                          (312) 616-5700 (facsimile)

                                          *Counsel for Plaintiff-Appellant*
                                          *Generac Power Systems, Inc.*

*Generac Power Systems, Inc. v. Kohler Company and Total Energy Systems, LLC*

*2013-1311*

# Addendum

1.    November 20, 2012 Order, *Generac Power Systems, Inc.
v. Kohler Company and Total Energy Systems, LLC*,
Case No. 2:11-cv-01120-JPS (E.D. Wis.) . . . . . . . . . . . . . . . . . . . . . .A1-A44

2.    November 29, 2012 Amended Order, *Generac Power Systems, Inc.
v. Kohler Company and Total Energy Systems, LLC*,
Case No. 2:11-cv-01120-JPS (E.D. Wis.) . . . . . . . . . . . . . . . . . . . . .A45-A88

3.    December 5, 2012 Order, *Generac Power Systems, Inc.
v. Kohler Company and Total Energy Systems, LLC*,
Case No. 2:11-cv-01120-JPS (E.D. Wis.) . . . . . . . . . . . . . . . . . . . . .A89-A96

4.    December 19, 2012 Judgment, *Generac Power Systems, Inc.
v. Kohler Company and Total Energy Systems, LLC*,
Case No. 2:11-cv-01120-JPS (E.D. Wis.) . . . . . . . . . . . . . . . . . . . . . . . .A97

5.    March 7, 2013 Order, *Generac Power Systems, Inc.
v. Kohler Company and Total Energy Systems, LLC*,
Case No. 2:11-cv-01120-JPS (E.D. Wis.) . . . . . . . . . . . . . . . . . . .A98-A114

6.    United States Patent No. 6,653,821 . . . . . . . . . . . . . . . . . . . . . . . .A115-A134

7.    October 13, 2010 Order, *IP Innovation L.L.C. et al. v. Red
Hat, Inc. et al.*, Case No. 2:07-cv-00447-RRR (E.D. Tex.). . . .A6699-A6708

# Addendum 1

November 20, 2012 Order,
*Generac Power Systems, Inc. v.*
*Kohler Company and Total Energy Systems, LLC*,
Case No. 2:11-cv-01120-JPS (E.D. Wis.)

A1-A44

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GENERAC POWER SYSTEMS, INC.,

               Plaintiff,

v.                                                                Case No. 11-CV-1120-JPS

KOHLER COMPANY and
TOTAL ENERGY SYSTEMS, LLC,

               Defendants.                **ORDER**

The Plaintiff, Generac Power Systems, Inc. ("Generac"), filed this action on December 9, 2011, alleging that Defendant Kohler Company ("Kohler") infringed upon Generac's patent over a "System Controller and Method for Monitoring and Controlling a Plurality of Generator Sets" (U.S. Patent No. 6,653,821 B2 (the '821 patent)). (Compl.).  On May 7, 2012, Generac filed an Amended Complaint, adding Total Energy Systems, LLC ("TES"), as a defendant. (Am. Compl. ¶ 4).

After receiving a short extension of time, Generac and Kohler both filed cross-motions for summary judgment on September 12, 2012. (Docket #'s 38, 40, 48). The parties have now fully briefed those motions, and the matter is ripe for decision. (Docket #'s 41, 53, 62, 64, 72, 83, 87, 93).

1.      **BACKGROUND**

Before turning to its substantive discussion of the dispute at hand and the controlling law, the Court will provide some factual background regarding the parties and products that form the foundation of this litigation.

Generac is a Wisconsin-based company in the business of manufacturing generator equipment; in connection with that business, Generac secured the '821 patent at issue in this case. (KPFF ¶¶ 1, 8, 9).

Generac initially applied for the '821 patent on June 15, 2001. (KPFF ¶ 20).
The Patent and Trade Office's ("PTO") examiners rejected each claim therein,
citing U.S. Patent Nos. 5,734,255 (the "Thompson patent") as anticipatory
prior art. (KPFF ¶ 23). That rejection was not final, though, and Generac
responded to it by alleging that the Thompson patent differed from the '821
patent insofar as the Thompson patent "does not show or suggest a user
interface that allows a remote user to select a generator set; to set values for
various predetermined operating parameters of the selected generator set;
and to transmit those user selected values to the generator set over the
network," and further added that the Thompson patent "merely allows
remote users to monitor various parameters." (KPFF ¶¶ 24–25; Stomma
Resp. Letter to PTO (Docket #49, Ex. 44) at 668, 669).

The PTO examiners eventually reversed course, withdrawing their
objections to the '821 patent on the basis of the Thompson patent and
ultimately granting[1] Generac the '821 patent, consisting of twenty-four
separate claims. (KPFF ¶¶ 9, 27, 31). In reaching their decision to grant the
'821 patent, the PTO examiners stated their rationale for doing so as follows:

> The prior art of record fails to teach, disclose, or
> suggest, either alone or in combination [a] controller for
> controlling generator sets connectable to a load, each
> generator set having the ability to be started and
> stopped and including a generator communications link
> for connecting the generator set to a network, an engine,
> and a generator driving by the engine which generates

---

[1]After removing their objections based on the Thompson patent, but prior
to ultimately granting the '821 patent, the PTO examiners objected to a number of
claims in the '821 patent on the basis of two separate patents that are not relevant
to this case; Generac amended several of its claims, added new claims, and
responded to the PTO examiners' new objections before the examiners finally
granted the '821 patent. (KPFF ¶¶ 28–30).

AC power, comprising: a user interface for allowing a user to select each of the plurality of generator sets and to set values for various predetermined operating parameters of each of the generator sets; and a communications link [connectable] to the network for transmitting the user set values of the predetermined operating parameters to each selected generator set.

(KPFF ¶ 31).

After the '821 patent was granted, Generac released the Modular Power Systems ("MPS") product, a generator system that takes advantage of the processes described in the '821 patent. (GPFF ¶ 25). Distilled to the simplest form possible, Generac's MPS is a generator system that is part of a network through which operational values may be transmitted after being configured through a user interface. (GPFF ¶¶ 20–21).[2]

Needless to say (otherwise, why would the Court be entertaining this suit), Kohler developed a very similar system, known as the Master Control Panel 3000 ("MCP 3000") and Decision-Maker Paralleling System ("DPS"), both of which were allegedly used, sold or offered for sale by TES. (GPFF ¶¶ 35–37; Compl. ¶¶ 18–20).

Generac then filed this suit, ultimately asserting that the DPS system infringes upon Claim 19 and Claim 23 of the '821 patent. (Compl.; KPFF ¶ 9).

## 2.    DISCUSSION

Turning now to its substantive discussion, the Court will first construe the relevant terms in Claim 19 and Claim 23 of Generac's '821 patent. After

---

[2]Kohler disputes Generac's proposed findings of fact that are cited in this paragraph as irrelevant and immaterial (*see* Kohler's Resp. to GPFF ¶¶ 20, 21, 25). The Court discusses these facts solely to provide narrative background, and does not view them as material. Therefore, the Court need not resolve the dispute over these facts at this juncture.

doing so, the Court will employ the construction in addressing the parties' substantive arguments on summary judgment. In doing so, the Court will determine whether the patent is, in fact, valid (as opposed to void as a result of anticipation or obviousness); if the Court decides that the patent is valid, only then must it determine whether Kohler or TES infringed upon it.

### 2.1    Claim Construction

The Court must construe two separate portions of the '821 patent: Claim 19 and Claim 23. (*See* KPFF ¶ 9). While the two claims share much in common, the Court will construe them separately, so that the terms of each, as determined by the Court, are as clear as possible. Furthermore, the parties disagree over whether patent '821 requires the absence of switchgear; the Court will examine that dispute after construing Claim 19 and Claim 23.

Typically, claim construction is a question of law for the Court, and therefore disputes over claim construction do not prevent summary judgment. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) ("We therefore…hold that in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim."). Claim construction often involves one of two separate scenarios: either it involves "little more than the application of the widely accepted meaning of commonly understood words"; or, it involves the "examination of terms that have a particular meaning in a field of art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). In applying widely accepted meanings under the first scenario, the Court may look to general purpose dictionaries to determine those meanings. *Id.* On the other hand, in the second scenario, the Court should look to a broader spectrum of evidence in order to give the claims their ordinary and customary meaning, as a

person of ordinary skill in the art would have applied to them at the time the invention was made. *Id.*, at 1313.  To determine that meaning, the Court should begin with the intrinsic evidence, such as the language of the claim, the remainder of the patent and its specification, and the prosecution history; it is only if the intrinsic evidence is not sufficient to resolve all ambiguities that the Court may look to extrinsic evidence, such as dictionaries, expert witnesses and case law. *Id.*, at 1314, 1317, 1324; *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir. 2005); *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004); *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

### 2.1.1    Claim 19

The specific terms of Claim 19, as approved by the PTO examiners, is as follows:

> A method of managing the distribution of electrical power, comprising the steps of:
>> interconnecting a plurality of generator sets to a load and to a network, each generator set having the ability to be started and stopped;
>> selecting each generator set and setting various predetermined operating parameters for each selected generator set; and
>> transmitting the settings of the predetermined operating parameters over the network to each selected generator set.

(United States Patent No. 6,653,821 (Nov. 25, 2003) (Docket #43, Ex. 1), at 14:43–14:50).

The parties subdivide Claim 19 into three separate process elements for the purpose of their discussion; the Court will address each of those process elements separately.

### 2.1.1.1  First Process Element of Claim 19

The first process element of Claim 19 provides for "interconnecting a plurality of generator sets to a load and to a network, each generator set having the ability to be started and stopped." (U.S. Patent No. 6,653,821, at 14:44-14:46). The parties generally agree that this element involves the interconnection of generator sets to both a load and to a network (though, as described further below, they disagree as to the meaning of several of the terms just used, and so disagree over the substantive meaning of this portion of the process element). (*See* KPFF ¶ 33, and Generac's Resp. to KPFF ¶ 33). They also agree that the phrase "[e]ach generator set having the ability to be started and stopped" is self-explanatory. (*See* KPFF ¶ 35, and Generac's Resp. to KPFF ¶ 35).

Despite those general areas of agreement, though, the parties substantially disagree over the substance of this process element. To begin, the parties fail to specify whether they agree to the meaning of the term "plurality," therefore, the Court will define that term for the sake of clarity. Furthermore, the parties specifically disagree over the meaning of the following terms: "generator set"; "network"; and "load." (Kohler Br. in Supp. (Docket #41), at 10; Generac Resp. (Docket #62), at 8–11; Kohler Reply (Docket #87), at 4–6). The Court now turns to its construction of each of the disputed terms.

### 2.1.1.1.1  "Plurality"

The parties have not asserted that the term "plurality" is a term of art, and the term is widely accepted as meaning "the fact or condition of denoting, comprising, or consisting of more than one." OXFORD ENGLISH DICTIONARY, Online (September 2012).

Therefore, the Court construes the term "plurality," as it is used in Claim 19, to mean "more than one."

### 2.1.1.1.2   "Generator Set"

Kohler argues that the term "generator set" should be construed to be synonymous with the term "generator" standing alone, which Kohler asserts is standard in the industry. (Kohler Reply at 4–5). Generac argues that the term "generator set," should in fact encompass more: specifically, "an engine, a generator control, and a communications link," as the term "generator set" is defined in the '821 patent specification. (Generac Resp. at 8).

The Court agrees with Generac. Before looking to outside evidence, such as outside definitions and expert witnesses, the Court should first look to the evidence intrinsic to the '821 patent, including its specification. *See, e.g.*, *Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582. Here, the '821 patent discusses the terms "generator" and "generator set" as though they are distinct from one another:

> Each generator set has the ability to be started and stopped and includes a generator connectable to a load. The generator generates AC power having a magnitude and a power factor, an AC voltage having a magnitude and a frequency, and an AC current having a magnitude and a frequency. Each generator also includes an engine, a generator control and a generator communications link. An engine is operatively connected to a generator for driving the generator. A generator control is operatively connected to the engine for controlling operation thereof and is operatively connected to the generator for controlling the AC generated thereby. The generator communications link connects the generator control to a network. A user interface allows a user to select a generator set and set values for various predetermined operating parameters of the selected generator set.

(U.S. Patent No. 6,653,821, at 2:57–3:5). The patent language specifies that "[e]ach generator set…includes a generator connectable to a load." (U.S. Patent No. 2:57–2:58). That generator, in turn, "includes an engine, a generator control and a generator communications link." (U.S. Patent No. 6,653,821, at 2:62–2:63). Thus, by the very terms of the '821 patent, the Court is constrained to conclude that the term "generator set" includes more than a generator alone.

Indeed, as urged by Generac, the Court must conclude that the term "generator set" includes an engine, a generator control, and a communications link.

### 2.1.1.1.3 "Network"

As to the term "network," Kohler argues that it is a term of art meaning "a communication system for the transmission of information." (Kohler Br. in Supp. at 10). Generac, on the other hand, argues that the term "should be interpreted by its plain and ordinary meaning," specifically "a digital network connecting generator sets such that they can communicate over the network and be individually addressed." (Generac Resp. at 9).[3]

As a preliminary matter, the Court agrees with Kohler that the term "network" is a term of art, as used by the '821 patent. Therefore, the Court will look first to the patent to determine whether the term "network" is

---

[3] Generac's position on this term is somewhat perplexing, urging the Court to adopt the "plain and ordinary meaning" of a nondescript term like "network," while simultaneously providing an extremely detailed definition thereof. A true plain and ordinary meaning of the term "network" would likely be understood by members of the general public to be nothing more than that suggested by Kohler—a communication system for the transmission of information.

defined therein. *See, e.g., Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582.

Both parties attempt to bolster their positions by identifying patent language stating that "it is contemplated that network system 10 include a network controller 170 which is operatively connected to a communication network 172 such as a telephone network, a computer network, the internet, or a combination for communication thereon." (*See* KPFF ¶ 44 and Generac Resp. to KPFF ¶ 44 (both citing U.S. Patent 6,653,821, at 11:41–11:43)). That language clearly identifies "communication network" as including items such as "a telephone network, a computer network, the internet, or a combination for communication thereon." (U.S. Patent 6,653,821, at 11:39–11:43).

Thus, given that language and the fact that the first process element of Claim 19 involves "interconnecting" generators to a network, the Court determines that the term "network," as used in the patent, contemplates—at the very least—a communication system for the transmission of information, as suggested by Kohler.

But, the Court cannot take the extra step, as requested by Generac, to define "network" with the vastly narrowing modifiers of being digital, connecting only generator sets, and enabling individual addressing. To begin this analysis with the first proposed modifier, "digital," the Court notes that there is nothing in the patent language that would specify that the network must be digital. Indeed, the examples of a "communication network" include a "telephone network," which may be either analog or digital. *See, e.g.*, ANDREW WHEEN, DOT-DASH TO DOT.COM: HOW MODERN TELE-COMMUNICATIONS EVOLVED FROM THE TELEGRAPH TO THE INTERNET 49–80

Page 9 of 44

(2011); In the Matter of Amendment of Part 68 of the Commission's Rules § 68.314, 12 F.C.C.R. 19281, 19296 (Feb. 29, 1996) (discussing terminal equipment and protective circuitry interconnected with an analog telephone network).  Therefore, the term "network" cannot be limited to solely digital networks.

Turning next to whether the term "network" must be limited to a connection between generator sets, the Court again determines that such narrowing modifier should not apply. The patent language describes a "network system 10" allowing "a single user to monitor several power generation systems 12 from a single locale and to control operation of these power generation systems 12…[,] to view the current operating conditions of each of the power generation systems 12, as well as, configure system controllers 14 from the remote locale" and to "obtain detailed information from individual generators 20*a* and 20*b* from the remote locale." (U.S. Patent No. 6,653,821, at 11:52–11:60). While that description contemplates the interconnection of generators, it also contemplates interconnection of those generators to system controllers and some form of display that would allow a user to "view" and "obtain" information from each of the generators. (U.S. Patent No. 6,653,821 at 11:52–11:60). Thus, with the understanding that the patent calls for the interconnection of more than the generators alone across a network, the Court cannot apply Generac's proposed limiting modifier.

The Court does agree with Generac, though, that "network" should be more limited than Kohler suggests; thus, the Court concludes that the term "network" mean a communication system for the transmission of information (be it digital or analog, and including telephone, computer, internet, or related) across which travels information that may be

individually addressed to generators or devices intended for the monitoring and control of those generators. This definition does not apply the unduly restrictive requirement that a "network" be digital or connect only generator sets; it does, however, limit a "network" being a communication system over which information relevant to the control and function of the generators is shared. Without this limitation, the term "network" would essentially be meaningless, a plurality of generator sets to *any* network, regardless of whether the controls could be sent over the network; that is, without some meaningful limitation, the simple connection of a generator to the internet would seem to satisfy the "network" connection requirement.

Thus, the Court is obliged to conclude that "network" must be construed as a communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators.

### 2.1.1.1.4  "Load"

Kohler argues that the term "load" should be defined as "power output (as of a power plant) or power consumption (as by a device)." (Kohler Br. in Supp. at 10). Generac argues that "load" should be construed only as a device that consumes power, as opposed to also including power-output devices, and specifically argues that "load" should not be construed to include a utility. (Generac Resp. at 10–11).

On the definition of "load," the Court agrees with Generac. Again, "load" is a term of art, and therefore the Court should first examine the patent to determine whether load is defined therein. *See, e.g.*, *Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582. The patent's language

explicitly states that "[d]uring a commercial power outage, it is often necessary for a consumer to continue supplying electrical power to a load," "a single generator may not generate enough electrical power to meet the demands of the load," and "multiple electrical generator are often needed to provide sufficient electrical power for the load connected thereto." (U.S. Patent No. 6,653,821, at 1:19–27). This language clearly contemplates the term "load" to mean some form of device that *receives* (as opposed to *provides*) electrical power from the generators.

Therefore, the Court is obliged to construe "load" to mean "a device that consumes electrical power for its operation."

### 2.1.1.2     Second Process Element of Claim 19

The Court now turns to the second process element of Claim 19, which provides for "selecting each generator set and setting various predetermined operating parameters for each selected generator set." The parties disagree over the meaning of the terms "selecting each generator set" and "predetermined operating parameters," as they are used in this process element.

### 2.1.1.2.1     "Selecting Each Generator Set"

Generac argues that the term "selecting each generator set" requires the existence of a user interface. (Generac Resp. at 12). Kohler, on the other hand, argues that Claim 19 lacks any reference to a user interface, and therefore should not be construed to include a user interface. (Kohler Reply at 6).

The Court must again agree with Generac. It would be widely accepted that "selecting each generator set" requires some user input—the act of "selecting"—that could not be accomplished without some system for

user input; therefore, the Court must conclude that, as a simple matter of logic, Claim 19 necessarily includes a user interface. Even if the Court were to determine that this phrase were a term of art, such that the Court should look to the intrinsic evidence, *Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582, it would reach the same conclusion, as the prosecution history's reasons for allowance includes a "user interface for allowing a user to select" generator sets. (Aguirrechea, Notice of Allowability, May 1, 2003 (Docket #49, Ex. 44, at 705–07), at 2).

As such, the Court is obliged to conclude that "selecting each generator set" necessarily includes the existence of a user interface.

### 2.1.1.2.2  "Predetermined Operating Parameters"

Generac asserts that the term "predetermined operating parameters" must mean parameters that are adjustable to change the operation of the generator set. (Generac Resp. at 13). Kohler did not dispute this in its Reply Brief (Kohler Reply at 4–6), and the Court does not believe Kohler could reasonably have done so. A parameter is "[a]ny distinguishing or defining characteristic," OXFORD ENGLISH DICTIONARY, Online (September 2012), and thus an "operating parameter" must be defined as a "distinguishing or defining characteristic as related to the operation of a system."

That definition is practically synonymous with the construction urged by Generac, which the Court will now adopt: "a parameter that when varied changes the operation of the system."

### 2.1.1.3  Third Process Element of Claim 19

The only potentially-disputed term in Claim 19 is "predetermined operating parameters," which the Court has already construed above to mean "a parameter that when varied changes the operation of the system."

Having now completed its construction of Claim 19 and for ease of reference, the Court provides the following table setting forth its final construction of each disputed term:

| CLAIM 19 | |
|---|---|
| **Disputed Term** | **Construction** |
| Plurality | More than one. |
| Generator Set | Includes an engine, a generator control, and a communications link. |
| Network | Communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators. |
| Load | A device that consumes electrical power for its operation. |
| Selecting Each Generator Set | Implies the inclusion of a user interface. |
| Predetermined Operating Parameters | Parameters that when varied change the operation of the system. |

### 2.1.2    Claim 23

The specific terms of Claim 23, as approved by the PTO examiners, is as follows:

A method of managing the distribution of electrical power, comprising the steps of:

interconnecting at least one generator set to a load and to a network, each generator set having the ability to be started and stopped;

selecting each generator set and setting various predetermined operating parameters for the selected generator set;

Page 14 of 44

transmitting the settings of the predetermined
operating parameters over the network to the
selected generator set;

starting the selected generator set at a first
predetermined time; and

stopping the selected generator set at a second
predetermined time.

(U.S. Patent No. 6,653,821, at 15:6–16:8).

As with Claim 19, the parties have subdivided Claim 23 into separate process elements. Claim 23 has five separate process elements, each of which the Court will address separately (despite the fact that the first three are practically identical to those found in Claim 19).

### 2.1.2.1 First Process Element of Claim 23

The first process element of Claim 23 is identical to the first process element of Claim 19, except that Claim 23 discusses the interconnection of "at least one generator set," whereas Claim 19 discusses the interconnection of a "plurality of generator sets."

### 2.1.2.1.1 "At Least One"

Kohler argues that the term "at least one" should be construed to cover a single generator, whereas Generac argues that the Court should find that "at least one" does *not* cover a single generator, but instead means more than one. (Kohler Br. in Supp. 11–12; Generac Resp. 11; Kohler Reply 6). In support of its contention, Generac argues that the term "at least one" should be defined as "more than one," because Claim 23 provides for a generator set that is "capable of linking to one or more additional generator sets to form the interconnected system of the patent." (Generac Resp. 11 (quoting Claim 23's language requiring "interconnecting at least one generator set to a… network, each generator set…")).

Generac's argument is nonsensical. To begin, the plain language of the term "at least one," clearly means "one or more than one"—not simply "more than one" as Generac argues. If a person on the street asked another for "at least one" dollar, the second person would know that the first was requesting one dollar or more than one dollar. Similarly, here, on its plain language, the term "at least one" means one generator or more than one generator.

But, even if the Court examines Claim 23's remaining language as Generac urges, the Court cannot possibly conclude that "at least one" as used in Claim 23 means "more than one." Generac seems to argue that use of the phrase "each generator set having the ability to be started and stopped," implies the required existence of more than one generator. (Generac Resp. 11). The Court disagrees: "each" does not necessarily imply plurality, especially when compared to the facially plain language "at least one," which explicitly allows for singularity.

Moreover, the intrinsic evidence also augurs in favor of defining "at least one" to mean "one or more than one." Claim 23 explicitly uses different language than Claim 19, interchanging "at least one" for "plurality." The Court has already determined that "plurality" means more than one—and if Generac intended its language to be construed as "more than one," the Court cannot fathom why it would change its language from something that clearly means "more than one" to a phrase ("at least one") that by its clear terms means "one or more than one."

Accordingly, the Court is obliged to conclude that "at least one" means "one or more than one."

### 2.1.2.1.2   Remainder of First Process Terms

The remainder of the disputed terms ("generator set," "network," and "load") in the first process element of Claim 23 are identical to those that were disputed in the first process element of Claim 19, and the parties do not argue that their meanings differ between claims; therefore, the Court will simply apply its construction of the Claim 19 terms to their identical Claim 23 counterparts.

### 2.1.2.2 Second and Third Process Elements of Claim 23

Similarly, the disputed terms in the second and third process elements of Claim 23 ("selecting each generator set" and "predetermined operating parameters") are identical to those in the second and third process elements of Claim 19. Because the parties do not argue that the meaning of the terms differ as between Claim 19 and Claim 23, the Court will apply its construction of the Claim 19 terms to their Claim 23 counterparts.

### 2.1.2.3   Fourth and Fifth Process Elements of Claim 23

The fourth and fifth process elements of Claim 23 provide for "starting…" and "stopping the selected generator set at a… predetermined time," respectively.

Kohler argues that this language allows the user to set only a specific time at which the generator will start and stop. (Kohler Br. in Supp. at 12). Generac, on the other hand, argues that the terms should be construed to allow for setting a predetermined time *or event* (such as when utility power is lost or regained) to start and stop the generator. (Generac Resp. 13).

The Court agrees with Generac. The Court views this phrase as being one of art, and may, therefore, look to both intrinsic and extrinsic evidence to construe it. *Phillips*, 415 F.3d at 1314, 1317, 1324; *Gillette Co.*, 405 F.3d at

1370; *Innova/Pure Water, Inc.*, 381 F.3d at 1116; *Interactive Gift Express, Inc.*, 256 F.3d at 1331; *Vitronics Corp.*, 90 F.3d at 1582. The intrinsic evidence augurs in favor of a finding that Claim 23 contemplates the setting of a predetermined event, such as a power outage, to start and/or stop the generator. To begin, nothing in the patent specifically provides that "time" must refer only to a time on the clock, and not, instead, to some period of time after an event. (*See* U.S. Patent No. 6,653,8321, at 8:26–52 (allowing for setting of time periods to operate under different commands, in addition to setting of calendar days and clock times to operate)). Furthermore, the summary of the invention provides that "[d]uring a commercial power outage, it is often necessary for a consumer to continue supplying electrical power to a load," implying that the invention is designed to address that problem, such as by engaging upon the loss of power. (U.S. Patent No. 6,653,821, at 1:19–1:21). Turning to the extrinsic evidence, Generac's expert, Jaime De La Ree, Ph.D, opined that a person of ordinary skill in the art would understand the term to contemplate the ability to start and/or stop after a predetermined event. (De La Ree Decl. (Docket #49, Ex. 2), at 39–40). Kohler failed to provide any rebuttal evidence, and, therefore, the Court sides with Generac on this disputed fact.

Therefore, the Court is obliged to conclude that the fourth and fifth process elements of Claim 23 allow for setting a predetermined time *or event* upon which the generators will start or stop.

Having finished its construction of Claim 23 and for ease of reference, the Court provides the following chart setting forth its final construction of each disputed term:

| CLAIM 23 | |
|---|---|
| **Disputed Term** | **Construction** |
| At Least One | One or more than one. |
| Generator Set | Includes an engine, a generator control, and a communications link. |
| Network | Communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators. |
| Load | A device that consumes electrical power for its operation. |
| Selecting Each Generator Set | Implies the inclusion of a user interface. |
| Predetermined Operating Parameters | Parameters that when varied change the operation of the system. |
| Starting the selected generator set at a first predetermined time | Allows for starting at a specified time or event. |
| Stopping the selected generator set at a second predetermined time | Allows for stopping at a specified time or event. |

### 2.1.3  Switchgear

Kohler argues that Generac "reads claims 19 and 23 as precluding the use of switchgear." (Kohler Reply at 2). In other words, Kohler believes that Generac understands the '821 patent to require an absence of switchgear.

Generac does no such thing. In fact, it seems Generac agrees with Kohler that the '821 patent should not be read to require an absence of

switchgear. (*See* Generac Reply (Docket #93) at 4). In its Reply Brief, Generac explicitly states that "the '821 patent actually made the new system indifferent to whether switchgear was present." (Generac Reply at 4).

The Court agrees that the '821 patent does not rely on the absence of switchgear. As Generac states, the '821 patent is indifferent to the existence of switchgear within its system. Therefore, regardless of whether a system includes switchgear, that system may infringe upon Claim 19 or Claim 23, provided that it carries out the steps in either patent claim.

The Court is obliged to conclude that the '821 patent does not require an absence of switchgear.

### 2.2    Summary Judgment Analysis

Kohler and Generac filed cross-motions for summary judgment. (Docket #40, #48). Kohler seeks summary judgment holding:  (1) that both Claim 19 and Claim 23 of the '821 patent are invalid as anticipated by prior art (Kohler Br. in Supp. 6-26); and (2) that Generac cannot establish willful infringement (Kohler Br. in Supp. 26–29). Generac, meanwhile, argues for summary judgment holding:  (1) that Claims 19 and 23 are not anticipated by prior art (Generac Br. in Supp. 23–30); (2) that the '821 patent is not invalid due to obviousness (Generac Br. in Supp. 19–23); and (3) that Kohler's DPS products infringe upon Claim 19 and Claim 23 (Generac Br. in Supp. 11–19).

After setting forth the summary judgment standard, the Court will first turn to the issue of anticipation, then to obviousness, and finally to infringement. This path of analysis is the most logical, since the Court need not reach the infringement issue if it determines either: (1) that prior art anticipates Claim 19 and Claim 23 of the '821 patent; or (2) that the '821 patent is invalid due to obviousness; if the Court determines either or both

cases apply, then infringement is simply not possible, because the claims and/or patent will be treated as invalid. *See* 35 U.S.C. §§ 102, 103. Further, the Court should examine anticipation before obviousness because "anticipation is the ultimate of obviousness"—that is, where there is anticipation, obviousness must follow. *In re Baxter Travenol Labs.*, 952 F.2d 388, 391 (Fed. Cir. 1991) (citing *In re Fracalossi*, 681 F.2d 792, 794 (CCPA 1982)).

The Court now turns to its analysis of these issues.

### 2.2.1   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

As Generac correctly points out, though, there is a different legal standard for Kohler to prevail on its invalidity claims than for Generac to prevail on its infringement claims. Indeed, invalidity must be established by clear and convincing evidence. *See, e.g., Procter and Gamble Co. v. Teva Pharmaceuticals USA, Inc.*, 566 F.3d 989, 993–94 (Fed. Cir. 2009) (citing *AK Steel Corp. v. Sollac & Ugine*, 195 F.3d 1322, 1326 (Fed. Cir. 1999)); *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (citing 35 U.S.C. § 282; *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999)). Therefore, Kohler must satisfy that heightened standard to show anticipation or obviousness,

Page 21 of 44

Case 2:11-cv-01120-JPS   Filed 11/20/12   Page 21 of 44   Document 104

**A21**

whereas Generac need only establish infringement by a preponderance of the evidence. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001) (citing *WMS Gaming, Inc.*, 184 F.3d at 1346).

### 2.2.2    Anticipation of the '821 Patent by Prior Art

Kohler (and TES, by extension, though for the purpose of this Order, the Court will refer to all joint arguments as emanating from Kohler) assert that the patents or products of several other entities (and even some of Generac's own) anticipated Generac's '821 patent, thus making the '821 invalid. Specifically, Kohler points to patents or products that it alleges anticipate the '821 patent: (1) U.S. Patent No. 5,734,255 (the Thompson patent); (2) U.S. Patent No. 5,323,328 (the Tanaka patent); (3) the Generator Power Control and *en*telligent software allegedly marketed by Encorp; (4) the PowerCommand system allegedly marketed by Cummins-Onan as early as 1996; and (5) the Utility 50 product allegedly marketed by Generac, itself, as early as June of 2000. (*See* Kohler Br. in Supp. at 3–7).

Under 35 U.S.C. § 102, a patent claim is invalid if, after having been properly construed, it is determined that a single prior art reference (such as a previously-existing patent, printed publication, or invention in public use or on sale) discloses every element that the Court determined to be a part of the patent claim in question. *See, e.g.,* 35 U.S.C. §§ 102(a), (b); *Nystrom v. TREX Co.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005); *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002); *Adv. Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000); *Beachcombers v. Wildewood Creative Products, Inc.*, 31 F.3d 1154, 1160 (Fed. Cir. 1994); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1379 (Fed. Cir. 1986); *see also Nordberg Inc. v. Telsmith, Inc.*, 881 F. Supp. 1252, 1282 (E.D. Wis. 1995), *aff'd*

*sub nom. Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394 (Fed. Cir. 1996). However, a prior art reference need not explicitly set forth every requirement of a claim; rather, "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing feature is necessarily present, or inherent, in the single anticipating reference." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005) (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); citing *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991), *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987)); *see also Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1376 (Fed. Cir. 2005) (quoting *In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1349 (Fed. Cir. 2002), for the proposition that "[u]nder the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claims limitations, it anticipates."). Whether prior art anticipates the patent claim in question is a question of fact that must be proved by the heightened standard of clear and convincing evidence, though the Court may decide it on summary judgment in the absence of a genuine dispute of material fact. *TriMed v. Stryker Corp.*, 608 F.3d 1333, 1343 (Fed. Cir. 2010); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005); *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). The burden to establish anticipation is "'especially difficult'" where, as with certain of the alleged prior art here, the alleged "infringer attempts to rely on prior art that was before the patent examiner during prosecution." *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) (citing *Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999)).

With that legal backdrop in mind, the Court now turns to examine each of the instances of alleged prior art.

### 2.2.2.1  Thompson

The Thompson patent was issued on March 31, 1998, and covers a "Control System and Circuits for Distributed Electrical Power Generating Stations." (U.S. Patent No. 5,734,255).

At the outset, the Court notes that, because the Thompson patent was before the PTO examiners that issued the '821 patent, Kohler has an extremely tough row to hoe to establish that Thompson anticipates the '821 patent. *Glaxo Group Ltd.*, 376 F.3d at 1348 (citing *Al-Site Corp.*, 174 F.3d at 1323). Nonetheless, the Court will examine each process element of Claim 19 and Claim 23 to determine whether they are anticipated by Thompson.

The second process elements of Claim 19 and Claim 23 requires the existence of a user interface that enables the selection of a generator set and the setting of its operating parameters.

Thompson does not disclose this element. It does provide a user interface (69), partially disclosing the first requirement. (U.S. Patent No. 5,734,255, Fig. 3 (at Sheet 3); Aguirrechea, Office Action Summary, Aug. 12, 2002 (Docket #43, Ex. 2, at 116–120), at 2).  However, that user interface is purely for "displaying performance parameters." (U.S. Patent No. 5,734,255, at 7:65–7:67). Kohler argues that the "user interface does not magically disappear when the display functions as a controller" (Kohler Reply at 7, n. 8), but the Thompson patent does not call for the display to function as a controller. (*See* U.S. Patent No. 5,734,255, at 7:55–7:67). Rather, the display is merely a "preferably"-included *part* of a controller; the display is connected to the controller "for displaying performance parameters of the generator

with which it is associated." The examiners must have concluded that the user interface did not allow for selection and control, given their conclusion that "the prior art…fails to teach, disclose or suggest…a user interface for allowing a user to select each of the plurality of generator sets and to set values for various predetermined operating parameters." (Aguirrechea, Notice of Allowability, May 1, 2003 (Docket #49, Ex. 44, at 705–07), at 2). Kohler has not established the ample support necessary to establish such user interface by the required clear and convincing evidence—let alone to overcome the "especially difficult" task of convincing the Court that Thompson anticipates, despite the PTO examiners' decision that it did not. *See, e.g., TriMed*, 608 F.3d at 1343; *SmithKline Beecham Corp.*, 403 F.3d at 1343; *Minn. Mining & Mfg. Co.*, 303 F.3d at 1301; *Glaxo Group Ltd.,*376 F.3d at 1348 (citing *Al-Site Corp.*, 174 F.3d at 1323). Thus, the Court cannot conclude that the Thompson display/user interface allows for the selection of a generator set and setting of that generator set's operating parameters, as contemplated by the second process element of Claim 19 and Claim 23.

Accordingly, the Court is obliged to deny Kohler's motion for summary judgment that Thompson anticipates the '821 patent.

### 2.2.2.2  Tanaka

The Tanaka patent, issued on June 21, 1994, contemplates a "system for controlling power generating plant having a plurality of units in accordance with distributed computer system." (U.S. Patent No. 5,323,328 (Docket #43, Ex. 4)).

Tanaka also fails to anticipate the '821 patent. As discussed in the Court's claim construction above, the first process elements of both Claim 19 and Claim 23 require a generator set that includes a generator, an

engine, a controller, and a communications link. Tanaka's generator sets do not include each of those items; rather, as Generac points out, they do not include a communications link and their controllers are external to the generation plant. (U.S. Patent No. 5,323,328, Fig. 3 (at Sheet 3)).

Moreover, the first process elements of both Claim 19 and Claim 23 require that the generator sets be connected to a load, or a device that consumes electricity for its operation—whereas the generator sets in Tanaka are not connected to a load. Rather, Tanaka's generators are connected to a transmission line that transmits power out of the generation plant, that transmission line not consuming electricity for its operation. (U.S. Patent No. 5,323,328, Fig. 3 (Connection point 114 is a utility line)).

Thus, the Court must deny Kohler's motion for summary judgment that Tanaka anticipates the '821 patent.

### 2.2.2.3   Encorp

It is Kohler's burden to establish anticipation by clear and convincing evidence. *See, e.g.*, *Procter and Gamble Co.*, 566 F.3d at 993–94 (citing *AK Steel Corp. v. Sollac & Ugine*, 195 F.3d at 1326); *Helifix Ltd.*, 208 F.3d at 1346 (citing 35 U.S.C. § 282; *WMS Gaming Inc.*, 184 F.3d 1339). Thus, if Kohler wishes to establish anticipation through the existence of a device offered for sale, it must establish some evidence of that device's actual existence. *See, e.g., Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1298–99 (Fed. Cir. 2010); *Oney v. Ratliff*, 182 F.3d 893, 896 (Fed. Cir. 1999).

Kohler wishes to show that Encorp either described a product in a publication or sold a product more than one year before the date of Generac's patent application that would anticipate the '821 patent under 35 U.S.C. § 102(b). To do so, Kohler must establish that a "single reference [or] device"

anticipates the '821 patent. *Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc.,* 726 F.2d 724, 727 (Fed. Cir. 1984). In other words, Kohler must show the existence of a single product or single document that clearly anticipates the '821 patent. *Id.*

Kohler has not established the existence of any Encorp product that would anticipate the '821 patent.[4] Despite extensive references to the involvement of their expert, Mr. Whitham, in the design, creation and/or supervision of Encorp products, Kohler does not establish that any such products *actually* exist. Therefore, it has not established by clear and convincing evidence any sort of anticipatory product.

Kohler has produced only two documents that could possibly establish anticipation of the '821 patent in a single reference: a line diagram illustrating a multi-generator Encorp system (Whitham Decl. (Docket #49, Ex.

---

[4]Kohler cites two cases in support of its contention that the Court should look to more than one piece of evidence to determine whether a claimed invention anticipates the '821 patent: *Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1373 (Fed. Cir. 1998) and *IP Innovation LLC, et al. v. Red Hat, Inc., et al.,* No. 2:07-cv-447 (RRR), (E.D. Tex. Oct. 13, 2010). But, *Woodland Trust* seems to establish only that a court can use written documents to corroborate oral testimony—*not* that it *should* gather multiple pieces of evidence together to establish anticipation. 148 Fed 1368, 1372–73. And, while *IP Innovation* did hold that there was "no error in using multiple references to describe a single prior art system for the purpose of showing anticipation," that point of law was applied where there was a single device. No. 2:07-cv-447, at 9 ("Dr. Wilson used a single device, the Chan system, to show anticipation."). Here, there seems to have been multiple devices, or a "suite of products," including the Generator Power Control and *en*telligent software, all of which Encorp may have hypothesized could be used together (as in the line diagram described elsewhere in this section, but of which there is no evidence that it was actually combined and created as a product. Therefore, the Court is unable to conclude that *IP Innovation* applies to the Encorp products as urged by Kohler. *Id.*

5), Fig. 1 (at 12)) and a presentation given to the Arizona Corporation Commission (Docket #47).

Each of those references, however, fails in some way to establish anticipation of the '821 patent. The line diagram is not extremely detailed, though it certainly does seem to exhibit generator sets connected to both a load and a network (CPM). (Whitham Decl., Fig. 1 (at 12)). However, there is no evidence that a user interface exists as part of the system—though the generator sets are connected to an item labeled *en*power, it is unclear from the document what *en*power is. Moreover, whether those items would allow for starting and stopping of the generators, selection of the generator sets, or setting of operating parameters—as required to anticipate the '821 patent—is unclear from the diagram. Therefore, the Court is left to conclude that Kohler has failed to establish by clear and convincing evidence that the line diagram anticipates the '821 patent.

The presentation, meanwhile, presents a much closer call. It is unclear from the presentation whether there is a user interface that allows selection of a generator set and input of operation parameters, as required by the first process elements of Claim 19 and Claim 23. Nonetheless, Mr. Whitham opined that the presentation establishes each of those items. (Whitham Decl. 25–30). The Court determines that, as to this point, there exists a material issue of fact.

Accordingly, the Court is obliged to deny both Kohler's and Generac's motion for summary judgment as to Encorp anticipation of the '821 patent.

### 2.2.2.4   Cummins-Onan

Kohler next argues that the Cummins-Onan PowerCommand system anticipates the '821 patent. Indeed, the PowerCommand system was offered

for sale prior to June 15, 2000. (*See, e.g.*, KPFF ¶ 95 (citing Gillette Dep. (Docket #65, Ex. 89), at 349:7–19); Generac Resp. to KPFF ¶ 95 (citing Gillette Dep., at 326:10–25, but failing to dispute that PowerCommand systems were offered for sale prior to June 15, 2000)). It may therefore anticipate the '821 patent. 35 U.S.C. § 102(b).

Examining the PowerCommand documents submitted by Kohler in support of its motion for summary judgment suggesting that the PowerCommand system anticipates the '821 patent,[5] the Court must conclude that the PowerCommand system anticipates Claim 19 of the '821 patent, but that it is unclear whether the PowerCommand system anticipates Claim 23.

### 2.2.2.4.1  Claim 19

The PowerCommand system establishes all of the requirements in Claim 19. As discussed in the Court's claim construction above, Claim 19 has three separate process elements. The first of those has several separate requirements:

(1)    the interconnection of more than one

(2)    generator sets (including an engine, a generator control, and a communications link)

(3)    to a load (a device that consumes electrical power for its operation) and

---

[5]The Court finds, here, that it is proper to examine all of the documents suggested by Kohler in determining whether the PowerCommand system anticipates. Unlike the alleged Encorp system above, the PowerCommand system appears to have been an actual product with intended paralleled use. Therefore, as the *IP Innovations* court suggested was appropriate, there would be "no error in using multiple references to describe a single prior art system for the purpose of showing anticipation." 2:07-cv-447 (RRR), at 9 (E.D. Tex. Oct. 13, 2010).

(4)     to a network (a communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators)

(5)     with each generator set having the ability to be started and stopped.

The second process element also has multiple separate requirements, specifically:

(1)     selection, through a user interface, of each generator set, and

(2)     "setting various predetermined operating parameters" (parameters that when varied change the operation of the system) "for each selected generator set."

Finally, the third process element has only one requirement: transmission of the operating parameters over a network to the selected generator sets.

The PowerCommand system meets each of these requirements. To begin, in satisfaction of the '821 patent's stated method, the PowerCommand system offers a method of managing the distribution of electrical power. The PowerCommand brochure makes clear that the system offers great control over the function of a generator set or sets. (*See* "PowerCommand Paralleling Generator Set Control" Bulleting S-1005 (Docket #44, Ex. F), at 1). Next, in satisfaction of the first element of Claim 19, the PowerCommand system contemplates:

(1)     the interconnection of more than one ("Real load sharing controls allow generator sets to share load")

(2)     generator sets, including an engine, a control, and a communications link (the following are all included in a single PowerCommand unit:

Page 30 of 44

"displays status of all critical engine…functions," implying the existence of an engine; "The control system," "Smart Starting Control System"; and "optional communications over the Onan PowerCommand Communications Network," implying the existence of a communications link)

(3)     to a load ("Real load sharing controls allow generator sets to share load") and

(4)     to a network ("The PowerCommand Control includes provisions for optional communications over the Onan PowerCommand Communications Network"; "from a remote location via modem, PC and PowerCommand Network Software")

(5)     with each generator set being capable of starting and stopping ("three position switch that starts and stops the generator set locally or enables start/stop control from a remote location.").

("PowerCommand Paralleling Generator Set Control" 1/96 Bulletin S-1005, at 1–6). As to the second and third elements of Claim 19, the PowerCommand system calls for the selection of generator sets through a user interface and the setting of various predetermined operating parameters, which may then be submitted over a network. ("PowerCommand Paralleling Generator Set Control" 1/96 Bulletin S-1005, at 4 (adjustment menu allows setting of operating parameters); 6 ("network is suitable for local or remote control and monitoring functions"); Onan PowerCommand Digital Paralleling" Bulletin F-1122 7/95, at 4 ("The Powercommand's integrated platform enables monitoring and control of all paralleling system components from a remote location via modem, PC and PowerCommand Network Software" (implying user interface for control)).

With the benefit of the evidence discussed above, the Court is satisfied that Kohler has established by clear and convincing evidence that the PowerCommand system anticipates Claim 19 of the '821 patent. Therefore, the Court is obliged to grant Kohler's motion for summary judgment on that issue, and simultaneously to deny Generac's motion for summary judgment as to non-anticipation.

### 2.2.2.4.2   Claim 23

While the Court has concluded that the evidence clearly shows anticipation of Claim 19, the evidence of record is unclear as to whether all of the Claim 23 requirements are fully satisfied.

The first three process elements of Claim 23 are practically coextensive with those of Claim 19, with the exception that Claim 23 also covers a single generator set. Despite that minor difference, the Court may still conclude that each of the first three process elements of Claim 23 are anticipated by the PowerCommand system, just as the three process elements of Claim 19 were anticipated.

Claim 23 adds an additional two process elements, though, of which the Court finds that there is not ample evidence to find anticipation. Those two additional elements require the starting and stopping of a generator set at a predetermined time *or event*. The PowerCommand system contemplates the starting and stopping of generators at a predetermined time ("PowerCommand Paralleling Generator Set Control" 1/96 Bulletin S-1005, at 4 (adjustment menu allows setting of time-delayed start and stop)), but does not include any information on the ability to start and/or stop the generators at pre-specified events, such as the loss of utility power.

Accordingly, the Court must deny Kohler's motion for summary judgment of anticipation of Claim 23 by the PowerCommand system. In truth, Kohler has not even presented an issue of material fact on this question—they have not proposed any facts that would establish a PowerCommand ability to start and/or stop generators at a pre-specified event. (KPFF ¶ 107).

Therefore, on this issue, the Court is obliged to grant Generac's motion for summary judgment that PowerCommand does not anticipate Claim 23 of the '821 patent.

### 2.2.2.5  Generac

As to anticipation, Kohler's final argument is that Generac's own Utility 50 product anticipates the '821 patent. It does not.

### 2.2.2.5.1  Claim 19

The Utility 50 product, as existed prior to June 15, 2000 (which is cutoff relevant for 35 U.S.C. § 102(b) anticipation), was a single-generator-set system without the ability to expand to include additional generator sets, and it therefore cannot be deemed to anticipate Claim 19, as Claim 19 requires the interconnection of more than one generator set. (GPFF ¶ 109; De La Ree Decl. (Docket #49, Ex. 2), at 15). Kohler has not provided any evidence to dispute that fact and, therefore, the Court must deem it as not viably in dispute.

Therefore, the Court is obliged to conclude that the Utility 50 product does not anticipate Claim 19, and to grant Generac's motion for summary judgment that Utility 50 does not anticipate Claim 19. However, that grant of judgment is ultimately moot, as the Court has already determined that Cummins-Onan's PowerCommand system anticipates Claim 19.

#### 2.2.2.5.2   Claim 23

Above, the Court concluded that the first process element of Claim 23 allowed for the interconnection of one or more generators to a load and to a network. Thus, there is nothing that clearly distinguishes the Utility 50 product from Claim 23. Generac's proposed facts do not establish that the Utility 50 product would not allow a single generator system to meet the entirety of process elements in Claim 23, as the Court construed them.

Accordingly, there is a question of material fact on this issue, and Generac's motion for summary judgment that Utility 50 does not anticipate Claim 23 must be denied.

### 2.2.3   Obviousness of '821 Patent

Having already determined that the Cummins-Onan PowerCommand system anticipates Claim 19, the Court need not engage in an analysis to determine whether Claim 19 is void for obviousness. *See In re Baxter Travenol Labs.*, 952 F.2d at 391 (citing *In re Fracalossi*, 681 F.2d 792, 794 (CCPA 1982)) ("anticipation is the ultimate of obviousness"). *See also In re Pearson*, 494 F.2d 1399, 1402 (C.C.P.A. 1974); *In re Kalm*, 378 F.2d 959, 962 (C.C.P.A. 1967) (lack of novelty in the claimed subject matter, such as evidence of disclosure in the prior art, is the "ultimate or epitome of obviousness").

However, having decided that none of the referenced prior art anticipates Claim 23, the Court must analyze whether it is obvious, in order to determine whether to grant Generac's motion for summary judgment of nonobviousness.

As with anticipation, defendants must establish invalidity as a result of obviousness by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, — U.S. —, 131 S. Ct.2238, 2242 (2011 (citing 35 U.S.C. § 282); *Alcon*

*Research, Ltd. v. Apotex, Inc.*, 687 F.3d 1362, 1366 (Fed. Cir. 2012). To establish obviousness, under 35 U.S.C. § 103, Kohler must show that the differences between the prior art and Claim 23 "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1374; *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012). This is a determination of law that is based on underlying determinations of fact, including "the scope and content of the prior art, the level of ordinary skill in the art, the differences between the claimed invention and the prior art, and secondary considerations of nonobviousness" (such as commercial success, long felt but unsolved needs, failure of others, etc.). *Star Scientific, Inc.*, 655 F.3d at 1374 (citing *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l*, 618 F.3d 1294, 1300 (Fed. Cir. 2010); *KSR Int' Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007)); *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). The Court must examine each of those four factors prior to reaching a conclusion on obviousness, and must do so "without any hint of hindsight." *Star Scientific, Inc.*, 655 F.3d at 1375 (citing *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998); *Kinetic Concepts, Inc.*, 688 F.3d at 1360 (citing *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1375 (Fed. Cir. 2012); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1076–77 (Fed. Cir. 2012)).

    Generac argues that expert evidence is a practical requirement to succeed in establishing nonobviousness. (Generac Br. in Supp., at 20 (citing *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004); *Mike's Train House, Inc. v. Broadway Ltd., Imps., LLC*, 708 F. Supp. 2d 527, 551 (D. Md.

2010))). But Generac's primary cited case, *Centricut, LLC*, does not deal with obviousness—rather, the Federal Circuit discussed the necessity of expert testimony to prove infringement, and further limited its analysis to the specific case before it. 390 F.3d at 1370. In fact, the *Centricut* court specifically noted that "[w]e do not state a per se rule that expert testimony is required to prove infringement when the art is complex." *Id.* Thus, in reality, *Centricut* has no bearing on the obviousness issue at hand. *Id.* Rather, as recited above, the Court must examine the evidence to determine whether there is evidence that could establish the obviousness of Claim 23.

The real question the Court must answer is whether Kohler, "as the party with the ultimate burden of proof on obviousness," presented evidence that could "demonstrate why it would have been obvious to combine the" prior art. *Mytee Products, Inc. v. Harris Research, Inc.*, 439 Fed. Appx. 882, 886 (Fed. Cir. 2011).[6] In *Mytee Products, Inc.*, the court held that a grant of summary judgment of nonobviousness was appropriate because the defendant's obviousness arguments were "nothing more than 'conclusory assertions, gross generalities, and unsupported assumptions made by counsel,'" and "failed to provide any reason why a person of ordinary skill would have been motivated to combine the references." *Id.*

————————————

[6]The Court notes, parenthetically, that Generac has cited both *Centricut, LLC*, and *Mytee Products, Inc.*, but failed to inform the Court that *Mytee Products, Inc.* specifically says that in an obviousness inquiry, the defendant was "not…necessarily required to submit expert testimony." (*Mytee Products, Inc.*, 439 Fed. Appx. at 886 (citing *Centricut, LLC*, 390 F.3d at 1369)). The Court views that omission as all but misleading: (1) Generac cited *Centricut, LLC*, for a point of law on obviousness when the case, in fact, dealt with infringement; and (2) failed to inform the Court that another cited source of law specifically counters their argument that *Centricut, LLC*, calls for submission of expert testimony in obviousness defenses.

Here, as opposed to in *Mytee Products, Inc.*, Kohler has provided ample expert testimony—even if that testimony might never reach a precise statement on obviousness. (*See generally* Whitham Decl.). Their expert witness, Christopher Whitham, provided testimony that a factfinder could determine may satisfy the four anticipation factors:

(1)   he specifically (and extensively) discussed the state of prior art (Whitham Decl., at 7–33);

(2)   he stated that a person of ordinary skill in the art for the technology of the '821 patent would have "at least a Bachelor of Science in Electrical Engineering or a closely related field and at least one to two years of experience working in the field," (GPFF ¶ 82);

(3)   he discussed differences between the claimed invention and the prior art (Whitham Decl., at 7–33); and

(4)   he set forth evidence of the secondary considerations of nonobviousness, such as commercial success, long felt but unresolved needs, failure of others, etc. (Whitham Decl., at 6–7, 32–33; Whitham Dep. (Docket #49, Ex. 29), at 63:11–14) and there is other evidence that shows that the '821 patent's inventor might have viewed his patent as obvious (Wedel Dep. (Docket #74, Ex. 8), at 251:2–5).

In light of this evidence, the Court agrees with Kohler that a reasonable trier of fact—namely, a jury in this case—may ultimately decide that the four above facts are present. Accordingly, summary judgment of nonobviousness is inappropriate at this juncture.

Therefore, the Court is obliged to deny Generac's motion for summary judgment of nonobviousness of Claim 23 of the '821 patent.

### 2.2.4    Infringement of '821 Patent

There is one final portion of the Court's analysis: infringement. This portion, itself, also has multiple sub-parts. To begin, Generac seeks entry of summary judgment on the issue of infringement, as to both Kohler and TES. (Generac Br. in Supp. 11–19). Therefore, the Court must analyze whether it should enter summary judgment against either of those parties, holding that they infringed upon Claim 23 of the '821 patent.[7] Furthermore, Kohler seeks entry of summary judgment holding that, even if it did infringe upon Claim 19, such infringement was not willful. (Kohler Br. in Supp. 26–29).

### 2.2.4.1   Infringement Analysis

Infringement may be either direct or indirect. *See, e.g.* 35 U.S.C. § 271. To establish direct infringement, Generac must show that Kohler and/or TES actually practiced every step of Claim 23, or that another individual practiced every step thereof as the agent of or under the direct control of Kohler and/or TES. *See, e.g., Akamai Tech., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1322–23 (Fed. Cir. 2012); *Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1060 (Fed. Cir. 2009); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1313 (Fed. Cir. 2003); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993); *Mowry v. Whitney*,

---

[7]The Court having already determined that Claim 19 is invalid due to anticipation and obviousness, Kohler and TES could not have infringed upon that Claim and, therefore, the Court need not engage in an infringement analysis on Claim 19.

**A38**

81 U.S. 620, 652 (1871). Induced infringement, on the other hand,[8] requires that Generac show that the defendant knowingly "cause[d], urge[d], encourage[d], or aid[ed]" another party to directly infringe upon Claim 23, with "specific intent to encourage" that infringement. *Akamai Tech., Inc.*, 692 F.3d at 1308 (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir.) (*en banc*); *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1379 n.13 (Fed. Cir. 2011)) (also citing *Global-Tech Appliances v. SEB S.A.*, — U.S. —, 131 S.Ct. 2060, 2068 (2011); *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 526 (1972); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961); *Henry v. A.B. Dick Co.*, 224 U.S. 1, 12 (1912); *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001); *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1196 (Fed. Cir. 1996)).

### 2.2.4.1.1   Infringement by Kohler

There is insufficient evidence at this juncture to find that Kohler, in fact, directly infringed upon Claim 23 of the '821 patent. As stated above, proof of direct infringement necessarily requires evidence that Kohler actually carried out each of the steps of Claim 23. Here, however, there is evidence that Kohler may not have ever actually performed all of Claim 23's steps. For instance, there is testimony that Kohler has not ever interconnected generators (Stiles Dep. (Docket #74, Ex. 6), at 303:25–304:11) or that the DPS system may not have been used to transmit parameters over a network (Stiles Dep. 438:17–20; 472:13–20). Kohler does not contest that the DPS

---

[8]Contrary to Kohler's contentions, the Court finds that Generac has pled induced infringement. Generac pled infringement (against Kohler, alone) under 35 U.S.C. § 271, which, of course, includes 35 U.S.C. § 271(b)—the inducement subsection. (Compl. ¶ 19; *see also* Compl. ¶ 18 (alleging only the use, sale or offer to sell against Defendant TES)).

system is capable of performing every step of Claim 23, but disputes whether it has ever actually performed every step. (*See generally* Kohler Resp. to GPFF ¶¶ 59–81). Indeed, at this juncture, the Court agrees with Kohler that there are issues of material fact as to whether Kohler has ever performed every listed step of Claim 23. Therefore, summary judgment of direct infringement by Kohler is inappropriate.

Similarly, summary judgment finding indirect infringement would also be inappropriate. Generac has failed to point the Court to any fact that would establish that any other party has directly infringed upon Claim 23 at Kohler's behest. Accordingly, there are material issues of fact that must be resolved in order to determine whether Kohler induced another's infringement. Therefore, summary judgment of indirect infringement by Kohler is inappropriate.

For these reasons, the Court is obliged to deny Generac's motion for summary judgment of Kohler's infringement.

#### 2.2.4.1.2   Infringement by TES

Just as it failed to do in regards to Kohler, Generac has failed to establish facts that TES has directly infringed upon Claim 23 of the '821 patent. As discussed above, there are disputes of fact as to whether TES ever actually performed every step of Claim 23. (*See, e.g.*, Stiles Dep., at 303:25–304:11, 438:17–20, 472:13–20).

As such, summary judgment of infringement by TES is inappropriate at this juncture, and the Court is accordingly obliged to deny Generac's motion for summary judgment on that matter.

### 2.2.4.2  Willfulness

The final prong of the Court's analysis is to determine whether Kohler is entitled to summary judgment that, in the case that it did infringe upon Generac's patent, such infringement was not willful.[9]

To establish willful infringement, Generac must show by clear and convincing evidence that Kohler acted in an objectively reckless manner and also, subjectively, that Kohler knew or should have known that its actions risked infringing upon the '821 patent. *In re Seagate Technology, LLC*, 447 F.3d 1360, 1371 (Fed. Cir. 2007) (*en banc*). In other words, if Generac has failed to produce evidence that would establish either of those prongs, then Kohler is entitled to summary judgment of nonwillfulness.

As to the first prong, objective recklessness, the inquiry turns upon "whether, given the facts and circumstances prior to [Kohler's allegedly] infringing actions, a reasonable person would have appreciated a high likelihood that acting would infringe a valid patent." *i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 582 (E.D. Tex. 2009), *aff'd, i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010).

The Court finds that, given the prior art of record in existence at the time of Kohler's allegedly infringing actions, Kohler's position was not objectively reckless. As discussed above in its anticipation analysis, the Court found that Claim 19 is actually anticipated by the Cummins-Onan PowerCommand system, and that questions of fact exist as to whether Claim 23 is anticipated by the same. Moreover, the other prior art of record contains

---

[9]The Court notes, parenthetically, that willfulness is a statutory requirement for punitive damages. *In re Seagate Technology, LLC*, 497 F.3d 1360, 1370 (Fed. Cir. 2007) (citing *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007)).

many commonalities with Kohler's allegedly-infringing DPS system. Objectively, the Court concludes that a reasonable person would have concluded that the '821 patent may have been invalid as anticipated. Certainly, Generac has failed to establish by clear and convincing evidence that Kohler's position was objectively unreasonable.

Accordingly, the Court is obliged to grant Kohler's motion for summary judgment that its action was not willful.

**3.     Conclusion**

Having concluded its analysis, the Court now summarizes its holdings. Summary judgment is appropriate as to the following matters:

- The Court is obliged to grant Kohler's motion for summary judgment insofar as relates to judgment that the Cummins-Onan PowerCommand system anticipates Claim 19; and

- The Court is obliged to grant Kohler's motion for summary judgment insofar as relates to judgment that Kohler did not willfully infringe upon Generac's patents.

Furthermore, all of the Claim 19 issues (including any arguments related to anticipation, obviousness, or infringement) are now moot, as a result of the Court's finding that Cummins-Onan anticipates Claim 19.

Summary judgment is inappropriate as to the remaining issues. Accordingly the following issues of fact are "live issues" for jury trial:

- Whether the Thompson patent anticipates Claim 23 of the '821 patent;

- Whether the Tanaka patent anticipates Claim 23 of the '821 patent;

- Whether the Encorp system anticipates Claim 23 of the '821 patent;

Page 42 of 44

- Whether the Cummins-Onan PowerCommand system anticipates Claim 23 of the '821 patent;

- Whether Generac's own Utility 50 device anticipates Claim 23 of the '821 patent;

- Whether Claim 23 is void for obviousness; and

- Whether Kohler did, in fact, infringe upon Claim 23 of the '821 patent.

Finally, as a housekeeping matter, the Court notes that it did not rely on the disputed supplemental declaration of John Ronza, and accordingly will deny Generac's motion to strike that declaration (Docket #98) as moot. Furthermore, the Court will not take action at this time on Kohler's motion to continue the trial date. (Docket #99). Rather, the Court will schedule a status conference with the parties to discuss that motion and this matter's trial posture. That conference will be held on Wednesday, November 28, 2012, at 8:30 A.M., and the parties may appear by phone if necessary (in such case, the parties are directed to provide the Court with a direct telephone number for all counsel that wish to participate in the conference).

Having fully addressed the parties' cross-motions for summary judgment, the Court now enters the following order.

Accordingly,

**IT IS ORDERED** that Kohler's Motion for Summary Judgment (Docket #40) be and the same is hereby **GRANTED in part and DENIED in part**, as more fully discussed above;

**IT IS FURTHER ORDERED** that Generac's Motion for Summary Judgment (Docket #48) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Generac's Motion to Strike the Supplemental Declaration of John Ronza (Docket #98) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that Kohler's Motion to Continue the Trial Date and Related Pretrial Deadlines (Docket #99) be and the same is hereby **HELD IN ABEYANCE**, pending appearance of the parties at a status conference to be held on **Wednesday, November 28, 2012, at 8:30 A.M.**

Dated at Milwaukee, Wisconsin, this 20th day of November, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

# Addendum 2

November 29, 2012 Amended Order,
*Generac Power Systems, Inc. v.*
*Kohler Company and Total Energy Systems, LLC*,
Case No. 2:11-cv-01120-JPS (E.D. Wis.)

A45-A88

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GENERAC POWER SYSTEMS, INC.,

                            Plaintiff,

v.                                                    Case No. 11-CV-1120-JPS

KOHLER COMPANY and
TOTAL ENERGY SYSTEMS, LLC,                            **AMENDED**
                                                      **ORDER**
                            Defendants.

The Plaintiff, Generac Power Systems, Inc. ("Generac"), filed this action on December 9, 2011, alleging that Defendant Kohler Company ("Kohler") infringed upon Generac's patent over a "System Controller and Method for Monitoring and Controlling a Plurality of Generator Sets" (U.S. Patent No. 6,653,821 B2 (the '821 patent)). (Compl.). On May 7, 2012, Generac filed an Amended Complaint, adding Total Energy Systems, LLC ("TES"), as a defendant. (Am. Compl. ¶ 4).

After receiving a short extension of time, Generac and Kohler both filed cross-motions for summary judgment on September 12, 2012. (Docket #'s 38, 40, 48). The parties have now fully briefed those motions, and the matter is ripe for decision. (Docket #'s 41, 53, 62, 64, 72, 83, 87, 93).

## 1.     BACKGROUND

Before turning to its substantive discussion of the dispute at hand and the controlling law, the Court will provide some factual background regarding the parties and products that form the foundation of this litigation.

Generac is a Wisconsin-based company in the business of manufacturing generator equipment; in connection with that business, Generac secured the '821 patent at issue in this case. (KPFF ¶¶ 1, 8, 9).

Generac initially applied for the '821 patent on June 15, 2001. (KPFF ¶ 20). The Patent and Trade Office's ("PTO") examiners rejected each claim therein, citing U.S. Patent Nos. 5,734,255 (the "Thompson patent") as anticipatory prior art. (KPFF ¶ 23). That rejection was not final, though, and Generac responded to it by alleging that the Thompson patent differed from the '821 patent insofar as the Thompson patent "does not show or suggest a user interface that allows a remote user to select a generator set; to set values for various predetermined operating parameters of the selected generator set; and to transmit those user selected values to the generator set over the network," and further added that the Thompson patent "merely allows remote users to monitor various parameters." (KPFF ¶¶ 24–25; Stomma Resp. Letter to PTO (Docket #49, Ex. 44) at 668, 669).

The PTO examiners eventually reversed course, withdrawing their objections to the '821 patent on the basis of the Thompson patent and ultimately granting[1] Generac the '821 patent, consisting of twenty-four separate claims. (KPFF ¶¶ 9, 27, 31). In reaching their decision to grant the '821 patent, the PTO examiners stated their rationale for doing so as follows:

> The prior art of record fails to teach, disclose, or suggest, either alone or in combination [a] controller for controlling generator sets connectable to a load, each generator set having the ability to be started and stopped and including a generator communications link for connecting the generator set to a network, an engine, and a generator driving by the engine which generates

---

[1]After removing their objections based on the Thompson patent, but prior to ultimately granting the '821 patent, the PTO examiners objected to a number of claims in the '821 patent on the basis of two separate patents that are not relevant to this case; Generac amended several of its claims, added new claims, and responded to the PTO examiners' new objections before the examiners finally granted the '821 patent. (KPFF ¶¶ 28–30).

AC power, comprising: a user interface for allowing a user to select each of the plurality of generator sets and to set values for various predetermined operating parameters of each of the generator sets; and a communications link [connectable] to the network for transmitting the user set values of the predetermined operating parameters to each selected generator set.

(KPFF ¶ 31).

After the '821 patent was granted, Generac released the Modular Power Systems ("MPS") product, a generator system that takes advantage of the processes described in the '821 patent. (GPFF ¶ 25). Distilled to the simplest form possible, Generac's MPS is a generator system that is part of a network through which operational values may be transmitted after being configured through a user interface. (GPFF ¶¶ 20–21).[2]

Needless to say (otherwise, why would the Court be entertaining this suit), Kohler developed a very similar system, known as the Master Control Panel 3000 ("MCP 3000") and Decision-Maker Paralleling System ("DPS"), both of which were allegedly used, sold or offered for sale by TES. (GPFF ¶¶ 35–37; Compl. ¶¶ 18–20).

Generac then filed this suit, ultimately asserting that the DPS system infringes upon Claim 19 and Claim 23 of the '821 patent. (Compl.; KPFF ¶ 9).

## 2.    DISCUSSION

Turning now to its substantive discussion, the Court will first construe the relevant terms in Claim 19 and Claim 23 of Generac's '821 patent. After

---

[2]Kohler disputes Generac's proposed findings of fact that are cited in this paragraph as irrelevant and immaterial (*see* Kohler's Resp. to GPFF ¶¶ 20, 21, 25). The Court discusses these facts solely to provide narrative background, and does not view them as material. Therefore, the Court need not resolve the dispute over these facts at this juncture.

doing so, the Court will employ the construction in addressing the parties' substantive arguments on summary judgment. In doing so, the Court will determine whether the patent is, in fact, valid (as opposed to void as a result of anticipation or obviousness); if the Court decides that the patent is valid, only then must it determine whether Kohler or TES infringed upon it.

### 2.1    Claim Construction

The Court must construe two separate portions of the '821 patent: Claim 19 and Claim 23. (*See* KPFF ¶ 9). While the two claims share much in common, the Court will construe them separately, so that the terms of each, as determined by the Court, are as clear as possible. Furthermore, the parties disagree over whether patent '821 requires the absence of switchgear; the Court will examine that dispute after construing Claim 19 and Claim 23.

Typically, claim construction is a question of law for the Court, and therefore disputes over claim construction do not prevent summary judgment. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) ("We therefore…hold that in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim."). Claim construction often involves one of two separate scenarios: either it involves "little more than the application of the widely accepted meaning of commonly understood words"; or, it involves the "examination of terms that have a particular meaning in a field of art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). In applying widely accepted meanings under the first scenario, the Court may look to general purpose dictionaries to determine those meanings. *Id.* On the other hand, in the second scenario, the Court should look to a broader spectrum of evidence in order to give the claims their ordinary and customary meaning, as a

person of ordinary skill in the art would have applied to them at the time the invention was made. *Id.*, at 1313.   To determine that meaning, the Court should begin with the intrinsic evidence, such as the language of the claim, the remainder of the patent and its specification, and the prosecution history; it is only if the intrinsic evidence is not sufficient to resolve all ambiguities that the Court may look to extrinsic evidence, such as dictionaries, expert witnesses and case law. *Id.*, at 1314, 1317, 1324; *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir. 2005); *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004); *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

### 2.1.1   Claim 19

The specific terms of Claim 19, as approved by the PTO examiners, is as follows:

> A method of managing the distribution of electrical power, comprising the steps of:
>> interconnecting a plurality of generator sets to a load and to a network, each generator set having the ability to be started and stopped;
>> selecting each generator set and setting various predetermined operating parameters for each selected generator set; and
>> transmitting the settings of the predetermined operating parameters over the network to each selected generator set.

(United States Patent No. 6,653,821 (Nov. 25, 2003) (Docket #43, Ex. 1), at 14:43–14:50).

The parties subdivide Claim 19 into three separate process elements for the purpose of their discussion; the Court will address each of those process elements separately.

Page 5 of 44

### 2.1.1.1   First Process Element of Claim 19

The first process element of Claim 19 provides for "interconnecting a plurality of generator sets to a load and to a network, each generator set having the ability to be started and stopped." (U.S. Patent No. 6,653,821, at 14:44-14:46). The parties generally agree that this element involves the interconnection of generator sets to both a load and to a network (though, as described further below, they disagree as to the meaning of several of the terms just used, and so disagree over the substantive meaning of this portion of the process element). (*See* KPFF ¶ 33, and Generac's Resp. to KPFF ¶ 33). They also agree that the phrase "[e]ach generator set having the ability to be started and stopped" is self-explanatory. (*See* KPFF ¶ 35, and Generac's Resp. to KPFF ¶ 35).

Despite those general areas of agreement, though, the parties substantially disagree over the substance of this process element. To begin, the parties fail to specify whether they agree to the meaning of the term "plurality," therefore, the Court will define that term for the sake of clarity. Furthermore, the parties specifically disagree over the meaning of the following terms: "generator set"; "network"; and "load." (Kohler Br. in Supp. (Docket #41), at 10; Generac Resp. (Docket #62), at 8–11; Kohler Reply (Docket #87), at 4–6). The Court now turns to its construction of each of the disputed terms.

### 2.1.1.1.1   "Plurality"

The parties have not asserted that the term "plurality" is a term of art, and the term is widely accepted as meaning "the fact or condition of denoting, comprising, or consisting of more than one." OXFORD ENGLISH DICTIONARY, Online (September 2012).

Therefore, the Court construes the term "plurality," as it is used in Claim 19, to mean "more than one."

### 2.1.1.1.2  "Generator Set"

Kohler argues that the term "generator set" should be construed to be synonymous with the term "generator" standing alone, which Kohler asserts is standard in the industry. (Kohler Reply at 4–5). Generac argues that the term "generator set," should in fact encompass more: specifically, "an engine, a generator control, and a communications link," as the term "generator set" is defined in the '821 patent specification. (Generac Resp. at 8).

The Court agrees with Generac. Before looking to outside evidence, such as outside definitions and expert witnesses, the Court should first look to the evidence intrinsic to the '821 patent, including its specification. *See, e.g.*, *Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582. Here, the '821 patent discusses the terms "generator" and "generator set" as though they are distinct from one another:

> Each generator set has the ability to be started and stopped and includes a generator connectable to a load. The generator generates AC power having a magnitude and a power factor, an AC voltage having a magnitude and a frequency, and an AC current having a magnitude and a frequency. Each generator also includes an engine, a generator control and a generator communications link. An engine is operatively connected to a generator for driving the generator. A generator control is operatively connected to the engine for controlling operation thereof and is operatively connected to the generator for controlling the AC generated thereby. The generator communications link connects the generator control to a network. A user interface allows a user to select a generator set and set values for various predetermined operating parameters of the selected generator set.

(U.S. Patent No. 6,653,821, at 2:57–3:5). The patent language specifies that "[e]ach generator set…includes a generator connectable to a load." (U.S. Patent No. 2:57–2:58). That generator, in turn, "includes an engine, a generator control and a generator communications link." (U.S. Patent No. 6,653,821, at 2:62–2:63). Thus, by the very terms of the '821 patent, the Court is constrained to conclude that the term "generator set" includes more than a generator alone.

Indeed, as urged by Generac, the Court must conclude that the term "generator set" includes an engine, a generator control, and a communications link.

### 2.1.1.1.3 "Network"

As to the term "network," Kohler argues that it is a term of art meaning "a communication system for the transmission of information." (Kohler Br. in Supp. at 10). Generac, on the other hand, argues that the term "should be interpreted by its plain and ordinary meaning," specifically "a digital network connecting generator sets such that they can communicate over the network and be individually addressed." (Generac Resp. at 9).[3]

As a preliminary matter, the Court agrees with Kohler that the term "network" is a term of art, as used by the '821 patent. Therefore, the Court will look first to the patent to determine whether the term "network" is

---

[3] Generac's position on this term is somewhat perplexing, urging the Court to adopt the "plain and ordinary meaning" of a nondescript term like "network," while simultaneously providing an extremely detailed definition thereof. A true plain and ordinary meaning of the term "network" would likely be understood by members of the general public to be nothing more than that suggested by Kohler—a communication system for the transmission of information.

defined therein. *See, e.g., Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582.

Both parties attempt to bolster their positions by identifying patent language stating that "it is contemplated that network system 10 include a network controller 170 which is operatively connected to a communication network 172 such as a telephone network, a computer network, the internet, or a combination for communication thereon." (*See* KPFF ¶ 44 and Generac Resp. to KPFF ¶ 44 (both citing U.S. Patent 6,653,821, at 11:41–11:43)). That language clearly identifies "communication network" as including items such as "a telephone network, a computer network, the internet, or a combination for communication thereon." (U.S. Patent 6,653,821, at 11:39–11:43).

Thus, given that language and the fact that the first process element of Claim 19 involves "interconnecting" generators to a network, the Court determines that the term "network," as used in the patent, contemplates—at the very least—a communication system for the transmission of information, as suggested by Kohler.

But, the Court cannot take the extra step, as requested by Generac, to define "network" with the vastly narrowing modifiers of being digital, connecting only generator sets, and enabling individual addressing. To begin this analysis with the first proposed modifier, "digital," the Court notes that there is nothing in the patent language that would specify that the network must be digital. Indeed, the examples of a "communication network" include a "telephone network," which may be either analog or digital. *See, e.g.*, ANDREW WHEEN, DOT-DASH TO DOT.COM: HOW MODERN TELE-COMMUNICATIONS EVOLVED FROM THE TELEGRAPH TO THE INTERNET 49–80

Page 9 of 44

(2011); In the Matter of Amendment of Part 68 of the Commission's Rules § 68.314, 12 F.C.C.R. 19281, 19296 (Feb. 29, 1996) (discussing terminal equipment and protective circuitry interconnected with an analog telephone network). Therefore, the term "network" cannot be limited to solely digital networks.

Turning next to whether the term "network" must be limited to a connection between generator sets, the Court again determines that such narrowing modifier should not apply. The patent language describes a "network system 10" allowing "a single user to monitor several power generation systems 12 from a single locale and to control operation of these power generation systems 12…[,] to view the current operating conditions of each of the power generation systems 12, as well as, configure system controllers 14 from the remote locale" and to "obtain detailed information from individual generators 20*a* and 20*b* from the remote locale." (U.S. Patent No. 6,653,821, at 11:52–11:60). While that description contemplates the interconnection of generators, it also contemplates interconnection of those generators to system controllers and some form of display that would allow a user to "view" and "obtain" information from each of the generators. (U.S. Patent No. 6,653,821 at 11:52–11:60). Thus, with the understanding that the patent calls for the interconnection of more than the generators alone across a network, the Court cannot apply Generac's proposed limiting modifier.

The Court does agree with Generac, though, that "network" should be more limited than Kohler suggests; thus, the Court concludes that the term "network" mean a communication system for the transmission of information (be it digital or analog, and including telephone, computer, internet, or related) across which travels information that may be

individually addressed to generators or devices intended for the monitoring and control of those generators. This definition does not apply the unduly restrictive requirement that a "network" be digital or connect only generator sets; it does, however, limit a "network" being a communication system over which information relevant to the control and function of the generators is shared. Without this limitation, the term "network" would essentially be meaningless, a plurality of generator sets to *any* network, regardless of whether the controls could be sent over the network; that is, without some meaningful limitation, the simple connection of a generator to the internet would seem to satisfy the "network" connection requirement.

Thus, the Court is obliged to conclude that "network" must be construed as a communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators.

### 2.1.1.1.4  "Load"

Kohler argues that the term "load" should be defined as "power output (as of a power plant) or power consumption (as by a device)." (Kohler Br. in Supp. at 10). Generac argues that "load" should be construed only as a device that consumes power, as opposed to also including power-output devices, and specifically argues that "load" should not be construed to include a utility. (Generac Resp. at 10–11).

On the definition of "load," the Court agrees with Generac. Again, "load" is a term of art, and therefore the Court should first examine the patent to determine whether load is defined therein. *See, e.g.*, *Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582. The patent's language

explicitly states that "[d]uring a commercial power outage, it is often necessary for a consumer to continue supplying electrical power to a load," "a single generator may not generate enough electrical power to meet the demands of the load," and "multiple electrical generator are often needed to provide sufficient electrical power for the load connected thereto." (U.S. Patent No. 6,653,821, at 1:19–27). This language clearly contemplates the term "load" to mean some form of device that *receives* (as opposed to *provides*) electrical power from the generators.

Therefore, the Court is obliged to construe "load" to mean "a device that consumes electrical power for its operation."

### 2.1.1.2    Second Process Element of Claim 19

The Court now turns to the second process element of Claim 19, which provides for "selecting each generator set and setting various predetermined operating parameters for each selected generator set." The parties disagree over the meaning of the terms "selecting each generator set" and "predetermined operating parameters," as they are used in this process element.

### 2.1.1.2.1    "Selecting Each Generator Set"

Generac argues that the term "selecting each generator set" requires the existence of a user interface. (Generac Resp. at 12). Kohler, on the other hand, argues that Claim 19 lacks any reference to a user interface, and therefore should not be construed to include a user interface. (Kohler Reply at 6).

The Court must again agree with Generac. It would be widely accepted that "selecting each generator set" requires some user input—the act of "selecting"—that could not be accomplished without some system for

user input; therefore, the Court must conclude that, as a simple matter of logic, Claim 19 necessarily includes a user interface. Even if the Court were to determine that this phrase were a term of art, such that the Court should look to the intrinsic evidence, *Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582, it would reach the same conclusion, as the prosecution history's reasons for allowance includes a "user interface for allowing a user to select" generator sets. (Aguirrechea, Notice of Allowability, May 1, 2003 (Docket #49, Ex. 44, at 705–07), at 2).

As such, the Court is obliged to conclude that "selecting each generator set" necessarily includes the existence of a user interface.

### 2.1.1.2.2 "Predetermined Operating Parameters"

Generac asserts that the term "predetermined operating parameters" must mean parameters that are adjustable to change the operation of the generator set. (Generac Resp. at 13). Kohler did not dispute this in its Reply Brief (Kohler Reply at 4–6), and the Court does not believe Kohler could reasonably have done so. A parameter is "[a]ny distinguishing or defining characteristic," OXFORD ENGLISH DICTIONARY, Online (September 2012), and thus an "operating parameter" must be defined as a "distinguishing or defining characteristic as related to the operation of a system."

That definition is practically synonymous with the construction urged by Generac, which the Court will now adopt: "a parameter that when varied changes the operation of the system."

### 2.1.1.3   Third Process Element of Claim 19

The only potentially-disputed term in Claim 19 is "predetermined operating parameters," which the Court has already construed above to mean "a parameter that when varied changes the operation of the system."

Having now completed its construction of Claim 19 and for ease of reference, the Court provides the following table setting forth its final construction of each disputed term:

| CLAIM 19 | |
|---|---|
| **Disputed Term** | **Construction** |
| Plurality | More than one. |
| Generator Set | Includes an engine, a generator control, and a communications link. |
| Network | Communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators. |
| Load | A device that consumes electrical power for its operation. |
| Selecting Each Generator Set | Implies the inclusion of a user interface. |
| Predetermined Operating Parameters | Parameters that when varied change the operation of the system. |

### 2.1.2   Claim 23

The specific terms of Claim 23, as approved by the PTO examiners, is as follows:

> A method of managing the distribution of electrical power, comprising the steps of:
>> interconnecting at least one generator set to a load and to a network, each generator set having the ability to be started and stopped;
>> selecting each generator set and setting various predetermined operating parameters for the selected generator set;

> transmitting the settings of the predetermined
> operating parameters over the network to the
> selected generator set;
> starting the selected generator set at a first
> predetermined time; and
> stopping the selected generator set at a second
> predetermined time.

(U.S. Patent No. 6,653,821, at 15:6–16:8).

As with Claim 19, the parties have subdivided Claim 23 into separate process elements. Claim 23 has five separate process elements, each of which the Court will address separately (despite the fact that the first three are practically identical to those found in Claim 19).

### 2.1.2.1   First Process Element of Claim 23

The first process element of Claim 23 is identical to the first process element of Claim 19, except that Claim 23 discusses the interconnection of "at least one generator set," whereas Claim 19 discusses the interconnection of a "plurality of generator sets."

### 2.1.2.1.1   "At Least One"

Kohler argues that the term "at least one" should be construed to cover a single generator, whereas Generac argues that the Court should find that "at least one" does *not* cover a single generator, but instead means more than one. (Kohler Br. in Supp. 11–12; Generac Resp. 11; Kohler Reply 6). In support of its contention, Generac argues that the term "at least one" should be defined as "more than one," because Claim 23 provides for a generator set that is "capable of linking to one or more additional generator sets to form the interconnected system of the patent." (Generac Resp. 11 (quoting Claim 23's language requiring "interconnecting at least one generator set to a… network, each generator set…")).

Generac's argument is nonsensical. To begin, the plain language of the term "at least one," clearly means "one or more than one"—not simply "more than one" as Generac argues. If a person on the street asked another for "at least one" dollar, the second person would know that the first was requesting one dollar or more than one dollar. Similarly, here, on its plain language, the term "at least one" means one generator or more than one generator.

But, even if the Court examines Claim 23's remaining language as Generac urges, the Court cannot possibly conclude that "at least one" as used in Claim 23 means "more than one." Generac seems to argue that use of the phrase "each generator set having the ability to be started and stopped," implies the required existence of more than one generator. (Generac Resp. 11). The Court disagrees: "each" does not necessarily imply plurality, especially when compared to the facially plain language "at least one," which explicitly allows for singularity.

Moreover, the intrinsic evidence also augurs in favor of defining "at least one" to mean "one or more than one." Claim 23 explicitly uses different language than Claim 19, interchanging "at least one" for "plurality." The Court has already determined that "plurality" means more than one—and if Generac intended its language to be construed as "more than one," the Court cannot fathom why it would change its language from something that clearly means "more than one" to a phrase ("at least one") that by its clear terms means "one or more than one."

Accordingly, the Court is obliged to conclude that "at least one" means "one or more than one."

### 2.1.2.1.2    Remainder of First Process Terms

The remainder of the disputed terms ("generator set," "network," and "load") in the first process element of Claim 23 are identical to those that were disputed in the first process element of Claim 19, and the parties do not argue that their meanings differ between claims; therefore, the Court will simply apply its construction of the Claim 19 terms to their identical Claim 23 counterparts.

### 2.1.2.2 Second and Third Process Elements of Claim 23

Similarly, the disputed terms in the second and third process elements of Claim 23 ("selecting each generator set" and "predetermined operating parameters") are identical to those in the second and third process elements of Claim 19. Because the parties do not argue that the meaning of the terms differ as between Claim 19 and Claim 23, the Court will apply its construction of the Claim 19 terms to their Claim 23 counterparts.

### 2.1.2.3    Fourth and Fifth Process Elements of Claim 23

The fourth and fifth process elements of Claim 23 provide for "starting…" and "stopping the selected generator set at a… predetermined time," respectively.

Kohler argues that this language allows the user to set only a specific time at which the generator will start and stop. (Kohler Br. in Supp. at 12). Generac, on the other hand, argues that the terms should be construed to allow for setting a predetermined time *or event* (such as when utility power is lost or regained) to start and stop the generator. (Generac Resp. 13).

The Court agrees with Generac. The Court views this phrase as being one of art, and may, therefore, look to both intrinsic and extrinsic evidence to construe it. *Phillips*, 415 F.3d at 1314, 1317, 1324; *Gillette Co.*, 405 F.3d at

1370; *Innova/Pure Water, Inc.*, 381 F.3d at 1116; *Interactive Gift Express, Inc.*, 256 F.3d at 1331; *Vitronics Corp.*, 90 F.3d at 1582. The intrinsic evidence augurs in favor of a finding that Claim 23 contemplates the setting of a predetermined event, such as a power outage, to start and/or stop the generator. To begin, nothing in the patent specifically provides that "time" must refer only to a time on the clock, and not, instead, to some period of time after an event. (*See* U.S. Patent No. 6,653,8321, at 8:26–52 (allowing for setting of time periods to operate under different commands, in addition to setting of calendar days and clock times to operate)). Furthermore, the summary of the invention provides that "[d]uring a commercial power outage, it is often necessary for a consumer to continue supplying electrical power to a load," implying that the invention is designed to address that problem, such as by engaging upon the loss of power. (U.S. Patent No. 6,653,821, at 1:19–1:21). Turning to the extrinsic evidence, Generac's expert, Jaime De La Ree, Ph.D, opined that a person of ordinary skill in the art would understand the term to contemplate the ability to start and/or stop after a predetermined event. (De La Ree Decl. (Docket #49, Ex. 2), at 39–40). Kohler failed to provide any rebuttal evidence, and, therefore, the Court sides with Generac on this disputed fact.

Therefore, the Court is obliged to conclude that the fourth and fifth process elements of Claim 23 allow for setting a predetermined time *or event* upon which the generators will start or stop.

Having finished its construction of Claim 23 and for ease of reference, the Court provides the following chart setting forth its final construction of each disputed term:

| CLAIM 23 | |
|---|---|
| **Disputed Term** | **Construction** |
| At Least One | One or more than one. |
| Generator Set | Includes an engine, a generator control, and a communications link. |
| Network | Communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators. |
| Load | A device that consumes electrical power for its operation. |
| Selecting Each Generator Set | Implies the inclusion of a user interface. |
| Predetermined Operating Parameters | Parameters that when varied change the operation of the system. |
| Starting the selected generator set at a first predetermined time | Allows for starting at a specified time or event. |
| Stopping the selected generator set at a second predetermined time | Allows for stopping at a specified time or event. |

### 2.1.3   Switchgear

Kohler argues that Generac "reads claims 19 and 23 as precluding the use of switchgear." (Kohler Reply at 2). In other words, Kohler believes that Generac understands the '821 patent to require an absence of switchgear.

Generac does no such thing. In fact, it seems Generac agrees with Kohler that the '821 patent should not be read to require an absence of

switchgear. (*See* Generac Reply (Docket #93) at 4). In its Reply Brief, Generac explicitly states that "the '821 patent actually made the new system indifferent to whether switchgear was present." (Generac Reply at 4).

The Court agrees that the '821 patent does not rely on the absence of switchgear. As Generac states, the '821 patent is indifferent to the existence of switchgear within its system. Therefore, regardless of whether a system includes switchgear, that system may infringe upon Claim 19 or Claim 23, provided that it carries out the steps in either patent claim.

The Court is obliged to conclude that the '821 patent does not require an absence of switchgear.

### 2.2    Summary Judgment Analysis

Kohler and Generac filed cross-motions for summary judgment. (Docket #40, #48). Kohler seeks summary judgment holding:  (1) that both Claim 19 and Claim 23 of the '821 patent are invalid as anticipated by prior art (Kohler Br. in Supp. 6-26); and (2) that Generac cannot establish willful infringement (Kohler Br. in Supp. 26–29). Generac, meanwhile, argues for summary judgment holding:  (1) that Claims 19 and 23 are not anticipated by prior art (Generac Br. in Supp. 23–30); (2) that the '821 patent is not invalid due to obviousness (Generac Br. in Supp. 19–23); and (3) that Kohler's DPS products infringe upon Claim 19 and Claim 23 (Generac Br. in Supp. 11–19).

After setting forth the summary judgment standard, the Court will first turn to the issue of anticipation, then to obviousness, and finally to infringement. This path of analysis is the most logical, since the Court need not reach the infringement issue if it determines either: (1) that prior art anticipates Claim 19 and Claim 23 of the '821 patent; or (2) that the '821 patent is invalid due to obviousness; if the Court determines either or both

cases apply, then infringement is simply not possible, because the claims and/or patent will be treated as invalid. *See* 35 U.S.C. §§ 102, 103. Further, the Court should examine anticipation before obviousness because "anticipation is the ultimate of obviousness"—that is, where there is anticipation, obviousness must follow. *In re Baxter Travenol Labs.*, 952 F.2d 388, 391 (Fed. Cir. 1991) *(citing In re Fracalossi*, 681 F.2d 792, 794 (CCPA 1982)).

The Court now turns to its analysis of these issues.

### 2.2.1  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

As Generac correctly points out, though, there is a different legal standard for Kohler to prevail on its invalidity claims than for Generac to prevail on its infringement claims. Indeed, invalidity must be established by clear and convincing evidence. *See, e.g., Procter and Gamble Co. v. Teva Pharmaceuticals USA, Inc.*, 566 F.3d 989, 993–94 (Fed. Cir. 2009) (citing *AK Steel Corp. v. Sollac & Ugine*, 195 F.3d 1322, 1326 (Fed. Cir. 1999)); *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (citing 35 U.S.C. § 282; *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999)). Therefore, Kohler must satisfy that heightened standard to show anticipation or obviousness,

whereas Generac need only establish infringement by a preponderance of the evidence. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001) (citing *WMS Gaming, Inc.*, 184 F.3d at 1346).

### 2.2.2    Anticipation of the '821 Patent by Prior Art

Kohler (and TES, by extension, though for the purpose of this Order, the Court will refer to all joint arguments as emanating from Kohler) assert that the patents or products of several other entities (and even some of Generac's own) anticipated Generac's '821 patent, thus making the '821 invalid. Specifically, Kohler points to patents or products that it alleges anticipate the '821 patent: (1) U.S. Patent No. 5,734,255 (the Thompson patent); (2) U.S. Patent No. 5,323,328 (the Tanaka patent); (3) the Generator Power Control and *en*telligent software allegedly marketed by Encorp; (4) the PowerCommand system allegedly marketed by Cummins-Onan as early as 1996; and (5) the Utility 50 product allegedly marketed by Generac, itself, as early as June of 2000. (*See* Kohler Br. in Supp. at 3–7).

Under 35 U.S.C. § 102, a patent claim is invalid if, after having been properly construed, it is determined that a single prior art reference (such as a previously-existing patent, printed publication, or invention in public use or on sale) discloses every element that the Court determined to be a part of the patent claim in question. *See, e.g.*, 35 U.S.C. §§ 102(a), (b); *Nystrom v. TREX Co.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005); *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002); *Adv. Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000); *Beachcombers v. Wildewood Creative Products, Inc.*, 31 F.3d 1154, 1160 (Fed. Cir. 1994); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1379 (Fed. Cir. 1986); *see also Nordberg Inc. v. Telsmith, Inc.*, 881 F. Supp. 1252, 1282 (E.D. Wis. 1995), *aff'd*

*sub nom. Nordberg, Inc. v. Telsmith, Inc.,* 82 F.3d 394 (Fed. Cir. 1996). However, a prior art reference need not explicitly set forth every requirement of a claim; rather, "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing feature is necessarily present, or inherent, in the single anticipating reference." *SmithKline Beecham Corp. v. Apotex Corp.,* 403 F.3d 1331, 1343 (Fed. Cir. 2005) (quoting *Schering Corp. v. Geneva Pharms., Inc.,* 339 F.3d 1373, 1377 (Fed. Cir. 2003); citing *Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264, 1268 (Fed. Cir. 1991), *Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744, 747 (Fed. Cir. 1987)); *see also Perricone v. Medicis Pharm. Corp.,* 432 F.3d 1368, 1376 (Fed. Cir. 2005) (quoting *In re Cruciferous Sprout Litigation,* 301 F.3d 1343, 1349 (Fed. Cir. 2002), for the proposition that "[u]nder the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claims limitations, it anticipates."). Whether prior art anticipates the patent claim in question is a question of fact that must be proved by the heightened standard of clear and convincing evidence, though the Court may decide it on summary judgment in the absence of a genuine dispute of material fact. *TriMed v. Stryker Corp.,* 608 F.3d 1333, 1343 (Fed. Cir. 2010); *SmithKline Beecham Corp. v. Apotex Corp.,* 403 F.3d 1331, 1343 (Fed. Cir. 2005); *Minn. Mining & Mfg. Co. v. Chemque, Inc.,* 303 F.3d 1294, 1301 (Fed. Cir. 2002). The burden to establish anticipation is "'especially difficult'" where, as with certain of the alleged prior art here, the alleged "infringer attempts to rely on prior art that was before the patent examiner during prosecution." *Glaxo Group Ltd. v. Apotex, Inc.,* 376 F.3d 1339, 1348 (Fed. Cir. 2004) (citing *Al-Site Corp. v. VSI Int'l Inc.,* 174 F.3d 1308, 1323 (Fed. Cir. 1999)).

With that legal backdrop in mind, the Court now turns to examine each of the instances of alleged prior art.

### 2.2.2.1  Thompson

The Thompson patent was issued on March 31, 1998, and covers a "Control System and Circuits for Distributed Electrical Power Generating Stations." (U.S. Patent No. 5,734,255).

At the outset, the Court notes that, because the Thompson patent was before the PTO examiners that issued the '821 patent, Kohler has an extremely tough row to hoe to establish that Thompson anticipates the '821 patent. *Glaxo Group Ltd.*, 376 F.3d at 1348 (citing *Al-Site Corp.*, 174 F.3d at 1323). Nonetheless, the Court will examine each process element of Claim 19 and Claim 23 to determine whether they are anticipated by Thompson.

The second process elements of Claim 19 and Claim 23 requires the existence of a user interface that enables the selection of a generator set and the setting of its operating parameters.

Thompson does not disclose this element. It does provide a user interface (69), partially disclosing the first requirement. (U.S. Patent No. 5,734,255, Fig. 3 (at Sheet 3); Aguirrechea, Office Action Summary, Aug. 12, 2002 (Docket #43, Ex. 2, at 116–120), at 2). However, that user interface is purely for "displaying performance parameters." (U.S. Patent No. 5,734,255, at 7:65–7:67). Kohler argues that the "user interface does not magically disappear when the display functions as a controller" (Kohler Reply at 7, n. 8), but the Thompson patent does not call for the display to function as a controller. (*See* U.S. Patent No. 5,734,255, at 7:55–7:67). Rather, the display is merely a "preferably"-included *part* of a controller; the display is connected to the controller "for displaying performance parameters of the generator

with which it is associated." The examiners must have concluded that the user interface did not allow for selection and control, given their conclusion that "the prior art…fails to teach, disclose or suggest…a user interface for allowing a user to select each of the plurality of generator sets and to set values for various predetermined operating parameters." (Aguirrechea, Notice of Allowability, May 1, 2003 (Docket #49, Ex. 44, at 705–07), at 2). Kohler has not established the ample support necessary to establish such user interface by the required clear and convincing evidence—let alone to overcome the "especially difficult" task of convincing the Court that Thompson anticipates, despite the PTO examiners' decision that it did not. *See, e.g., TriMed*, 608 F.3d at 1343; *SmithKline Beecham Corp.*, 403 F.3d at 1343; *Minn. Mining & Mfg. Co.*, 303 F.3d at 1301; *Glaxo Group Ltd.,*376 F.3d at 1348 (citing *Al-Site Corp.*, 174 F.3d at 1323). Thus, the Court cannot conclude that the Thompson display/user interface allows for the selection of a generator set and setting of that generator set's operating parameters, as contemplated by the second process element of Claim 19 and Claim 23.

Accordingly, the Court is obliged to deny Kohler's motion for summary judgment that Thompson anticipates the '821 patent.

### 2.2.2.2  Tanaka

The Tanaka patent, issued on June 21, 1994, contemplates a "system for controlling power generating plant having a plurality of units in accordance with distributed computer system." (U.S. Patent No. 5,323,328 (Docket #43, Ex. 4)).

Tanaka also fails to anticipate the '821 patent. As discussed in the Court's claim construction above, the first process elements of both Claim 19 and Claim 23 require a generator set that includes a generator, an

Page 25 of 44

engine, a controller, and a communications link. Tanaka's generator sets do not include each of those items; rather, as Generac points out, they do not include a communications link and their controllers are external to the generation plant. (U.S. Patent No. 5,323,328, Fig. 3 (at Sheet 3)).

Moreover, the first process elements of both Claim 19 and Claim 23 require that the generator sets be connected to a load, or a device that consumes electricity for its operation—whereas the generator sets in Tanaka are not connected to a load. Rather, Tanaka's generators are connected to a transmission line that transmits power out of the generation plant, that transmission line not consuming electricity for its operation. (U.S. Patent No. 5,323,328, Fig. 3 (Connection point 114 is a utility line)).

Thus, the Court must deny Kohler's motion for summary judgment that Tanaka anticipates the '821 patent.

### 2.2.2.3   Encorp

It is Kohler's burden to establish anticipation by clear and convincing evidence. *See, e.g.*, *Procter and Gamble Co.*, 566 F.3d at 993–94 (citing *AK Steel Corp. v. Sollac & Ugine*, 195 F.3d at 1326); *Helifix Ltd.*, 208 F.3d at 1346 (citing 35 U.S.C. § 282; *WMS Gaming Inc.*, 184 F.3d 1339). Thus, if Kohler wishes to establish anticipation through the existence of a device offered for sale, it must establish some evidence of that device's actual existence. *See, e.g.*, *Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1298–99 (Fed. Cir. 2010); *Oney v. Ratliff*, 182 F.3d 893, 896 (Fed. Cir. 1999).

Kohler wishes to show that Encorp either described a product in a publication or sold a product more than one year before the date of Generac's patent application that would anticipate the '821 patent under 35 U.S.C. § 102(b). To do so, Kohler must establish that a "single reference [or] device"

anticipates the '821 patent. *Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc.,* 726 F.2d 724, 727 (Fed. Cir. 1984). In other words, Kohler must show the existence of a single product or single document that clearly anticipates the '821 patent. *Id.*

Kohler has not established the existence of any Encorp product that would anticipate the '821 patent.[4] Despite extensive references to the involvement of their expert, Mr. Whitham, in the design, creation and/or supervision of Encorp products, Kohler does not establish that any such products *actually* exist. Therefore, it has not established by clear and convincing evidence any sort of anticipatory product.

Kohler has produced only two documents that could possibly establish anticipation of the '821 patent in a single reference: a line diagram illustrating a multi-generator Encorp system (Whitham Decl. (Docket #49, Ex.

---

[4]Kohler cites two cases in support of its contention that the Court should look to more than one piece of evidence to determine whether a claimed invention anticipates the '821 patent: *Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1373 (Fed. Cir. 1998) and *IP Innovation LLC, et al. v. Red Hat, Inc., et al.,* No. 2:07-cv-447 (RRR), (E.D. Tex. Oct. 13, 2010). But, *Woodland Trust* seems to establish only that a court can use written documents to corroborate oral testimony—*not* that it *should* gather multiple pieces of evidence together to establish anticipation. 148 Fed 1368, 1372–73. And, while *IP Innovation* did hold that there was "no error in using multiple references to describe a single prior art system for the purpose of showing anticipation," that point of law was applied where there was a single device. No. 2:07-cv-447, at 9 ("Dr. Wilson used a single device, the Chan system, to show anticipation."). Here, there seems to have been multiple devices, or a "suite of products," including the Generator Power Control and *en*telligent software, all of which Encorp may have hypothesized could be used together (as in the line diagram described elsewhere in this section, but of which there is no evidence that it was actually combined and created as a product. Therefore, the Court is unable to conclude that *IP Innovation* applies to the Encorp products as urged by Kohler. *Id.*

5), Fig. 1 (at 12)) and a presentation given to the Arizona Corporation Commission (Docket #47).

Each of those references, however, fails in some way to establish anticipation of the '821 patent. The line diagram is not extremely detailed, though it certainly does seem to exhibit generator sets connected to both a load and a network (CPM). (Whitham Decl., Fig. 1 (at 12)). However, there is no evidence that a user interface exists as part of the system—though the generator sets are connected to an item labeled *en*power, it is unclear from the document what *en*power is. Moreover, whether those items would allow for starting and stopping of the generators, selection of the generator sets, or setting of operating parameters—as required to anticipate the '821 patent—is unclear from the diagram. Therefore, the Court is left to conclude that Kohler has failed to establish by clear and convincing evidence that the line diagram anticipates the '821 patent.

The presentation, meanwhile, presents a much closer call. It is unclear from the presentation whether there is a user interface that allows selection of a generator set and input of operation parameters, as required by the first process elements of Claim 19 and Claim 23. Nonetheless, Mr. Whitham opined that the presentation establishes each of those items. (Whitham Decl. 25–30). The Court determines that, as to this point, there exists a material issue of fact.

Accordingly, the Court is obliged to deny both Kohler's and Generac's motion for summary judgment as to Encorp anticipation of the '821 patent.

#### 2.2.2.4   Cummins-Onan

Kohler next argues that the Cummins-Onan PowerCommand system anticipates the '821 patent. Indeed, the PowerCommand system was offered

for sale prior to June 15, 2000. (*See, e.g.*, KPFF ¶ 95 (citing Gillette Dep. (Docket #65, Ex. 89), at 349:7–19); Generac Resp. to KPFF ¶ 95 (citing Gillette Dep., at 326:10–25, but failing to dispute that PowerCommand systems were offered for sale prior to June 15, 2000)). It may therefore anticipate the '821 patent. 35 U.S.C. § 102(b).

Examining the PowerCommand documents submitted by Kohler in support of its motion for summary judgment suggesting that the PowerCommand system anticipates the '821 patent,[5] the Court must conclude that the PowerCommand system anticipates Claim 19 of the '821 patent, but that it is unclear whether the PowerCommand system anticipates Claim 23.

### 2.2.2.4.1   Claim 19

The PowerCommand system establishes all of the requirements in Claim 19. As discussed in the Court's claim construction above, Claim 19 has three separate process elements. The first of those has several separate requirements:

(1)    the interconnection of more than one

(2)    generator sets (including an engine, a generator control, and a communications link)

(3)    to a load (a device that consumes electrical power for its operation) and

---

[5]The Court finds, here, that it is proper to examine all of the documents suggested by Kohler in determining whether the PowerCommand system anticipates. Unlike the alleged Encorp system above, the PowerCommand system appears to have been an actual product with intended paralleled use. Therefore, as the *IP Innovations* court suggested was appropriate, there would be "no error in using multiple references to describe a single prior art system for the purpose of showing anticipation." 2:07-cv-447 (RRR), at 9 (E.D. Tex. Oct. 13, 2010).

(4)    to a network (a communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators)

(5)    with each generator set having the ability to be started and stopped.

The second process element also has multiple separate requirements, specifically:

(1)    selection, through a user interface, of each generator set, and

(2)    "setting various predetermined operating parameters" (parameters that when varied change the operation of the system) "for each selected generator set."

Finally, the third process element has only one requirement: transmission of the operating parameters over a network to the selected generator sets.

The PowerCommand system meets each of these requirements. To begin, in satisfaction of the '821 patent's stated method, the PowerCommand system offers a method of managing the distribution of electrical power. The PowerCommand brochure makes clear that the system offers great control over the function of a generator set or sets. (*See* "PowerCommand Paralleling Generator Set Control" Bulleting S-1005 (Docket #44, Ex. F), at 1). Next, in satisfaction of the first element of Claim 19, the PowerCommand system contemplates:

(1)    the interconnection of more than one ("Real load sharing controls allow generator sets to share load")

(2)    generator sets, including an engine, a control, and a communications link (the following are all included in a single PowerCommand unit:

Page 30 of 44

"displays status of all critical engine…functions," implying the existence of an engine; "The control system," "Smart Starting Control System"; and "optional communications over the Onan PowerCommand Communications Network," implying the existence of a communications link)

(3)    to a load ("Real load sharing controls allow generator sets to share load") and

(4)    to a network ("The PowerCommand Control includes provisions for optional communications over the Onan PowerCommand Communications Network"; "from a remote location via modem, PC and PowerCommand Network Software")

(5)    with each generator set being capable of starting and stopping ("three position switch that starts and stops the generator set locally or enables start/stop control from a remote location.").

("PowerCommand Paralleling Generator Set Control" 1/96 Bulletin S-1005, at 1–6). As to the second and third elements of Claim 19, the PowerCommand system calls for the selection of generator sets through a user interface and the setting of various predetermined operating parameters, which may then be submitted over a network. ("PowerCommand Paralleling Generator Set Control" 1/96 Bulletin S-1005, at 4 (adjustment menu allows setting of operating parameters); 6 ("network is suitable for local or remote control and monitoring functions"); Onan PowerCommand Digital Paralleling" Bulletin F-1122 7/95, at 4 ("The Powercommand's integrated platform enables monitoring and control of all paralleling system components from a remote location via modem, PC and PowerCommand Network Software" (implying user interface for control)).

Page 31 of 44

With the benefit of the evidence discussed above, the Court is satisfied that Kohler has established by clear and convincing evidence that the PowerCommand system anticipates Claim 19 of the '821 patent. Therefore, the Court is obliged to grant Kohler's motion for summary judgment on that issue, and simultaneously to deny Generac's motion for summary judgment as to non-anticipation.

### 2.2.2.4.2   Claim 23

While the Court has concluded that the evidence clearly shows anticipation of Claim 19, the evidence of record is unclear as to whether all of the Claim 23 requirements are fully satisfied.

The first three process elements of Claim 23 are practically coextensive with those of Claim 19, with the exception that Claim 23 also covers a single generator set. Despite that minor difference, the Court may still conclude that each of the first three process elements of Claim 23 are anticipated by the PowerCommand system, just as the three process elements of Claim 19 were anticipated.

Claim 23 adds an additional two process elements, though, of which the Court finds that there is not ample evidence to find anticipation. Those two additional elements require the starting and stopping of a generator set at a predetermined time *or event*. The PowerCommand system contemplates the starting and stopping of generators at a predetermined time ("PowerCommand Paralleling Generator Set Control" 1/96 Bulletin S-1005, at 4 (adjustment menu allows setting of time-delayed start and stop)), but does not include any information on the ability to start and/or stop the generators at pre-specified events, such as the loss of utility power.

Accordingly, the Court must deny Kohler's motion for summary judgment of anticipation of Claim 23 by the PowerCommand system. In truth, Kohler has not even presented an issue of material fact on this question—they have not proposed any facts that would establish a PowerCommand ability to start and/or stop generators at a pre-specified event. (KPFF ¶ 107).

Therefore, on this issue, the Court is obliged to grant Generac's motion for summary judgment that PowerCommand does not anticipate Claim 23 of the '821 patent.

### 2.2.2.5   Generac

As to anticipation, Kohler's final argument is that Generac's own Utility 50 product anticipates the '821 patent. It does not.

### 2.2.2.5.1   Claim 19

The Utility 50 product, as existed prior to June 15, 2000 (which is cutoff relevant for 35 U.S.C. § 102(b) anticipation), was a single-generator-set system without the ability to expand to include additional generator sets, and it therefore cannot be deemed to anticipate Claim 19, as Claim 19 requires the interconnection of more than one generator set. (GPFF ¶ 109; De La Ree Decl. (Docket #49, Ex. 2), at 15). Kohler has not provided any evidence to dispute that fact and, therefore, the Court must deem it as not viably in dispute.

Therefore, the Court is obliged to conclude that the Utility 50 product does not anticipate Claim 19, and to grant Generac's motion for summary judgment that Utility 50 does not anticipate Claim 19. However, that grant of judgment is ultimately moot, as the Court has already determined that Cummins-Onan's PowerCommand system anticipates Claim 19.

#### 2.2.2.5.2    Claim 23

Above, the Court concluded that the first process element of Claim 23 allowed for the interconnection of one or more generators to a load and to a network. Thus, there is nothing that clearly distinguishes the Utility 50 product from Claim 23. Generac's proposed facts do not establish that the Utility 50 product would not allow a single generator system to meet the entirety of process elements in Claim 23, as the Court construed them.

Accordingly, there is a question of material fact on this issue, and Generac's motion for summary judgment that Utility 50 does not anticipate Claim 23 must be denied.

### 2.2.3    Obviousness of '821 Patent

Having already determined that the Cummins-Onan PowerCommand system anticipates Claim 19, the Court need not engage in an analysis to determine whether Claim 19 is void for obviousness. *See In re Baxter Travenol Labs.*, 952 F.2d at 391 (citing *In re Fracalossi*, 681 F.2d 792, 794 (CCPA 1982)) ("anticipation is the ultimate of obviousness"). *See also In re Pearson*, 494 F.2d 1399, 1402 (C.C.P.A. 1974); *In re Kalm*, 378 F.2d 959, 962 (C.C.P.A. 1967) (lack of novelty in the claimed subject matter, such as evidence of disclosure in the prior art, is the "ultimate or epitome of obviousness").

However, having decided that none of the referenced prior art anticipates Claim 23, the Court must analyze whether it is obvious, in order to determine whether to grant Generac's motion for summary judgment of nonobviousness.

As with anticipation, defendants must establish invalidity as a result of obviousness by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, — U.S. —, 131 S. Ct.2238, 2242 (2011 (citing 35 U.S.C. § 282); *Alcon*

*Research, Ltd. v. Apotex, Inc.*, 687 F.3d 1362, 1366 (Fed. Cir. 2012). To establish obviousness, under 35 U.S.C. § 103, Kohler must show that the differences between the prior art and Claim 23 "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1374; *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012). This is a determination of law that is based on underlying determinations of fact, including "the scope and content of the prior art, the level of ordinary skill in the art, the differences between the claimed invention and the prior art, and secondary considerations of nonobviousness" (such as commercial success, long felt but unsolved needs, failure of others, etc.). *Star Scientific, Inc.*, 655 F.3d at 1374 (citing *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l*, 618 F.3d 1294, 1300 (Fed. Cir. 2010); *KSR Int' Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007)); *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). The Court must examine each of those four factors prior to reaching a conclusion on obviousness, and must do so "without any hint of hindsight." *Star Scientific, Inc.*, 655 F.3d at 1375 (citing *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998); *Kinetic Concepts, Inc.*, 688 F.3d at 1360 (citing *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1375 (Fed. Cir. 2012); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1076–77 (Fed. Cir. 2012)).

Generac argues that expert evidence is a practical requirement to succeed in establishing nonobviousness. (Generac Br. in Supp., at 20 (citing *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004); *Mike's Train House, Inc. v. Broadway Ltd., Imps., LLC*, 708 F. Supp. 2d 527, 551 (D. Md.

2010))). But Generac's primary cited case, *Centricut, LLC*, does not deal with obviousness—rather, the Federal Circuit discussed the necessity of expert testimony to prove infringement, and further limited its analysis to the specific case before it. 390 F.3d at 1370. In fact, the *Centricut* court specifically noted that "[w]e do not state a per se rule that expert testimony is required to prove infringement when the art is complex." *Id.* Thus, in reality, *Centricut* has no bearing on the obviousness issue at hand. *Id.* Rather, as recited above, the Court must examine the evidence to determine whether there is evidence that could establish the obviousness of Claim 23.

The real question the Court must answer is whether Kohler, "as the party with the ultimate burden of proof on obviousness," presented evidence that could "demonstrate why it would have been obvious to combine the" prior art. *Mytee Products, Inc. v. Harris Research, Inc.*, 439 Fed. Appx. 882, 886 (Fed. Cir. 2011).[6] In *Mytee Products, Inc.*, the court held that a grant of summary judgment of nonobviousness was appropriate because the defendant's obviousness arguments were "nothing more than 'conclusory assertions, gross generalities, and unsupported assumptions made by counsel,'" and "failed to provide any reason why a person of ordinary skill would have been motivated to combine the references." *Id.*

---

[6] The Court notes, parenthetically, that Generac has cited both *Centricut, LLC*, and *Mytee Products, Inc.*, but failed to inform the Court that *Mytee Products, Inc.* specifically says that in an obviousness inquiry, the defendant was "not…necessarily required to submit expert testimony." (*Mytee Products, Inc.*, 439 Fed. Appx. at 886 (citing *Centricut, LLC*, 390 F.3d at 1369)). The Court views that omission as all but misleading: (1) Generac cited *Centricut, LLC*, for a point of law on obviousness when the case, in fact, dealt with infringement; and (2) failed to inform the Court that another cited source of law specifically counters their argument that *Centricut, LLC*, calls for submission of expert testimony in obviousness defenses.

Here, as opposed to in *Mytee Products, Inc.*, Kohler has provided ample expert testimony—even if that testimony might never reach a precise statement on obviousness. (*See generally* Whitham Decl.). Their expert witness, Christopher Whitham, provided testimony that a factfinder could determine may satisfy the four anticipation factors:

(1)  he specifically (and extensively) discussed the state of prior art (Whitham Decl., at 7–33);

(2)  he stated that a person of ordinary skill in the art for the technology of the '821 patent would have "at least a Bachelor of Science in Electrical Engineering or a closely related field and at least one to two years of experience working in the field," (GPFF ¶ 82);

(3)  he discussed differences between the claimed invention and the prior art (Whitham Decl., at 7–33); and

(4)  he set forth evidence of the secondary considerations of nonobviousness, such as commercial success, long felt but unresolved needs, failure of others, etc. (Whitham Decl., at 6–7, 32–33; Whitham Dep. (Docket #49, Ex. 29), at 63:11–14) and there is other evidence that shows that the '821 patent's inventor might have viewed his patent as obvious (Wedel Dep. (Docket #74, Ex. 8), at 251:2–5).

In light of this evidence, the Court agrees with Kohler that a reasonable trier of fact—namely, a jury in this case—may ultimately decide that the four above facts are present. Accordingly, summary judgment of nonobviousness is inappropriate at this juncture.

Therefore, the Court is obliged to deny Generac's motion for summary judgment of nonobviousness of Claim 23 of the '821 patent.

### 2.2.4   Infringement of '821 Patent

There is one final portion of the Court's analysis: infringement. This portion, itself, also has multiple sub-parts. To begin, Generac seeks entry of summary judgment on the issue of infringement, as to both Kohler and TES. (Generac Br. in Supp. 11–19). Therefore, the Court must analyze whether it should enter summary judgment against either of those parties, holding that they infringed upon Claim 23 of the '821 patent.[7] Furthermore, Kohler seeks entry of summary judgment holding that, even if it did infringe upon Claim 19, such infringement was not willful. (Kohler Br. in Supp. 26–29).

### 2.2.4.1   Infringement Analysis

Infringement may be either direct or indirect. *See, e.g.* 35 U.S.C. § 271. To establish direct infringement, Generac must show that Kohler and/or TES actually practiced every step of Claim 23, or that another individual practiced every step thereof as the agent of or under the direct control of Kohler and/or TES. *See, e.g., Akamai Tech., Inc. v. Limelight Networks, Inc.,* 692 F.3d 1301, 1322–23 (Fed. Cir. 2012); *Linear Tech. Corp. v. ITC,* 566 F.3d 1049, 1060 (Fed. Cir. 2009); *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1311 (Fed. Cir. 2006); *Moba, B.V. v. Diamond Automation, Inc.,* 325 F.3d 1306, 1313 (Fed. Cir. 2003); *Joy Techs., Inc. v. Flakt, Inc.,* 6 F.3d 770, 773 (Fed. Cir. 1993); *Mowry v. Whitney,*

---

[7]The Court having already determined that Claim 19 is invalid due to anticipation and obviousness, Kohler and TES could not have infringed upon that Claim and, therefore, the Court need not engage in an infringement analysis on Claim 19.

81 U.S. 620, 652 (1871). Induced infringement, on the other hand,[8] requires that Generac show that the defendant knowingly "cause[d], urge[d], encourage[d], or aid[ed]" another party to directly infringe upon Claim 23, with "specific intent to encourage" that infringement. *Akamai Tech., Inc.*, 692 F.3d at 1308 (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir.) (*en banc*); *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1379 n.13 (Fed. Cir. 2011)) (also citing *Global-Tech Appliances v. SEB S.A.*, — U.S. —, 131 S.Ct. 2060, 2068 (2011); *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 526 (1972); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961); *Henry v. A.B. Dick Co.*, 224 U.S. 1, 12 (1912); *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001); *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1196 (Fed. Cir. 1996)).

### 2.2.4.1.1   Infringement by Kohler

There is insufficient evidence at this juncture to find that Kohler, in fact, directly infringed upon Claim 23 of the '821 patent. As stated above, proof of direct infringement necessarily requires evidence that Kohler actually carried out each of the steps of Claim 23. Here, however, there is evidence that Kohler may not have ever actually performed all of Claim 23's steps. For instance, there is testimony that Kohler has not ever interconnected generators (Stiles Dep. (Docket #74, Ex. 6), at 303:25–304:11) or that the DPS system may not have been used to transmit parameters over a network (Stiles Dep. 438:17–20; 472:13–20). Kohler does not contest that the DPS

---

[8]Contrary to Kohler's contentions, the Court finds that Generac has pled induced infringement. Generac pled infringement (against Kohler, alone) under 35 U.S.C. § 271, which, of course, includes 35 U.S.C. § 271(b)—the inducement subsection. (Compl. ¶ 19; *see also* Compl. ¶ 18 (alleging only the use, sale or offer to sell against Defendant TES)).

system is capable of performing every step of Claim 23, but disputes whether it has ever actually performed every step. (*See generally* Kohler Resp. to GPFF ¶¶ 59–81). Indeed, at this juncture, the Court agrees with Kohler that there are issues of material fact as to whether Kohler has ever performed every listed step of Claim 23. Therefore, summary judgment of direct infringement by Kohler is inappropriate.

Similarly, summary judgment finding indirect infringement would also be inappropriate. Generac has failed to point the Court to any fact that would establish that any other party has directly infringed upon Claim 23 at Kohler's behest. Accordingly, there are material issues of fact that must be resolved in order to determine whether Kohler induced another's infringement. Therefore, summary judgment of indirect infringement by Kohler is inappropriate.

For these reasons, the Court is obliged to deny Generac's motion for summary judgment of Kohler's infringement.

### 2.2.4.1.2   Infringement by TES

Just as it failed to do in regards to Kohler, Generac has failed to establish facts that TES has directly infringed upon Claim 23 of the '821 patent. As discussed above, there are disputes of fact as to whether TES ever actually performed every step of Claim 23. (*See, e.g.*, Stiles Dep., at 303:25–304:11, 438:17–20, 472:13–20).

As such, summary judgment of infringement by TES is inappropriate at this juncture, and the Court is accordingly obliged to deny Generac's motion for summary judgment on that matter.

### 2.2.4.2  Willfulness

The final prong of the Court's analysis is to determine whether Kohler is entitled to summary judgment that, in the case that it did infringe upon Generac's patent, such infringement was not willful.[9]

To establish willful infringement, Generac must show by clear and convincing evidence that Kohler acted in an objectively reckless manner and also, subjectively, that Kohler knew or should have known that its actions risked infringing upon the '821 patent. *In re Seagate Technology, LLC*, 447 F.3d 1360, 1371 (Fed. Cir. 2007) (*en banc*). In other words, if Generac has failed to produce evidence that would establish either of those prongs, then Kohler is entitled to summary judgment of nonwillfulness.

As to the first prong, objective recklessness, the inquiry turns upon "whether, given the facts and circumstances prior to [Kohler's allegedly] infringing actions, a reasonable person would have appreciated a high likelihood that acting would infringe a valid patent." *i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 582 (E.D. Tex. 2009), *aff'd*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010).

The Court finds that, given the prior art of record in existence at the time of Kohler's allegedly infringing actions, Kohler's position was not objectively reckless. As discussed above in its anticipation analysis, the Court found that Claim 19 is actually anticipated by the Cummins-Onan PowerCommand system, and that questions of fact exist as to whether Claim 23 is anticipated by the same. Moreover, the other prior art of record contains

---

[9]The Court notes, parenthetically, that willfulness is a statutory requirement for punitive damages. *In re Seagate Technology, LLC*, 497 F.3d 1360, 1370 (Fed. Cir. 2007) (citing *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007)).

many commonalities with Kohler's allegedly-infringing DPS system. Objectively, the Court concludes that a reasonable person would have concluded that the '821 patent may have been invalid as anticipated. Certainly, Generac has failed to establish by clear and convincing evidence that Kohler's position was objectively unreasonable.

Accordingly, the Court is obliged to grant Kohler's motion for summary judgment that its action was not willful.

**3.    Conclusion**

Having concluded its analysis, the Court now summarizes its holdings. Summary judgment is appropriate as to the following matters:

- The Court is obliged to grant Kohler's motion for summary judgment insofar as relates to judgment that the Cummins-Onan PowerCommand system anticipates Claim 19; and

- The Court is obliged to grant Generac's motion for summary judgment insofar as relates to judgment that the Cummins-Onan PowerCommand system does not anticipate Claim 23; and

- The Court is obliged to grant Kohler's motion for summary judgment insofar as relates to judgment that Kohler did not willfully infringe upon Generac's patents.

Furthermore, all of the Claim 19 issues (including any arguments related to anticipation, obviousness, or infringement) are now moot, as a result of the Court's finding that Cummins-Onan anticipates Claim 19.

Summary judgment is inappropriate as to the remaining issues. Accordingly the following issues of fact are "live issues" for jury trial:

- Whether the Thompson patent anticipates Claim 23 of the '821 patent;

- Whether the Tanaka patent anticipates Claim 23 of the '821 patent;

- Whether the Encorp system anticipates Claim 23 of the '821 patent;

- Whether Generac's own Utility 50 device anticipates Claim 23 of the '821 patent;

- Whether Claim 23 is void for obviousness; and

- Whether Kohler did, in fact, infringe upon Claim 23 of the '821 patent.

Finally, as a housekeeping matter, the Court notes that it did not rely on the disputed supplemental declaration of John Ronza, and accordingly will deny Generac's motion to strike that declaration (Docket #98) as moot. Furthermore, the Court will not take action at this time on Kohler's motion to continue the trial date. (Docket #99). Rather, the Court will schedule a status conference with the parties to discuss that motion and this matter's trial posture. That conference will be held on Wednesday, November 28, 2012, at 8:30 A.M., and the parties may appear by phone if necessary (in such case, the parties are directed to provide the Court with a direct telephone number for all counsel that wish to participate in the conference).

Having fully addressed the parties' cross-motions for summary judgment, the Court now enters the following order.

Accordingly,

**IT IS ORDERED** that Kohler's Motion for Summary Judgment (Docket #40) be and the same is hereby **GRANTED in part and DENIED in part**, as more fully discussed above;

**IT IS FURTHER ORDERED** that Generac's Motion for Summary Judgment (Docket #48) be and the same is hereby **GRANTED in part and DENIED in part**, as more fully discussed above;

**IT IS FURTHER ORDERED** that Generac's Motion to Strike the Supplemental Declaration of John Ronza (Docket #98) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that Kohler's Motion to Continue the Trial Date and Related Pretrial Deadlines (Docket #99) be and the same is hereby **HELD IN ABEYANCE**, pending appearance of the parties at a status conference to be held on **Wednesday, November 28, 2012, at 8:30 A.M.**

Dated at Milwaukee, Wisconsin, this 29th day of November, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

# Addendum 3

December 5, 2012 Order,
*Generac Power Systems, Inc. v.*
*Kohler Company and Total Energy Systems, LLC*,
Case No. 2:11-cv-01120-JPS (E.D. Wis.)

A89-A96

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GENERAC POWER SYSTEMS, INC.,

                                Plaintiff,

v.                                                          Case No. 11-CV-1120-JPS

KOHLER COMPANY and
TOTAL ENERGY SYSTEMS, LLC,

                                Defendants.                 **ORDER**

Defendant Kohler Company ("Kohler") filed a motion to clarify the Court's November 28, 2012 Order. (Kohler Mtn. Clarify (Docket #106)). In that motion, Kohler requested that the Court reconsider its ruling on the anticipation of Claim 23 of the '821 patent. The Court previously found that the Cummins-Onan PowerCommand system does not anticipate Claim 23, due to the PowerCommand's lack of ability to start and stop at a predetermined event. (Summary Judgment Order (Docket #104) at 32–33). Accordingly, the Court granted plaintiff Generac Power Systems, Inc. ("Generac"), summary judgment on that issue, holding that the PowerCommand system definitively does not anticipate Claim 23. (Summary Judgment Order at 43–44).

In its Motion to Clarify, Kohler argues that the Court's claim construction required the ability to start and stop "at a specified time *or event*." (Kohler Mtn. Clarify at 1 (citing Court's Summary Judgment Order at 18, 19, 32) (emphasis in original)). Kohler places specific emphasis on the disjunctive nature of the construction, arguing that the "*or*" means that the

Page 1 of 8

fourth and fifth process elements are met if the PowerCommand system has the ability to start and stop at *either* a specified time *or* at a specified event. (Kohler Mtn. Clarify at 1–2). Kohler further argues that, even if the Court's construction were to be phrased in the conjunctive, the PowerCommand system is able to shut down upon specified events, such as the loss of utility power. (Kohler Mtn. Clarify at 2–3). Accordingly, Kohler seeks that this Court hold that Claim 23 is anticipated and invalid, such that the remainder of this case should be dismissed.

At the Court's behest, Generac filed a response, which simultaneously responded to Kohler's Claim 23 arguments and raised new issues relating to both Claim 19 and Claim 23. (Generac Resp. (Docket #128)). In addressing Kohler's Claim 23 arguments, Generac posits that the PowerCommand system does not allow for the setting of a "specified time," because it only allows for a time delay adjustment. (Generac Resp. 4–5). Generac also argues that the Court should deem process elements four and five of Claim 23 to be conjunctive, such that Claim 23 is not anticipated because the PowerCommand system does not contemplate starting and stopping at a predetermined event. (Generac Resp. 4–5). In addition to that limited response, Generac also urges the Court to overturn its Claim 19 anticipation ruling and determine that the PowerCommand system does not anticipate either Claim 19 or Claim 23. (Generac Resp. 1–3). Generac bases its argument—which, the Court notes parenthetically, is essentially a motion for reconsideration—on late-produced documents, which Generac argues establish that the PowerCommand system is incapable of setting predetermined operating parameters. (Generac Resp. 1–3).

Kohler filed its reply, maintaining its previously-asserted arguments and further arguing that Generac's newly-minted reconsideration arguments should be ignored. (Kohler Reply (Docket #144) at 1–3).

To insure clarity, the Court will address each of these arguments separately, beginning with Generac's Claim 19 arguments and then moving on to both parties' Claim 23 arguments.

1.    **CLAIM 19**

The Court may reconsider a prior ruling when new evidence has become available. *See, e.g.*, *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995); *Executive Center III, LLC v. Meieran*, 823 F. Supp. 2d 883, 897 (E.D. Wis. 2011). Here, there is new evidence available, in the form of a late-produced PowerCommand Network Manual, and accordingly reconsideration is appropriate.[1]

However, even with the benefit of new information, the Court still finds that the PowerCommand system anticipates Claim 19.

The Court previously determined that predetermined operating parameters are "[p]arameters that when varied change the operation of the system." (*See, e.g.*, Summary Judgment Order at 13–14). That definition does not include a separate explanation of the term "predetermined," as it perhaps would have if the parties had raised this issue at the time. Predetermined, of course, means "determined in advance." Oxford English Dictionary, Online (September 2012). This, itself, raises the additional question of what time the parameters must be determined in advance of. The patent itself does

---

[1] The Court understands and sympathizes with Kohler that it was not given an adequate chance to respond to what is essentially a motion for reconsideration. However, given that the Court ultimately sides with Kohler on this issue, the Court does not believe that such an opportunity is necessary.

not include any indication as to what, exactly, those parameters must be determined in advance of. In the absence of such indication, the only logical time for predetermination cutoff is prior to the implementation of those parameters by transmission to the generator set, because it is at that juncture that the user can no longer determine those values. Thus, to clarify, the Court determines that predetermined operating parameters are parameters that are set prior to their transmission and when varied change the operation of the system.[2]

Generac notes that the PowerCommand system only allows for "start, stop, wake up, load demand on/off, etc.," which it argues do not constitute predetermined operating parameters. (Generac Resp. at 2–3). Contrary to Generac's argument, start and stop (let alone wake up or load demand on/off) are parameters that change the operation of the system, and are thus operating parameters.

The issue is, therefore, whether the PowerCommand system allows those parameters to be determined in advance of their transmission to a generator. Generac and its experts argue that any operating parameters must be set in real time, meaning that they cannot be predetermined. (Generac Resp. at 2 (citing 12/3/12 De La Ree Decl. (Docket #132) at ¶ 8; Kirchner Decl. (Docket #129) at ¶ 5)). Generac's experts provide little evidence to support their conclusions that the controls must be set in real time. (*See* 12/3/12 De La

---

[2]"District courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) (citing *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996)). Here, the Court's understanding of the technology—and, it seems the parties' understanding of the technology—is still evolving. Thus, it is not inappropriate for the Court to make this slight clarification.

Ree Decl. at ¶¶ 4–8 (citing Preliminary PowerCommand Network
Installation and Operation Manual (Docket #130, Ex. A) at 152248–152249;
PowerCommand Software for Windows, Brochure S-1088 (Docket #130, Ex.
B) at 0066238); Kirchner Decl. at ¶¶ 2–5 (citing Preliminary PowerCommand
Network Installation and Operation Manual at 152248–152249)). However,
even if the PowerCommand system *does* require real-time input of
parameters as Generac asserts, those parameters would still be determined
prior to transmission, making them predetermined operating parameters.
Moreover, the PowerCommand software brochure states that a user must
"confirm all commands before…they are sent to the genset," implying that
the parameters may be set prior to the real-time user confirmation and,
therefore, making them determined in advance of their transmission.
(PowerCommand Software for Windows, Brochure S-1088 at 0066238).
Accordingly, the Court is obliged to determine that, even with the newly-
disclosed evidence in hand, Claim 19 is anticipated, because the
PowerCommand system allows for setting predetermined operating
parameters.

2.    **CLAIM 23**

By extension, Generac makes the same argument as to Claim 23 that
it did for Claim 19—essentially, that the new information conclusively
establishes that the PowerCommand system does not match the second or
third process elements of Claim 23 (as related to predetermined operating
parameters), and, therefore, cannot anticipate that Claim. (Generac Resp. at
3–4). For the same reason as noted above relating to Claim 19, this argument
fails. The Court has confirmed its previous finding that the PowerCommand
system allows for the setting and transmission of predetermined operating

Page 5 of 8

parameters, in satisfaction of the second and third process elements in Claim 19, which are identical to those in Claim 23 and, therefore, those elements in Claim 23 are also satisfied.

The Court next turns to Kohler's argument that the Court should clarify its prior Order and hold that the PowerCommand system anticipates Claim 23 of the '821 patent. On this point, Kohler argues that the disjunctive "or" in the Court's construction implies that the fourth and fifth process elements of Claim 23 would be met if the PowerCommand system allowed for either starting and stopping at a specified time *or* starting and stopping at a specified event. (Kohler Mtn. Clarify at 1–2; Kohler Reply at 1–2). But that is a misunderstanding of the Court's construction. The Court's use of the disjunctive "or" connotes the ability to perform a range of stopping capabilities. In other words, to satisfy the fourth and fifth process elements of Claim 23, a system must be able to start and stop at a range of events such as the reaching of a pre-specified time or date to the loss of utility power. In reaching its claim construction, the Court relied on the Declaration of Dr. Jamie De La Ree, who urged this very range of capabilities understanding in his submission to the Court. (Summary Judgment Order at 18 (citing 9/10/12 De La Ree Decl. (Docket #49, Ex. 2) at 39–40)). Furthermore, the range of capabilities understanding is fully consistent with the Court's chosen language, under which a system allows for starting and stopping at a specified time and also allows for starting and stopping at a specified event.

Kohler further argues that the PowerCommand system is capable of engaging in the event of lost power, in satisfaction of the Court's reading of the fourth and fifth process elements. (Kohler Mtn. Clarify 2–3). The PowerCommand may be able to start and stop at the loss and re-gaining

of utility power, but that ability seems either to affect *all* of the generator sets (*see* PowerCommand Paralleling Digital Master Control Isolated Bus Applications 7/95 Bulletin PCP-002A (Docket #45, Ex. 4) at 7) or to simply provide a user with warnings or messages related to conditions (*see* PowerCommand Paralleling Generator Set Control 1/96 Bulletin S-1005 (Docket #45, Ex. 1) at 5). Neither of those abilities satisfy the fourth and fifth process elements of Claim 23, which require the ability to *actually* start and stop *selected* (implying the capability to start and stop less than all) generator sets at predetermined times and events. Thus, the Court's determination that the PowerCommand system does not anticipate Claim 23 is correct and should stand.

3.    **CONCLUSION AND SCHEDULING MATTERS**

The Court is thus obliged to deny Kohler's Motion to Clarify (Docket #106). Thus, the case stands in the same posture as noted by the Court in its Revised Summary Judgment Order (Docket #108). Both the parties and the Court have amply prepared for trial, and will, therefore, proceed to trial as previously scheduled; Kohler's Motion to Continue the Trial Date (Docket #99) will thus be denied, as well.

The Court must also deny Kohler's Motion to Bifurcate this matter into two separate trials (one regarding invalidity and one regarding infringement) (Docket # 110). Bifurcation in patent matters "is the exception, not the rule." *Real v. Bunn-O-Matic Corp.*, 195 F.R.D. 618, 620 (citing *Remcor Products Co. v. Servend Int'l Inc.*, 1994 WL 594723 (N.D. Ill. Oct. 28, 1994); *THK Am. Inc. v. NSK Co. Ltd.*, 151 F.R.D. 625 (N.D. Ill. 1993); *Kimberly-Clark Corp. v. James River Corp. of Va.*, 131 F.R.D. 607, 608 (N.D. Ga. 1989). Indeed, "'[C]ourts should not order separate trials unless such a disposition is clearly

necessary.'" *Real*, 195 F.R.D. at 620 (quoting *Laitram Corp. v. Hewlett-Packard Co.*, 791 F. Supp. 113, 114 (E.D. La. 1992)). Here, bifurcation would require the selection of two separate juries, each of which would have to be apprised of the highly technical nature of this case. Kohler has not shown that separate trials are clearly necessary, and judicial economy would best be served by trying the issues in one trial. Thus, the Court will deny Kohler's Motion to Bifurcate (Docket #110).

Accordingly,

**IT IS ORDERED** that Kohler's Motion to Clarify (Docket #106) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Kohler's Motion to Continue the Trial Date (Docket #99) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that Kohler's Motion to Bifurcate (Docket #110) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 5th day of December, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Case 2:11-cv-01120-JPS   Filed 12/05/12   Page 8 of 8   Document 147

**A96**

# Addendum 4

December 19, 2012 Judgment,
*Generac Power Systems, Inc. v.*
*Kohler Company and Total Energy Systems, LLC*,
Case No. 2:11-cv-01120-JPS (E.D. Wis.)

A97

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

GENERAC POWER SYSTEMS, INC.,

                              Plaintiff,

v.                                                          Case No. 11-CV-1120-JPS

KOHLER CO. and
TOTAL ENERGY SYSTEMS, LLC,

                              Defendant.                    **JUDGMENT**

**Decision by Court.** This action came before the Court, presided over by the Honorable J.P. Stadtmueller, for a trial by jury. The issues have been tried and on December 17, 2012, the jury returned a verdict finding that Kohler Company and Total Energy Systems, LLC, did not infringe claim 23 of Generac Power Systems' U.S. Patent No. 6,653,821, and further that claim 23 of the '821 patent is invalid as anticipated and obvious. Having found that Kohler and TES did not infringe Generac's '821 patent, the jury did not award any damages to Generac as against Kohler or TES.

        **IT IS ORDERED AND ADJUDGED** this action be and the same is hereby **DISMISSED** on the merits, together with defendants' costs as may be taxed by the Clerk of Court.

                              APPROVED:

                              _____
                              J.P. Stadtmueller
                              U.S. District Judge

                              JON W. SANFILIPPO
                              Clerk of Court

___December 17, 2012___        s/Nancy A. Monzingo
Date                           By: Deputy Clerk

# Addendum 5

March 7, 2013 Order,
*Generac Power Systems, Inc. v.*
*Kohler Company and Total Energy Systems, LLC*,
Case No. 2:11-cv-01120-JPS (E.D. Wis.)

A98-A114

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GENERAC POWER SYSTEMS, INC.,

                            Plaintiff,

v.                                                      Case No. 11-CV-1120-JPS

KOHLER COMPANY and
TOTAL ENERGY SYSTEMS, LLC,

                            Defendants.              **ORDER**

    Generac Power Systems, Inc. (Generac), commenced this patent infringement suit against Kohler Company (Kohler) and Total Energy Systems (TES) on December 9, 2011. (Docket #1). After a period for discovery, Generac and Kohler filed cross-motions for summary judgment. (Docket #40, #48). The Court entered its final order on those motions on  November 29, 2012, denying Generac's motion for summary judgment and granting in part and denying in part Kohler's motion for summary judgment. (Docket #108). The Court's order left a number of issues remaining for trial. (Docket #108).

    The parties elected to proceed to trial which was conducted before a jury commencing on December 11, 2012. (*See, e.g.*, Docket #167). The trial concluded on December 17, 2012, when the jury returned its verdict finding: (1) that Kohler did not directly infringe upon Claim 23 of Generac's U.S. Patent No. 6,653,821 (the '821 patent); (2) that TES did not directly infringe upon Claim 23 of the '821 patent; (3) that Kohler did not induce infringement of Claim 23 of the '821 patent; (4) than Kohler did not contributorily infringe Claim 23 of the '821 patent; (5) that Claim 23 of Generac's '821 patent is invalid as anticipated by a number of prior art systems; and (6) that Claim 23 of the '821 patent is invalid as obvious at the time of invention. (Docket #171).

Generac has now moved for a judgment as a matter of law (Docket #179) and for a new trial (Docket #180). The parties have fully briefed Generac's motions, and the Court will now issue its decision on the matter. (Docket #181, #188, #191).

## 1.    BACKGROUND

Given the fact that the Court's legal analysis is very closely related to the trial record, the Court will recount the majority of the specific trial record during its substantive discussion of the law. Nonetheless, before turning to its discussion, the Court will provide a general factual and procedural background for context.[1]

Kohler has developed and sold generator set products known generally as the Decision-Maker Paralleling System (DPS). (Docket #108, at 3). TES, as a Kohler distributor, has sold a number of these systems. (Docket #108, at 3).

The DPS product operates in a fashion similar to Generac's Modular Power System (MPS) product, which Generac has manufactured and sold for several years, taking advantage of the patented method described in the '821 patent. (Docket #108, at 3).

Given that similarity, Generac filed suit against Kohler and TES, arguing that those two companies infringed upon claims 19 and 23 of Generac's patent in their manufacture and sale of the DPS product. (Docket #19). Both Kohler and TES counterclaimed, arguing that claims 19 and 23 of the '821 patent are invalid as both anticipated and obvious. (Docket #20, #35).

---

[1]As the Court noted in the background section of its summary judgment order, its discussion of the facts is ultimately irrelevant to the substantive legal analysis. (Docket #108, at 3). The Court provides this background for purely contextual purposes.

After a period for discovery, both Generac and Kohler filed cross-motions for summary judgment, which also included briefing on the issue of claim construction. (Docket #40, #48).

The Court denied Generac's motion, but granted in part and denied in part Kohler's motion. (Docket #108, at 43–44). In doing so, the Court first construed claims 19 and 23.[2] (Docket #108, at 4–20). Having construed those claims, the Court next determined that a piece of prior art, the Cummins-Onan PowerCommand System (the PowerCommand system), anticipates Claim 19, making Claim 19 invalid. (Docket #108, at 32). The Court did not, however, find Claim 23 invalid. Rather, it held that the PowerCommand system *does not* anticipate Claim 23. (Docket #108, at 33). It also found that it could not determine whether any of the other pieces of prior art anticipate Claim 23. (*See* Docket #108, at 43). Finally, the Court found that it could not determine whether Claim 23 is void for obviousness or whether Kohler and TES infringed upon Claim 23 in some manner. (*See* Docket #108, at 43).

Accordingly, the Court left open the following issues for determination at trial: (1) whether a number of pieces of prior art anticipate Claim 23, making that claim invalid; (2) whether Claim 23 is void for obviousness; and (3) whether Kohler or TES infringed upon Claim 23. (*See* Docket #108, at 43).

Shortly after the Court entered its summary judgment order, Kohler moved for clarification. (Docket #106). Kohler's motion requested that the Court reexamine and clarify its original claim construction, and—based upon

---

[2]The entire claim construction is far too lengthy to recount here. As such, rather than setting forth the construction in its entirety, the Court will address the relevant sections of the claim construction in its substantive discussion, as may be necessary to deal with the issues.

such revised construction—hold that the PowerCommand system anticipates Claim 23 or that Claim 23 was obvious at the time of invention. (*See* Docket #106, at 1–3). More specifically, Kohler requested that Claim 23's final two process elements be read to require the ability to start and stop at a specified time *or* event; in other words, Kohler asked the Court to read those elements very broadly and in the disjunctive, such that they would be satisfied by the ability to start and stop at a pre-specified time, alone, without regard to the ability to stop at a pre-specified event. (Docket #106, at 1–2). Generac opposed Kohler's request, instead urging that the two elements should be read conjunctively, requiring the ability to start and stop at *both* pre-specified times *and* pre-specified events, and further that the PowerCommand system even lacked the ability to start and stop at pre-specified times, meaning it could not possibly satisfy Claim 23. (Docket #128, at 4–5).

Ultimately, the Court adopted the conjunctive reading of the final two elements of Claim 23. (Docket #147, at 6–7). Applying that clarified reading to the PowerCommand system, the Court, nonetheless, determined that PowerCommand does not anticipate Claim 23. (Docket #147, at 7).

That clarification order was the last substantive order issued before trial. The Court reserved ruling on a number of motions *in limine* outstanding until trial, when the record was more fully developed. (Docket #111, #112, #113, #114, #116, #118, #119, #131).

Finally, trial began on December 10, 2012. (Docket #152). After approximately five days, the Court submitted the cause to the jury, which returned its verdict on December 17, 2012. (Docket #172).[3] As earlier noted,

---

[3]As already noted, the Court will reserve a substantial portion of its recitation of the trial record until it reaches its substantive discussion of the merits of Generac's arguments.

Kohler and TES prevailed on every question submitted to the jury, with the jury finding that neither Kohler nor TES infringed upon Claim 23, and further that Claim 23 is invalid as anticipated and obvious. (Docket #171).

Following trial, Generac submitted the two separate motions now before the Court: a motion for judgment as a matter of law (Docket #179) and a motion for a new trial (Docket #180).

## 2.    DISCUSSION OF GENERAC'S POST-TRIAL MOTIONS

Distilled to their essentials, Generac's post-trial motions seek the following forms of relief:

(1)    a judgment as a matter of law that Kohler and TES infringed upon Claim 23 of the '821 patent or, in the alternative, a new trial on that issue; and

(2)    a judgment as a matter of law that Claim 23 is not invalid as either anticipated or obvious or, in the alternative, a new trial on the issue of validity.

(Docket #179, #180, #181 at 1). Generac argues that judgment as a matter of law or a new trial is proper on the infringement issues, asserting that the weight of the evidence could not have provided a "legally sufficient evidentiary basis…for a reasonable jury to find that neither Kohler nor TES infringed claim 23 of the '821 patent." (Docket #181, at 3). As to the validity issues, Generac argues: (1) that Kohler and TES did not present "legally sufficient evidence to support the jury's findings of invalidity"; (2) that the jury "applied an incorrect construction of the claims"; and (3) that Kohler's counsel "made improper statements regarding the Court's summary judgment ruling on claim 19 that unfairly influenced the jury to misapply the law and evidence in a manner that was prejudicial to Generac." (Docket #181, at 9, 14–15). The Court will now address each of these issues in turn.

### 2.1 Legal Standards

In its requests both for judgment as a matter of law and for a new trial, Generac faces an uphill battle. Both issues are procedural, and should be reviewed under the law of the circuit in which the reviewing district sits—in this case, the Seventh Circuit. *See, e.g., Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1347 (Fed. Cir. 2005); *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1324 (Fed. Cir. 2005); *Riverwood Int'l Corp. v. R.A. Jones & Co., Inc.*, 324 F.3d 1346, 1352 (Fed. Cir. 2003) (citing *EMI Group N. Am., Inc v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1347 (Fed. Cir. 2001)). But that standard of review is deferential to the verdict reached at trial; indeed, the Court should not overturn the jury's verdict if the record discloses a reasonable basis to support that verdict. *Spesco, Inc. v. General Elec. Co.*, 719 F.2d 233, 237 (7th Cir. 1983); *McMath v. City of Gary, Ind.*, 976 F.2d 1026, 1032 (7th Cir. 1992); *Foster v. Cont'l Can Corp.*, 783 F.2d 731, 735 (7th Cir. 1986).

Judgment as a matter of law, pursuant to Rule 50(b), would be appropriate in this instance only if Generac can show that no reasonable jury could have found for Kohler on any of the given issues when viewing the evidence in the light most favorable to Kohler; in applying this standard the Court cannot reweigh the evidence or substitute its own credibility determinations for those reached by the jury. *Denius v. Dunlap*, 330 F.3d 919, 927–28 (7th Cir. 2003); *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001); *Applebaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 378–79 (7th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000)).

As to Generac's motion for a new trial pursuant to Rule 59(a), such may be granted where the jury's verdict is against the weight of the evidence

or if, for some reason, the trial was not fair to the parties. *See, e.g., Marcus & Millichap Inv. Servs. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011) (citing *Pickett v. Sheridan Health Care Center*, 610 F.3d 434, 440 (7th Cir. 2010)); *Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 480 (7th Cir. 2000); *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992). But, to satisfy that standard, Generac must show that the verdict was against the "manifest weight of the evidence" or that a prejudicial error occurred—meaning that the Court must accord the verdict great deference in determining whether to grant a new trial. *Bankcard*, 203 F.3d at 480; *Foster*, 783 F.2d at 735. Indeed, the Court should not grant a new trial on a finding that the verdict was against the weight of the evidence unless it determines that "the record shows that the jury's verdict resulted in a miscarriage of justice or whether the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995).

Against this highly deferential backdrop, the Court next turns to Generac's arguments for both judgment as a matter of law and for a new trial.

### 2.2    Substantive Issues

As noted above, Generac takes issue with the following two general aspects of the jury's finding: first, Generac disagrees with the jury's finding that neither Kohler nor TES infringed Claim 23 of the '821 patent; and, second, Generac believes the jury erred in holding Claim 23 invalid as anticipated and obvious. (Docket #179, #180, #181 at 1).

#### 2.2.1    Infringement

Generac argues that the evidence at trial established that both Kohler and TES infringed Claim 23 of the '821 patent, thus making the jury's verdict

unreasonable and against the weight of the evidence. (Docket #181, at 3–9). In support of that contention, Generac directs the Court to various portions of the testimony of Kohler's witnesses Michael Pincus, a Kohler engineer, and Christopher Stiles, a TES executive. (Docket #181, at 4–9). Generac contends that the testimony of those two individuals establishes that both Kohler and TES infringed Claim 23 of the '821 patent.

Infringement of a method claim—be it direct infringement or indirect infringement—requires that every step of the method claim was practiced. *See, e.g., Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1306–08 (Fed. Cir. 2012) (*en banc*) (discussing both direct and indirect infringement standards and concluding that, to establish infringement of a method claim, a plaintiff must show that every step of the method has, in fact, been practiced whether by the allegedly infringing party or another) (citing *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311 (Fed. Cir. 2005); *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1568 (Fed. Cir. 1983); *Deepsouth Packaging Co. v. Laitram Corp.*, 406 U.S. 518, 526 (1972); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961); *Henry v. A.B. Dick Co.*, 224 U.S. 1, 12 (1912)). In other words, a plaintiff cannot establish infringement of a method claim without establishing that some party (whether alone or with others) has practiced every element of the claim. *See, e.g., Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1060–61 (Fed. Cir. 2009) (citing *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380 (Fed. Cir. 2007); *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993)). By extension, this means that the sale or manufacture of a product that potentially infringes, alone and without proof that every step of the method

was actually carried out, does not constitute infringement. *See, e.g., Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1313 (Fed. Cir. 2003) (citing *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1579 (Fed. Cir. 1993)); *Akamai Techs.*, 692 F.3d at 1308 ("There is no such thing as attempted patent infringement, so if there is no infringement, there can be no indirect liability for infringement.").

Thus, the primary question that the Court must answer to determine whether judgment as a matter of law or a new trial is appropriate on the infringement issue is as follows: did Generac produce evidence at trial establishing that every element of Claim 23 had been practiced—whether by Kohler, TES, or others—making the jury's verdict of noninfringement unreasonable or against the weight of the evidence?

Generac did not. Based upon the evidence presented at trial, the Court must conclude that the jury's verdict is not only imminently reasonable, but also perfectly consistent with that evidence. Accordingly, the Court cannot grant Generac's motion for judgment as a matter of law or a new trial on the issue of infringement.

The key aspect of this conclusion relates to the Court's construction of the fourth and fifth elements of Claim 23. The Court determined that the fourth and fifth elements of Claim 23 require "the ability to actually start [and stop] selected (implying the capability to start [and stop] less than all) generator sets at predetermined times and events." (Docket #166 at 15–16). This construction means that, in order for infringement of Claim 23 to occur, the infringer must create a product that actually has this capability to start and stop less than all of the generators at a range of predetermined times and

events. In other words, if a product is not able to start and stop less than all of its generators in response to such a range, it does not infringe Claim 23.

Simply put, Generac never established evidence that the Kohler DPS possessed this capability. None of the testimony established that the DPS systems had the ability to start and stop less than all of the generators in a system at predetermined times and events. In fact, the testimony of Mr. Pincus and Mr. Stiles, to which Generac points the Court in support of its supposition that the trial evidence establishes the satisfaction of the fourth and fifth elements of Claim 23, actually comes closer to supporting Kohler's and TES's contentions of *non*infringement. Mr. Pincus' testimony provides that the DPS product would start up all of the generators at the time of a power outage. (Docket #181, at 6). This is inconsistent with the Court's claim construction that the fourth and fifth elements require the capability to start and stop less than all of the generators. Meanwhile, Mr. Stiles' testimony is noncommittal, allowing only that the DPS product can be set up to start and stop less than all of the generators "[i]f we set up the MCP with those load commands." (Docket #181, at 7). Moreover, the only other evidence to which Generac cites, a list of the DPS product's benefits taken from Kohler's website, provides simply that, "Because your DPS automatically turns off any generators in your system when your needs are low." (Docket #181, at n. 1). This lacks not only any evidence that DPS products *actually* operate in this way, but also any evidence that the product has the capability to turn *on* less than all of the generators—and, indeed, Mr. Pincus' testimony seems to indicate precisely the opposite. (Docket #181, at 6, n. 1). Even Generac's own expert, Dr. Jaime De La Ree, testified that, at the loss of power, all of the generators would power on. (Trial Tr. 319:2 ("You probably noticed that all

Page 10 of 17

of the gensets came on"); *contra* Trial Tr. 327:19–329:21 (but, again, this testimony does not establish that any DPS product actually had this ability—only that certain Kohler training materials contemplate the ability to power on or off less than all generators in response to a range of events and times)).

Given this state of the evidence, the Court is obliged to conclude that the jury's verdict was both reasonable and consistent with the evidence. Indeed, the evidence seems to fully support Kohler's and TES's contention that the DPS product lacked capabilities that would satisfy the fourth and fifth elements of Claim 23. At the very least, the evidence on the issue is open to rational disagreement. Certainly, a reasonable jury could have reached the same conclusion as the jury did in this case, and that conclusion is not against the manifest weight of the evidence such that judgment as a matter of law or a new trial would be necessary. *See, e.g.*, *Denius*, 330 F.3d at 927–28; *Bruso*, 239 F.3d at 857; *Bankcard*, 203 F.3d at 480; *Foster*, 783 F.2d at 735.

Therefore, the Court must deny Generac's motions for judgment as a matter of law and a new trial on the issue of infringement.

### 2.2.2   Invalidity

Generac next argues that it is entitled to judgment as a matter of law or a new trial on the issue of invalidity. That argument is primarily based upon an assertion that the jury relied on an incorrect construction of Claim 23 and that the jury was improperly prejudiced by Kohler's closing arguments.

### 2.2.2.1   Insufficient Evidence and Improper Construction

As to the first issue—whether the Court must grant judgment as a matter of law or a new trial, because the jury lacked sufficient evidence to

Page 11 of 17

reach its verdict or applied an improper construction of Claim 23—the Court must conclude that Generac's arguments fails, and accordingly the jury verdict should stand. Generac's arguments may be broken down into two separate contentions: first, that the jury's anticipation verdict was in error; and, second, that the jury's obviousness verdict was in error.

As to the first of those contentions, the Court notes that Kohler argues that Generac has waived any argument on the issue of anticipation as to several of the prior art references. (*See* Docket #188, at 13). While that may very well be the case, for the reasons that follow, the Court finds that—even if it were to consider those prior art references—it still would not find that Generac is entitled to judgment as a matter of law or a new trial on their sufficiency of the evidence or improper construction arguments.

Generac's argument on the anticipation issue can be distilled to the following: the evidence did not establish that the prior art systems had the capability of being expanded, and the Court should have read such expandability capabilities into its construction of Claim 23. Generac may be correct in asserting that the prior art references found to anticipate Claim 23 are incapable of joining together with other systems. (Docket #181, at 10 (citing Trial Tr. at 112:6–14; 113:4–114:13; 148:7–10; 314:9–16; 480:22–25)).

That fact is ultimately irrelevant, as Generac is incorrect in asserting that the Court's construction of Claim 23 included an expandability requirement. In fact, the Court's construction was quite the opposite. The Court concluded that Generac's contention that the phrase "at least one" should be read to require expandability was "nonsensical." (Docket #108, at 15–16). Indeed, the Court stands by that determination. The plain language of the phrase "at least one" means exactly what it says—*at least one*; or

something that is not less than one, but could be one or more than one. Generac appeared to treat this portion of the construction as an afterthought, saying little more in support of its expandability contention than "Claim 23 covers a system that is capable of expanding by incorporating one or more additional generator sets. In essence, the system is ready for subsequent gensets to be added as contemplated from the outset." (Docket #53, at 15 (citing Generac's Proposed Facts ¶¶ 59–61; citing the report of Dr. De La Ree (Docket #49, Ex. 2), at 28)). The Court did not find any ambiguities, and therefore was not required to look at Dr. De La Ree's report. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1314, 1317, 1324 (Fed. Cir. 2005); *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir. 2005); *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004); *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (all noting that the Court should determine the meaning of a claim beginning with the intrinsic evidence, such as the language of the claim, before turning to extrinsic evidence, such as expert witnesses). Thus, the Court concludes that its claim construction on the "at least one" issue was absolutely appropriate. It also made that construction clear, noting and dismissing as nonsensical Generac's expandability argument. (Docket #108, at 15–16). But, more importantly, at this juncture in the litigation, the Court's claim construction is settled—it is not going to change, though the Court well appreciates the fact that Generac will likely argue this issue on appeal.

Claim construction was settled before trial. (*See* Docket #108, #128). The Court held that Claim 23 does not require expandability. The jury employed that construction, and found that the prior art systems anticipate

Claim 23. The evidence supports that finding. Therefore, judgment as a matter of law or a new trial on the issue of anticipation would be inappropriate.

Turning to Generac's contention that the obviousness verdict must be overturned, the Court must again disagree. Generac is correct that a challenger to a patent claim "must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention." (Docket #108, at 10 (citing *ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012); *Procter & Gamble v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009))). But that does not mean that a jury cannot use their common sense. Here, Kohler presented ample evidence of the state of prior art at the time of invention, along with testimony related to the existence of each of the Claim 23's elements in the prior art and the wisdom of employing those elements. (Trial Tr. 377:23–384:5, 552:3–554:9, 680:3–10). The Court finds that such evidence is more than sufficient to have allowed the jury to conclude, employing the evidence and their own common sense, that a skilled artisan at the time of the invention would have been motivated to combine the prior art to achieve Claim 23.

For these reasons, the Court is also obliged to deny Generac's motion for judgment as a matter of law or a new trial on the issues of anticipation and obviousness, as related to the sufficiency of the evidence and claim construction arguments.

### 2.2.2.2  Improper Prejudice

Generac's last argument rests upon Kohler's introduction during closing arguments of the portions of the Court's summary judgment order

striking down Claim 19. (Docket #181, at 14–16; Docket #191, at 8–9). Generac argues that the introduction of those portions, as well as some of Kohler's statements regarding the importance of Claim 19, prejudiced the jury to ignore the totality of the evidence. (Docket #181, at 14–16; Docket #191, at 8–9). Kohler disagrees, arguing that the jury instructions cured any prejudice and further that Generac waived any argument against use of the Court's prior order by failing to object and also, itself, using portions of the Court's order. (Docket #188, at 23–27).

Again, the Court must agree with Kohler. To begin, the jury instructions, informing the jury to examine the entirety of Claim 23 and to not treat the statements of counsel as evidence, provided the jury with a caution against relying too heavily on Kohler's statements. The Court must presume that the jury followed its instructions, and thus did not give prejudicial weight to Kohler's statements. *See, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 540–41 (1993) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). Moreover, "comments made by attorneys during closing arguments rarely rise to the level of reversible error," and the Court does not believe that Kohler's statements were so egregious as to truly infect the jury to an extent warranting reversal. *See, e.g.*, *Pickett*, 610 F.3d at 445 (citing *Miksis v. Howard*, 106 F.3d 754, 764 (7th Cir. 1997); *Moylan v. The Meadow Club*, 979 F.2d 1246, 1250–51 (7th Cir. 1992)); *Sheldon v. Munford, Inc.*, 950 F.2d 403, 410 (7th Cir. 1991); *Valbert v. Pass*, 866 F.2d 237, 241 (7th Cir. 1989) (citing *Gonzalez v. Volvo of America Corp.*, 752 F.2d 295, 298 (7th Cir.1985) (per curiam); *Joseph v. Brierton*, 739 F.2d 1244 (7th Cir.1984); *Klotz v. Sears, Roebuck & Co.*, 267 F.2d 53, 54-55 (7th Cir.), *cert. denied*, 361 U.S. 877 (1959); *Levin v. Hanks*, 356 So.2d

21, 22 (Fla.App.1978), all of which involve either some form of dishonesty or an improper request for damages)).

Furthermore, Generac did, indeed, waive any objection to Kohler's statements, for a number of reasons. To begin, Generac failed to object to the statements either at the time Kohler first requested to make the statements, when Kohler actually did make the statements, immediately after Kohler's closing arguments, or even prior to the close of trial. (Trial Tr. 926:16–927:6 (Court sustains Kohler's request to present portions of the summary judgment order, and Generac does not voice objection); because Generac failed to voice an objection, there are no other citations to the record that the Court can employ, here). There was certainly ample time to object at one of those points, but Generac failed to do so, thus waiving its objection. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238–39 (1940) ("counsel…cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial" (citing *Crumpton v. United States*, 138 U.S. 361, 364 (1891)).

For these reasons, the Court is obliged to deny Generac's request for a new trial on the basis of Kohler's statements during closing argument.

4.    **CONCLUSION**

The Court has concluded that it is obliged to deny Generac's requests for judgment as a matter of law or a new trial in every respect. Therefore, the Court will deny Generac's motions for judgment as a matter of law (Docket #179) and for a new trial (Docket #180).

Accordingly,

**IT IS ORDERED** that Generac's motion for judgment as a matter of law (Docket #179) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that Generac's motion for a new trial (Docket #180) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 7th day of March, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Page 17 of 17

**A114**

# Addendum 6

United States Patent No. 6,653,821

A115-A134



US006653821B2

(12) **United States Patent**
Kern et al.

(10) **Patent No.:**    US 6,653,821 B2
(45) **Date of Patent:**    Nov. 25, 2003

(54) **SYSTEM CONTROLLER AND METHOD FOR MONITORING AND CONTROLLING A PLURALITY OF GENERATOR SETS**

(75) Inventors: **Robert D Kern**, Waukesha, WI (US); **Gerald C. Ruehlow**, Oconomowoc, WI (US); **Steven J. Wilcox**, Delafield, WI (US); **Francis X. Wedel**, Lake Mills, WI (US); **Graham McLean**, Lymm (GB); **Phillip Harrison**, MacClesfield (GB); **Hongping Zhou**, Preston (GB)

(73) Assignee: **Generac Power Systems, Inc.**, Waukesha, WI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/882,765**

(22) Filed: **Jun. 15, 2001**

(65) **Prior Publication Data**

US 2002/0190527 A1 Dec. 19, 2002

(51) Int. Cl.[7] .......................... **H02P 15/00**; H02P 3/00; H02P 9/06; H02J 1/00; H02J 7/00

(52) U.S. Cl. ................................ **322/7**; 322/8; 307/57; 307/64; 290/40 B

(58) Field of Search .......................... 322/7, 8; 307/57, 307/64; 290/40 B

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,278,771 | A | * | 1/1994 | Nyenya ........................ 307/38 |
| 5,684,710 | A | * | 11/1997 | Ehlers et al. .............. 307/115 |
| 5,734,255 | A | * | 3/1998 | Thompson et al. ........ 290/2 |
| 5,754,033 | A | * | 5/1998 | Thomson ................... 307/57 |
| 5,973,481 | A | * | 10/1999 | Thompson et al. ........ 290/2 |
| 5,994,794 | A | * | 11/1999 | Wehrlen ..................... 307/66 |
| 6,055,163 | A | * | 4/2000 | Wagner et al. ............ 363/37 |
| 6,107,927 | A | * | 8/2000 | Dvorsky et al. .......... 340/658 |
| 6,166,525 | A | * | 12/2000 | Crook ........................ 322/11 |
| 6,172,428 | B1 | * | 1/2001 | Jordan .................... 290/40 C |
| 6,351,692 | B1 | * | 2/2002 | Eaton et al. ............... 700/287 |

* cited by examiner

*Primary Examiner*—Nestor Ramirez
*Assistant Examiner*—Jaydi A. Aguirrechea
(74) *Attorney, Agent, or Firm*—Boyle Fredrickson Newholm Stein & Gratz S.C.

(57) **ABSTRACT**

In accordance with the present invention, a system controller and method for monitoring and controlling a plurality of generator sets are provided. Each generator set generates electrical power and includes a generator communications link for connecting a generator set to a network. A user interface allows a user to select a generator set and set values for various predetermined operating parameters of the selected generator sets. Thereafter, a communications link connectable to the network transmits the user set values of the predetermined operating parameters to the selected generator set.

**24 Claims, 11 Drawing Sheets**





FIG. 1

TX-0001-002



FIG. 2

TX-0001-003

TX-0001-004



POWER CONNECTIONS
CONTROL AND MONITORING
SERIAL COMMUNICATIONS

FIG. 3



FIG. 4a

TX-0001-005



FIG. 4b

TX-0001-006



FIG. 5

TX-0001-007



FIG. 6

TX-0001-008



FIG. 7

TX-0001-009



FIG. 8

TX-0001-010



FIG. 9

TX-0001-011



FIG. 10

US 6,653,821 B2

1

# SYSTEM CONTROLLER AND METHOD FOR MONITORING AND CONTROLLING A PLURALITY OF GENERATOR SETS

## FIELD OF THE INVENTION

This invention relates to electrical generators, and in particular, to a system control for monitoring and controlling one or more generator sets which are connectable to a load.

## BACKGROUND AND SUMMARY OF THE INVENTION

As is known, electrical generators are used in a wide variety of applications. Electrical generators utilize a driving engine directly coupled to a generator or alternator through a common shaft. Upon actuation of the engine, the crankshaft thereof rotates the common shaft so as to drive the alternator which, in turn, generates electrical power. During a commercial power outage, it is often necessary for a consumer to continue supplying electrical power to a load. However, a single generator may not generate enough electrical power to meet the demands of the load. Consequently, multiple electrical generators are often needed to provide sufficient electrical power for the load connected thereto, independent of the commercial electrical power provided by a utility. Alternatively, it is often desirable for a consumer to generate its own electrical power which may be less expensive than the electrical power commercially available or to generate electrical power in excess of its own needs and to sell such power to the utility. In order to interconnect the output of each of the customer's generators to the utility grid, the output of each of the customer's generators must be placed in parallel with the commercial electrical power provided by the utility.

Typically, each generator set connected to a load or to a utility grid is controlled and monitored independently of the other generator sets connected to the load or the utility grid. As such, coordinating operation of each of the generator sets connected to a load or a utility grid may be burdensome and somewhat time consuming. Hence, it is highly desirable to provide a central system control for controlling and monitoring one or more generator sets provided at remote locations which have the capability of supplying electrical power to a load independent from the utility grid or supplying electrical power in parallel with the commercial electrical power provided by the utility.

Therefore, it is a primary object and feature of the present invention to provide a system control for controlling and monitoring a plurality of generator sets connectable to a load.

It is a further object and feature of the present invention to provide a system control controlling and monitoring a plurality of generator sets in parallel with the commercial electrical power provided by a utility.

It is a still further object and feature of the present invention to provide a system control for controlling and monitoring a plurality of generator sets which allows a user to monitor the commercial electrical power supplied by a utility and simultaneously vary the electrical power supplied by the plurality of generator sets as the demand for electrical power by a load change.

It is a still further object and feature of the present invention to provide a system control for controlling and monitoring a plurality of generator sets which is simple to utilize and inexpensive to manufacture.

2

In accordance with the present invention, the system controller is provided for controlling one or more generator sets connected to a load. Each generator set has the ability to be started and stopped and includes a communication link for connecting the generator set to a network, an engine, and a generator driven by the engine which generates AC power having a magnitude and a power factor and an AC voltage having a magnitude and a frequency. The controller includes a user interface for allowing the user to select a generator set and to set values for various predetermined operating parameters of the selected generator set. The communications link is connectable to the network for transmitting the user set values of the predetermined operating parameters to the selected generator set.

The controller may include a monitoring structure connectable to a utility source which provides AC power having a magnitude and a power factor, AC voltage having a magnitude and a frequency, and AC current having a magnitude and a frequency. The monitoring structure measures the magnitude of the frequency of the AC voltage in AC current and provides the same to the user interface for display. The user interface includes a display screen for displaying the magnitude of the AC power, AC voltage and AC current of the utility source and the power factor of the AC power of the utility source. The communications link transmits the magnitude and the power factor of the AC power of the utility source and the magnitudes and frequencies of the AC voltage and AC current of the utility source to each of the generator sets connected to the network.

The user interface may include a display screen for displaying generator icons identifying corresponding generator sets attached to the network. In addition, the user interface may include a generator setting screen for each generator set connected to the network. Each generator set setting screen allowing the user to input the values of a portion of the various operating parameters of the selected generator sets. A first of the various operating parameters is a starting time for starting the selected generator set and a second of a various operating parameters is a stopping time for stopping the selected generator set. The user interface includes a generator command screen for each generator set connected to the network. Each generator command screen allows the user to input the starting time for starting the selected generator set and the stopping time for stopping the selected generator set. Each generator command screen also includes a day setting for allowing the user to select at least one day on which the selected generator set will be started and stopped in response to the starting time and stopping time inputted by the user. A special day screen may also be provided for each generator set connected to the network. The special day screen allows the user to input a special day on which the selected generator set will be stopped.

In accordance with a further aspect of the present invention, a power generation system is provided for providing electrical power. The power generation system includes at least one generator set connectable to a load and to a network. Each generator set has the ability to be started and stopped and includes a generator connectable to a load. The generator generates AC power having a magnitude and a power factor, an AC voltage having a magnitude and a frequency, and an AC current having a magnitude and a frequency. Each generator also includes an engine, a generator control and a generator communications link. An engine is operatively connected to a generator for driving the generator. A generator control is operatively connected to the engine for controlling operation thereof and is operatively connected to the generator for controlling the AC

TX-0001-013

US 6,653,821 B2

3

generated thereby. The generator communications link connects the generator control to a network. A user interface allows a user to select a generator set and set values for various predetermined operating parameters of the selected generator set. A system communication link is connectable to the network for transmitting the user set values of the predetermined operating parameters to the generator control of the selected generator set.

The power generation system includes a monitoring structure connectable to a utility source which provides AC power having a magnitude and a power factor, AC voltage having a magnitude and frequency, and AC current having a magnitude and a frequency. The monitoring structure measures the magnitude and the frequency of the AC voltage and the AC current and provides the same to the user interface. The user interface includes the display screen for displaying the magnitudes of the AC power, AC voltage and AC current of the utility source and the power factor of the AC power of the utility source. The systems communications link transmits the magnitude and the power factor of the AC power of the utility source and the magnitudes and frequencies of the AC voltage and AC current of the utility source to each of the generator controls of the generator sets connected to the network.

The user interface also includes the display screen for displaying generator icons identifying corresponding generator sets attached to the network, and a generator setting screen for each generator set connected to the network. Each generator setting screen allows the user to input the values of the portion of the various operating parameters of the selected generator set. A first of the various operating parameters is a starting time for starting the selected generator sets and a second of the various operating parameters is a stopping time for stopping the selected generator set. The user interface includes a generator command screen for each generator set connected to the network. Each generator command screen allows the user to input the starting time for starting the selected generator set and the stopping time for stopping the selected generator set. Each generator command screen also includes a day setting for allowing the user to select the day on which the selected generator set will be started and stopped in response to the starting time and stopping time inputted by the user. The user interface may also include a special day screen for each generator set connected to the network. The special day screen allows the user to input a special day on which the selected generator set will be stopped.

In accordance with a still further aspect of the present invention, a method of managing the distribution of electrical power is provided. The method includes the steps of interconnecting at least one generator set to a load and to a network. Each generator set has the ability to be started and stopped. A generator set is selected and various predetermined operating parameters are set for the selected generator set. The settings of the predetermined operating parameters are transmitted over the network to the selected generators.

The method includes the additional steps providing a utility source. The utility source supplying AC power having a magnitude and a power factor, AC voltage has a magnitude and a frequency, and AC current having a magnitude and a frequency. The magnitude and the frequency of the AC voltage and the AC current are measured. Thereafter, the magnitudes of the AC power, AC voltage and AC current of the utility source and the power factor and the power factor of the AC power of the utility source and the power factor of the AC power of the utility source are displayed to a user.

The magnitude and the power factor of the AC power of the utility source and the magnitude and frequencies of the

4

AC voltage and AC current of the utility source are transmitted to each of the generator sets connected to the network. User generator icons identifying corresponding generator sets attached to the network are displayed. It is contemplated to start the selected generator set to the first predetermined time and stop the selected generator set at a second predetermined time. The first and second predetermined times are transmitted to the selected generator set over the network.

BRIEF DESCRIPTION OF THE DRAWINGS

The drawings furnished herewith illustrate a preferred construction of the present invention in which the above advantages and features are clearly disclosed as well as others which will be readily understood from the following description of the illustrated embodiment.

In the drawings:

FIG. **1** is a schematic view of a network system for controlling and managing the distribution of electrical power;

FIG. **2** is a schematic view of a first embodiment of a power generation system;

FIG. **3** is a schematic view of a second embodiment of a power generation system;

FIG. **4***a* is a schematic view of a generator structure for generating electrical power for the power generation system of FIG. **3**;

FIG. **4***b* is a schematic view of the generator structure of FIG. **4***a* for the power generation system of FIG. **2**;

FIG. **5** is a display screen for monitoring the supply and distribution of electrical power provided by the power generation systems of FIGS. **1** and **2**;

FIG. **6** is a generator settings display screen for allowing the user to provide the generator settings for the generator structure of FIG. **4**;

FIG. **7** is a command settings display screen for controlling the starting and stopping of the generator structure of FIG. **4**;

FIG. **8** is a holiday settings display screen for allowing a user to specify days on which the generator structure of FIG. **4** is not operated;

FIG. **9** is a system setting display screen for allowing the user to specify the settings of the power generation system of FIGS. **2**–**3**; and

FIG. **10** is a clock programming screen for allowing a user to program a day and a time for use with the screens of FIGS. **5**–**9**.

DETAILED DESCRIPTION OF THE DRAWINGS

Referring to FIG. **1**, a network control system for controlling and monitoring a plurality of power generation systems is generally generated by the reference numeral 10. Each of the power generation systems is generally designated by the reference numeral 12. Each power generation system includes system controller **14** operatively connected to a plurality of generator panels **16** by serial communications link **18**. Each generator panel **16** is operatively connected to a corresponding generator **20***a* and **20***b*, as hereinafter described.

As best seen in FIGS. **4***a*–**4***b*, generator panel **16** is operatively connected an engine **22** and a corresponding generator **20***a* or **20***b*. It can be appreciated that the following description of generator panel **16** operatively connected to generator **20***a* will be understood to describe a second

TX-0001-014

US 6,653,821 B2

5                                                                                           6

generator panel **16** operatively connected to generator **20***b*, as if fully described herein. Engine **22** receives fuel such as natural gas or liquid propane vapor through an intake. The fuel provided to engine **22** is compressed and ignited within the cylinders thereof so as to generate reciprocating motion of the pistons of engine **22**. The reciprocating motion of the pistons of engine **22** is converted to rotary motion by a crankshaft. The crankshaft is operatively coupled to generator **20***a* through shaft **28** such that as the crankshaft is rotated by operation of engine **22**, shaft **28** drives generator **20***a* which, in turn, converts the mechanical energy by engine **22** to electrical power on output **31** of generator **20***a* for transmission and distribution.

Digital governor **26** is operatively connected to throttle **24** which controls the volume of intake air to engine **22**. As is known, digital governor **26** protects engine **22** from over-speed conditions and maintains engine **22** at a desired engine speed which, in turn, causes generator **20***a* to generate a desired electrical power at a desired frequency. Digital governor **26** controls the engine speed of engine **22** by regulating the position of throttle **24**, and hence, the amount of fuel and air provided to the combustion chamber of engine **22**. As is known, throttle **24** is movable between a wide-open position wherein engine **22** runs at full power and a closed position wherein engine **22** runs at minimum power. Generator control **42** controls operation of digital governor **26**, and hence, throttle **24**, as hereinafter described.

As is conventional, generator **20***a* generates AC voltage having a magnitude and a frequency and AC current having a magnitude and a frequency. In alternating current power transmission and distribution, the cosine of the phase angle (θ) between the AC voltage and the AC current is known as the power factor. The AC power generated by generator **20***a* may be calculated in according to the expression:

$$P = I \times V \times \cos\,\theta$$

wherein P is the AC power; I is the root means square of the AC current; and V is the root means square of the AC voltage.

The magnitude of the AC output voltage of generator **20***a* is monitored by voltage regulator **30**. As is conventional, generator **20***a* includes an armature winding or exciter which controls the magnitude of the AC output voltage of generator **20***a*. Voltage regulator **30** acts to increase or decrease the excitation of the exciter of generator **20***a* to the degree needed to maintain the magnitude of the AC output voltage at a desired value.

It is contemplated to operatively connect engine **22** and generator **20***a* to an alarm system **32**. Alarm system **32** monitors various operating conditions of engine **22** and generator **20***a* and provides a warning if any of the operating conditions fall outside normal operating levels. In addition, alarm system **32** is operatively connected to generator control **42** such that generator control **42** may shut down generator **20***a* in response to certain, predetermined alarm conditions on engine **22** and/or generator **20***a* so as to prevent damage to power generation system **12**.

Referring to FIGS. **2** and **4***b*, it is contemplated to connect generators **20***a* and **20***b* to corresponding loads **34** and **36**, respectively, through corresponding transfer switches **38**. Each transfer switch **38** isolates the electrical power supplied by a utility on supply line **40** from the electrical power supplied at outputs **31** of corresponding generators **20***a* and **20***b*. Electrical power supplied on supply line **40** is monitored such that if the electrical power from the utility fails, engines **22** are started by generator controls **42**, FIG. **4***b*, in

a conventional manner. With engines **22** of power generation systems **12** started, generators **20***a* and **20***b* generate electrical power, as heretofore described. When the electrical power generated by generators **20***a* and **20***b* reaches the magnitude and frequency desired by the user, generator control **42** through transfer switch control **33** causes transfer switches **38** to transfer loads **34** and **36** from supply line **40** to corresponding outputs **31** of generators **20***a* and **20***b*, respectively. In response to restoration of electrical power on supply line **40** by the utility, generator controls **42** through transfer switch controls **33** cause transfer switches **38** to transfer loads **34** and **36** from outputs **31** of generators **20***a* and **20***b*, respectively, to supply line **40**. Thereafter, engines **22** are stopped by corresponding generator controls **42**. By stopping engines **22**, generators **20***a* and **20***b* no longer generate electrical power.

Alternatively, referring to FIGS. **3** and **4***a*, in the event of a power outage, generators **20***a* and **20***b* may be put in parallel with each other in order to supply electrical power to load **74**. Generators **20***a* and **20***b* are put in parallel with each other by connecting outputs **31** of generators **20***a* and **20***b* to supply line **40**. However, prior to connecting outputs **31** of generators **20***a* and **20***b* to supply line **40**, it is necessary to match the magnitude of the AC output voltage of generator **20***a* with the magnitude of the AC output voltage of generator **20***b*. In addition, the outputs of generators **20***a* and **20***b* must be synchronized. In order to synchronize the outputs of generators **20***a* and **20***b*, the phase sequences and the frequencies of the outputs of generators **20***a* and **20***b* must be identical. Once synchronized, generator control **42** through transfer switch control **33** causes transfer switches **44***a* and **44***b* to close such that outputs **31** of generators **20***a* and **20***b*, respectively, are coupled to supply line **40**. Thereafter, supply line **40** is connected to load **74**, as hereinafter described.

It is also contemplated to put generators **20***a* and **20***b* in parallel with the utility by connecting outputs **31** of generators **20***a* and **20***b* to the utility. In order to put generators **20***a* and **20***b* in parallel with the utility, it is necessary to match the magnitude of the AC output voltages of generators **20***a* and **20***b* with the magnitude of the AC voltage of the utility. In addition, the outputs of generators **20***a* and **20***b* must be synchronized with the utility. In order to synchronize the outputs of generators **20***a* and **20***b* with the utility, the phase sequences and the frequencies of the outputs of generators **20***a* and **20***b* must be identical in phase and frequency with the utility.

Referring back to FIGS. **4***a* and **4***b*, by way of example, voltage matching is accomplished by voltage regulators **30** of generator panels **16**. Each voltage regulator **30** is supplied with the magnitude of the AC voltage provided by the utility, as hereinafter described, and thereafter, raises or lowers the AC voltage provided by corresponding generators **20***a* or **20***b* to precisely match the magnitude of the AC voltage provided by the utility under the control of corresponding generator controls **42** of generator panels **16**. As such, it is contemplated to operatively connect generator controls **42** of generator panels **16** to supply line **40** to monitor the utility. Synchronization is achieved by increasing or decreasing the engine speed, as heretofore described, such that phase sequence and the frequency of the AC outputs of generators **20***a* and **20***b* are identical to the phase and frequency supplied by the utility. Synchronizers **35** monitor the AC power provided by the utility and provide such information to corresponding generator controls **42**. Once synchronization is achieved, transfer switches **44***a* and **44***b* are closed by generator controls **42** through transfer switch controls **33**

TX-0001-015

US 6,653,821 B2

7

such that outputs 31 of generators 20a and 20b, respectively, are coupled to supply line 40. Thereafter, supply line 40 is connected to the utility, as hereinafter described.

When generators 20a and 20b are connected in parallel with the utility, the AC output voltages of generators 20a and 20b cannot be varied by excitation of corresponding exciters of generators 20a and 20b. Excitation of exciters of generators 20a and 20b controls the power factors of the electrical power supplied by generators 20a and 20b to the utility. As such, the excitation of exciters of generators 20a and 20b when generators 20a and 20b are connected in parallel with the utility is known as volt-ampere-reactance (VAR) control, block 50.

Further, when generators 20a and 20b are connected in parallel with the utility, the opening and closing of throttles 24 by digital governors 26 does not change the engine speeds of corresponding engines 22. The opening and closing of throttles 24 increases the AC power supplied to the utility by generators 20a and 20b. As such, the opening and closing of throttles 34 when generators 20a and 20b are connected in parallel with the utility is known as power control, block 52.

Generator controls 42 of the generator panels 16 are operatively connected to serial communications link 18 by communication interfaces 56. In the preferred embodiment, each communication interface 56 is a RS485. Referring to FIGS. 2 and 3, serial communications link 18 allows system controller 14 to communicate with generator controls 42 of generator panels 16. System controller 14 includes a micro-controller and a visual display. The microcontroller executes a software program which is displayed on the visual display of system controller 14. The software program allows a user to monitor the electrical power supplied by the utility; to monitor various operating conditions of the engines and generators of the power generation systems 12; and to control various operating parameters of power generation systems 12.

Referring to FIG. 3, in a first embodiment, system controller 14 is operatively connected by line 58 to the utility to monitor the utility and to measure the voltage and current provided by the utility. In addition, system controller 14 is operatively connected by line 59 to supply line 40 to monitor the electrical power supplied by generators 20a and 20b. System controller 14 is also operatively connected to switches 61 and 63 by lines 65 and 67 in order to control the opening and closing of switches 61 and 63, for reasons hereinafter described. In an alternate embodiment, FIG. 2, system controller 14 is connected by line 69 to the utility to monitor the utility and to measure the voltage and current provided by the utility.

The magnitudes of the voltage and current provided by the utility are displayed on display screen 60, FIG. 5. Display screen 60 includes voltage display 62 for displaying the magnitude of the rms voltage provided by the utility and current display 64 for displaying the magnitude of the rms current provided by the utility. System controller 14 calculates the power supplied by the utility and power factor of the power supplied and displays the same on display screen 60 at power display 66 and power factor display 68, respectively.

Display screen 60 also includes utility icon 70 representing the utility, load icon 72 representing load 74, and generator icons 76 and 78 representing corresponding generators 20a and 20b, respectively. Generator power displays 80 and 82 are positioned adjacent corresponding generator icons 76 and 78, respectively, to display the power and power factor of the outputs of generators 20a and 20b. In

8

addition, the total power provided by generators 20a and 20b is displayed by total power display 84. Display screen 60 also includes a time display 86 for displaying the date and time, as well as, power connections having switch icons 88a–d therein which represent the states of switches 61, 63, 44a and 44b, respectively, of FIG. 3.

System controller 14 further includes generator settings screen 90, FIG. 6, for allowing a user to input a plurality of settings for generators 20a and 20b. Generator setting screen 90 includes number-of-generators input 92 for allowing a user to input the number of generators connected to communications link 18. In addition, generator setting screen 90 includes inputs for identifying the generator (either generator 20a or generator 20b) for which the settings on the generator settings screen pertain 94; the maximum kilowatts produced by the identified generator 96; the recommended minimum kilowatts for efficient operation of the identified generator 98; the maximum power which may be produced by the identified generator in volt-ampere-reactance 100; the priority of operation of the identified generator as compared to the other generators of the power generation system 102; and a slave address for the generator control 42 of generator panel 16 for the identified generator 104. Generator settings scroll bar 105 is provided for allowing a user to scroll through the settings for each generator.

Referring to FIG. 7, system controller 14 further includes a command settings screen generally designated by the reference numeral 106. Command settings screen 106 allows a user to input various parameters for starting and stopping generators 20a and 20b. Command settings screen 106 includes inputs for identifying: a command (by number) for operation of the generators (either generator 20a and generator 20b) 108; a mode the user desires the generators to operate during a prescribed time period 110; the maximum kilowatts to be produced by the generators or consumed from the utility during the prescribed time period depending on the mode selected by the user 112; and a user selected limit for the power factor of the electrical power produced by the generators or consumed from the utility during the prescribed time period depending on the mode selected by the user 114.

Command setting screen 106 also includes inputs for identifying the prescribed time period for which a user desires the generators to operate under the identified command. These inputs include a month 116 and a day 118 for starting the identified generator and a month 120 and a day 122 for stopping the generators. Inputs are also provided for an hour 124 and a minute 126 for starting the generators on each day for which the generators are intended to operate and an hour 128 and a minute 130 for stopping the generators on each day for which the generators are intended to operate. Inputs are also provided for identifying specific days of the week and holidays 132a–h during the prescribed time period for which the generators are intended not to operate. Command scroll bar 131 is provided for allowing the user to scroll through each command.

Referring to FIG. 8, system controller 14 further includes a holiday screen generally designated by the reference numeral 134. Holiday screen 134 includes inputs for a user: to identify holidays (by number) on which generators 20a and 20b will not be operational 135; and to specify a month 136 and a day 138 for each holiday identified. Holiday scroll bar 137 is provided for allowing the user to scroll through each holiday identified.

As best seen in FIG. 9, system controller 14 includes a system settings screen generally designated by the reference numeral 142. System settings screen 142 includes inputs for

TX-0001-016

US 6,653,821 B2

9

a user: to specify if a password is needed 144a to connect system controller 14 to network 172, for reasons hereinafter described, and if a password is needed 144b to interconnect system controller 14 to serial communications link 18; to specify a password 146 which must be entered by a user to gain access to screens of FIGS. 6–10; to specify a current transformer ratio which steps down the current provided by utility so as to allow such current to be measured by the ammeter of system controller 14; to specify a voltage scaling factor to calibrate the volt meter which measures the voltage provided by the utility 150; and to specify a system voltage 152 to be generated by power generation system 12 (typically, the utility voltage).

Referring to FIG. 10, a clock-programming screen is generally designated by the reference numeral 154. Clock programming screen 154 includes a scrollable calendar display 156 for displaying a calendar to a user. In addition, the clock-programming screen 154 includes inputs for allowing a user to specify the month 158, the day of the month 160, the year 162, the weekday 164, the hour 166 and the minute 168. The day and time inputted on clock-programming screen 154 are displayed by time display 86 on display screen 60.

In operation, for each power generation system 12, generator panels 16 and system controller 14 are connected to a common serial communications link 18. Initially, a user inputs a plurality of settings for generators 20a and 20b on generator settings screen 90 and the various parameters for starting and stopping generators 20a and 20b on command settings screen 106 of system controller 14, as heretofore described. In addition, the user enters the inputs heretofore described on holiday screen 134, system settings screen 142, and clock programming screen 154 of system controller 14.

Thereafter, in order to gain access to the various screens of system controller 14, the user is prompted to enter the password provided at input 146 of system settings screen 142. After obtaining access to the various screens of system controller 14, the user may monitor power generation system 12 and/or may vary the inputs, as heretofore described.

With respect to power generation systems 12 of FIGS. 1–2 and 4b, system controller 14 monitors the electrical power supplied to supply line 40 by the utility. The magnitude of the rms voltage provided by the utility and the magnitude of the rms current provided by the utility are displayed on display screen 60, FIG. 5. In addition, the power supplied by the utility and power factor of the power supplied are displayed on display screen 60. Further, display screen 60 displays the date and time, as well as, the power connections of power generation system 12.

If the electrical power from the utility fails, generator controls 42 of generator panels 16 start engines 22 such that generators 20a and 20b generate electrical power, as heretofore described. When the electrical power generated by generators 20a and 20b reaches the magnitude and frequency desired by the user, transfer switches 38 transfer loads 34 and 36 from supply line 40 to corresponding outputs 31 of generators 20a and 20b, respectively. The power and power factor of the outputs of generators 20a and 20b, as well as, the total power provided by generators 20a and 20b to loads 34 and 36, respectively, are displayed on display screen 60. Display screen 60 also updates the power connections of power generation system 12.

In response to restoration of electrical power on supply line 40 by the utility, generator controls 42 of generator panels 16 cause transfers switches 38 to transfer loads 34 and 36 from outputs 31 of generators 20a and 20b, respectively, to the utility connected to supply line 40.

10

Thereafter, generator controls 42 stop corresponding engines 22 such that generators 20a and 20b no longer generate electrical power.

Alternatively, generators 20a and 20b may be placed in parallel with a utility by connecting outputs 31 of generators 20a and 20b to the utility through supply line 40. As heretofore described, in order to put generators 20a and 20b in parallel with the utility, it is necessary to match the magnitudes of the AC output voltages of generators 20a and 20b with the magnitude of the AC voltage of the utility. In addition, the outputs of generators 20a and 20b must be synchronized with the utility such that the phase sequences and the frequencies of the outputs of generators 20a and 20b are identical in phase and frequency with the utility.

Once the outputs of generators 20a and 20b are synchronized with the utility and the magnitudes of the AC output voltages of generators 20a and 20b match of the AC voltage of the utility, generator controls 42 of generator powers 16 cause transfer switches 38 to close such that loads 34 and 36 are operatively connected to the utility through supply line 40 and to outputs 31 of generators 20a and 20b, respectively. The AC power and power factor provided by generators 20a and 20b, as well as, the total power provided by generators 20a and 20b, respectively, are displayed on display screen 60. Display screen 60 also updates the power connections of power generation system 12. It can be appreciated that generator controls 42 of generator panels 16 control the power factors of the electrical power supplied by corresponding generators 20a and 20b and the AC power supplied by generators 20a and 20b, as heretofore described, in accordance with the inputs provided by a user on command settings screen 106.

Referring to the embodiment of FIGS. 3 and 4a in the event of a power outage, system controller 14 advises each of generator controls 42 of generator panels 16 accordingly. Generator controls 42 of generator panels 16 start engines 22 such that generators 20a and 20b generate electrical power, as heretofore described. When the electrical power generated by generators 20a and 20b reaches the magnitude and frequency desired by the user, transfer switches 44a and 44b close so as to connect supply line 40 to corresponding outputs 31 of generators 20a and 20b, respectively. Thereafter, system controller 14 opens switch 61 and closes switch 63 in order to connect supply line 40 to load 74, and to hence, transfer load 74 from the utility to generators 20a and 20b. The power and power factor provided by generators 20a and 20b, as well as, the total power provided by generators 20a and 20b to load 74, are displayed on display screen 60. Display screen 60 also updates the power connections of power generation system 12.

In response to restoration of electrical power by the utility, system controller 14 advises generator controls 42 of generator panels 16 accordingly. Thereafter, system controller 14 closes switch 61 and opens switch 63 in order to connect the utility to load 74. In addition, generator controls 42 of generator panels 16 open transfer switches 44a and 44b so as to disconnect the outputs 31 of generators 20a and 20b, respectively, from supply line 40. Generator controls 42 stop corresponding engines 22 such that generators 20a and 20b no longer generate electrical power, or alternatively, system controller 14 returns to operating generators 20a and 20b, as provided by a user on command setting screen 106 Display screen 60 updates the information displayed thereon accordingly.

Alternatively, generators 20a and 20b may be placed in parallel with the utility by connecting outputs 31 of generators 20a and 20b to the utility through supply line 40. As

TX-0001-017

US 6,653,821 B2

11

heretofore described, in order to put generators **20***a* and **20***b* in parallel with the utility, it is necessary to match the magnitudes of the AC output voltages of generators **20***a* and **20***b* with the magnitude of the AC voltage of the utility. In addition, the outputs of generators **20***a* and **20***b* must be synchronized with the utility such that the phase sequences and the frequencies of the outputs of generators **20***a* and **20***b* are identical in phase and frequency with the utility.

Once the outputs of generators **20***a* and **20***b* are synchronized with the utility and the magnitudes of the AC output voltages of generators **20***a* and **20***b* match of the AC voltage of the utility, transfer switches **44***a* and **44***b* close such that outputs **31** of generators **20***a* and **20***b* are connected to supply line **74**. Thereafter, system controller **14** closes switch **63** in order to connect supply line **40** to the utility and to load **74**. The power and power factor provided by generators **20***a* and **20***b*, as well as, the total power provided by generators **20***a* and **20***b* to load **74**, are displayed on display screen **60**. Display screen **60** also updates the power connections of power generation system **12**.

It is contemplated that system controller **14** incorporate a load shedding feature such that if the electrical power from the utility fails and if the plurality of generators in power generation system **12** are inadequate to provide sufficient electrical power to support load **74**, system controller **14** may disconnect a portion of load **74** from supply line **40**. A circuit breaker with a shunt trip is provided in series with portions of load **74**. If the electrical power from the utility fails, system controller **14** trips the circuit breaker and removes a corresponding portion of load **74** from the system. It is contemplated that multiple load shedding relays be provided and the system controller **14** only shed such portion of load **74** as necessary to allow the generators of power generation system **12** to provide adequate electrical power to the load. By way of example, if one or more of the plurality of electrical generators of power generation system **12** are off line, additional portions of the load may be shed in order to for the generators in operation to provide adequate electrical power to load **74**.

Referring back to FIG. **1**, it is contemplated that network system **10** include a network controller **170** which is operatively connected to a communication network **172** such as a telephone network, a computer network, the internet, or a combination for communication thereon. Network controller includes a microprocessor and one or more visual displays. It is further contemplated to interconnect systems controller **14** to network **172**, as heretofore described. It is contemplated that the microcontroller of network controller **172** execute a software program so as to allow a user to access each system controller **14** and selectively display the screens, FIGS. **5–10** of the selected system controller **14** on the visual display of the network controller **170**. As such, the network system **10** allows for a single user to monitor several power generation systems **12** from a single locale and to control operation of these power generation systems **12** in the heretofore described. Consequently, a user is able to view the current operating conditions of each of the power generation systems **12**, as well as, configure system controllers **14** from the remote locale. In addition, the user can obtain detailed information from individual generators **20***a* and **20***b* from the remote locale.

Various modes of carrying out the invention are contemplated as being within the scope of the following claims particularly pointing out and distinctly claiming the subject matter which is regarded as the invention.

We claim:

1. A controller for controlling a plurality of generator sets connectable to a load, each generator set having the ability

12

to be started and stopped and including a generator communications link for connecting the generator set to a network, an engine, and a generator driven by the engine which generates AC power having a magnitude and a power factor and AC voltage having a magnitude and a frequency, comprising:

a user interface for allowing a user to select each of the plurality of generator sets and to set values for various predetermined operating parameters of each of the generator sets; and

a communications link connectable to the network for transmitting the user set values of the predetermined operating parameters to each selected generator set.

2. The controller of claim 1 further comprising a monitoring structure connectable to a utility source which provides AC power having a magnitude and a power factor, AC voltage having a magnitude and a frequency, and AC current having a magnitude and a frequency, the monitoring structure measuring the magnitude and the frequency of the AC voltage and the AC current and providing the same to the user interface for display.

3. The controller of claim 2 wherein the user interface includes a display screen for displaying the magnitudes of the AC power, AC voltage and AC current of the utility source and the power factor of the AC power of the utility source.

4. The controller of claim 2 wherein the communications link transmits the magnitude and the power factor of the AC power of the utility source and the magnitudes and frequencies of the AC voltage and AC current of the utility source to each of the generator sets connected to the network.

5. The controller of claim 1 wherein the user interface includes a display screen, the display screen displaying generator icons identifying corresponding generator sets attached to the network.

6. The controller of claim 1 wherein the user interface includes a generator settings screen for each of a plurality of generator sets connected to the network, each generator settings screen allowing the user to input the values of a portion of the various operating parameters of each selected generator set.

7. A controller for controlling one or more generator sets connectable to a load, each generator set having the ability to be started and stopped and including a generator communications link for connecting the generator set to a network, an engine, and a generator driven by the engine which generates AC power having a magnitude and a power factor and AC voltage having a magnitude and a frequency, comprising:

a user interface for allowing a user to select a generator set and to set values for various predetermined operating parameters of the selected generator set; and

a communications link connectable to the network for transmitting the user set values of the predetermined operating parameters to the selected generator set;

wherein a first of the various operating parameters is a starting time for starting the selected generator set and a second of the various operating parameters is a stopping time for stopping the selected generator set and wherein the user interface includes a generator command screen for each generator set connected to the network, each generator command screen allowing the user to input the starting time for starting the selected generator set and the stopping time for stopping the selected generator set.

8. The controller of claim 7 wherein each generator command screen includes a day setting for allowing a user

TX-0001-018

US 6,653,821 B2

13

to select at least one day on which the selected generator set will be started and stopped in response to the starting time and stopping time inputted by the user.

**9.** The controller of claim **7** wherein the user interface includes a special day screen for each generator set connected to the network, the special day screen allowing the user to input a special day on which the selected generator set will be stopped.

**10.** A power generation system for providing electrical power, comprising;

a plurality of generator sets connectable to a load and to a network, each generator set having the ability to be started and stopped and including:

a generator connectable to the load, the generator generating AC power having a magnitude and a power factor, AC voltage having a magnitude and a frequency, and AC current having a magnitude and a frequency;

an engine operatively connected to the generator for driving the generator, the engine having an adjustable engine speed;

a generator control operatively connected to the engine for controlling operation thereof and operatively connected to the generator for controlling the AC power generated thereby; and

a generator communications link for operatively connecting the generator control to the network;

a user interface for allowing a user to select each of the plurality of generator sets and to set values for various predetermined operating parameters of each selected generator set; and

a system communications link connectable to the network for transmitting the user set values of the predetermined operating parameters to the generator control of each selected generator set.

**11.** The power generation system of claim **10** further comprising a monitoring structure connectable to a utility source which provides AC power having a magnitude and a power factor, AC voltage having a magnitude and a frequency, and AC current having a magnitude and a frequency, the monitoring structure measuring the magnitude and the frequency of the AC voltage and the AC current and providing the same to the user interface.

**12.** The power generation system of claim **11** wherein the user interface includes a display screen for displaying the magnitudes of the AC power, AC voltage and AC current of the utility source and the power factor of the AC power of the utility source.

**13.** The power generation system of claim **11** wherein the system communications link transmits the magnitude and the power factor of the AC power of the utility source and the magnitudes and frequencies of the AC voltage and AC current of the utility source to each of the generator controls of the generator sets connected to the network.

**14.** The power generation system of claim **10** wherein the user interface includes a generator settings screen for each generator set connected to the network, each generator settings screen allowing the user to input the values of a portion of the various operating parameters of each selected generator set.

**15.** The power generation system of claim **10** wherein the user interface includes a display screen, the display screen displaying generator icons identifying corresponding generator sets attached to the network.

**16.** A power generation system for providing electrical power, comprising:

at least one generator set connectable to a load and to a network, each generator set having the ability to be started and stopped and including:

14

a generator connectable to the load, the generator generating AC power having a magnitude and a power factor, AC voltage having a magnitude and a frequency, and AC current having a magnitude and a frequency;

an engine operatively connected to the generator for driving the generator, the engine having an adjustable engine speed;

a generator control operatively connected to the engine for controlling operation thereof and operatively connected to the generator for controlling the AC power generated thereby; and

a generator communications link for operatively connecting the generator control to the network;

a user interface for allowing a user to select a generator set and to set values for various predetermined operating parameters of the selected generator set; and

a system communications link connectable to the network for transmitting the user set values of the predetermined operating parameters to the generator control of the selected generator set;

wherein a first of the various operating parameters is a starting time for starting the selected generator set and a second of the various operating parameters is a stopping time for stopping the selected generator set and wherein the user interface includes a generator command screen for each generator set connected to the network, each generator command screen allowing the user to input the starting time for starting the selected generator set and the stopping time for stopping the selected generator set.

**17.** The power generation system of claim **16** wherein each generator command screen includes a day setting for allowing a user to select a day on which the selected generator set will be started and stopped in response to the starting time and stopping time inputted by the user.

**18.** The power generation system of claim **16** wherein the user interface includes a special day screen for each generator set connected to the network, the special day screen allowing the user to input a special day on which the selected generator set will be stopped.

**19.** A method of managing the distribution of electrical power, comprising the steps of:

interconnecting a plurality of generator sets to a load and to a network, each generator set having the ability to be started and stopped;

selecting each generator set and setting various predetermined operating parameters for each selected generator set; and

transmitting the settings of the predetermined operating parameters over the network to each selected generator set.

**20.** The method of claim **19** comprising the additional steps of:

providing a utility source, the utility source supplying AC power having a magnitude and a power factor, AC voltage having a magnitude and a frequency, and AC current having a magnitude and a frequency;

measuring the magnitude and the frequency of the AC voltage and the AC current; and

displaying to a user the magnitudes of the AC power, AC voltage and AC current of the utility source and the power factor of the AC power of the utility source.

**21.** The method of claim **20** comprising the additional step of transmitting the magnitude and the power factor of the AC power of the utility source and the magnitudes and frequen-

TX-0001-019

US 6,653,821 B2

**15**

cies of the AC voltage and AC current of the utility source to each of the generator sets connected to the network.

**22**. The method of claim **20** comprising the additional step of displaying to a user generator icons identifying corresponding generator sets attached to the network.

**23**. A method of managing the distribution of electrical power, comprising the steps of:

   interconnecting at least one generator set to a load and to a network, each generator set having the ability to be started and stopped;

   selecting a generator set and setting various predetermined operating parameters for the selected generator set;

**16**

transmitting the settings of the predetermined operating parameters over the network to the selected generator set;

starting the selected generator set at a first predetermined time; and

stopping the selected generator set at a second predetermined time.

**24**. The method of claim **23** comprising the additional step of transmitting the first and second predetermined times to the selected generator set over the network.

\* \* \* \* \*

TX-0001-020

# Addendum 7

October 13, 2010 Order,
*IP Innovation L.L.C. et al. v. Red Hat, Inc. et al.*,
Case No. 2:07-cv-00447-RRR (E.D. Tex.)

A6699-A6708

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| IP INNOVATION L.L.C. and<br>TECHNOLOGY LICENSING CORP.,<br><br>Plaintiffs,<br><br>v.<br><br>RED HAT, INC. and<br>NOVELL, INC.,<br><br>Defendants. | Case No. 2:07-cv-447 (RRR)<br><br>**Jury Trial Demanded** |

**ORDER DENYING PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF
LAW ON INFRINGEMENT AND VALIDITY OR IN THE ALTERNATIVE FOR A
NEW TRIAL**

IP Innovation L.L.C. and Technology Licensing Corporation (collectively, "Plaintiffs")

move for judgment as a matter of law on infringement and validity, or in the alternative, for a

new trial.  (Document No. 248.)  Because substantial evidence supports the jury verdict of

noninfringement and invalidity, this court DENIES the motion.

I

Plaintiffs own by assignment U.S. Patent Nos. 5,072,412 ("'412 patent"), 5,394,521

("'521 patent"), and 5,533,183 ("'183 patent").  These related patents, based on the same

specification, each carry the title "User Interface with Multiple Workspaces for Sharing Display

System Objects."  All patents name three inventors: Dr. D. Austin Henderson, Jr.; Dr. Stuart K.

Card; and Mr. John T. Maxwell, III.

The patents relate to a graphical user interface that spans across multiple workspaces. A "workspace" is a "display system entity that includes a collection of display objects together with spatial display relations between them." Document No. 87 at 23 ("Claim Construction Order"); *see also* '412 patent col.8 ll.46-49. A "display object" is a "visually distinguishable display feature or set of features which is coherent, in the sense of sticking together in a display." Claim Construction Order at 23; *see also* '412 patent col.7 ll.25-27. Pointers, icons, windows, and menus are examples of display objects. '412 patent col.1 ll.38-63, col.7 ll.28-39. A "display system object provides the visible features of each of the display objects." *Id.* col.8 ll.21-28. A display system object can be linked to multiple display objects that appear in different workspaces and "receive[] and respond[] to user signals relating to those display objects." *Id.*; *see also id.* col.5 ll.10-13.

Figures 1A and 1B illustrate "a number of general features of the present invention, including switching from the display of one workspace to another." *Id.* col.9 ll.36-38.



**FIG. 1A**    **FIG. 1B**

*Id.* figs. 1A, 1B. The first workspace (10) has a window for a text editing application (12), a window for a graphics application (14), and a door icon (16). *Id.* col.9 ll.52-58. A user can click on the door icon to switch from the first workspace to the second workspace (20). *Id.* col.10 ll.2-

2

5.  The second workspace has a window for a text editing application (22), a window for another graphics application (24), and a back door icon (26).  *Id.* col.10 ll.6-9, 14-17.  The user can click on the back door icon to return to the first workspace.  *Id.* col.10 ll.15-17.

The same display system object calls a text editing application to provide windows (12) and (22).  *Id.* col.10 ll.9-11.  The workspaces display the windows at different locations and with different dimensions, as can be seen from the cutting off of the character "d" in window (22).  *Id.* col.10 ll.11-14.  However, "the state of the underlying display system object will be continuous." *Id.* col.10 ll.25-27.  In other words, if the user edits the contents of window (12) and clicks on the door icon (16) to switch to the second workspace, the changes will be reflected in window (22). *Id.* col.10 ll.23-25.  Windows (12) and (22) "illustrate the phenomenon of object constancy, under which two successively displayed objects are perceived as the same object." *Id.* col.10 ll.30-32.

Plaintiffs allege that Red Hat, Inc. and Novell, Inc. (collectively, "Defendants") infringe: claims 1 and 21 of the '412 patent; claim 8 of the '521 patent; and claim 1 of the '183 patent. The claims cover a particular technique for switching between two workspaces.  Claim 1 of the '412 patent is representative and recites:

A system comprising:

a display;

first and second workspace data structures relating respectively to first and second workspaces that can be presented on the display;
> each of the first and second workspaces including a respective set of display objects;
> each of the display objects being perceptible as a distinct, coherent set of display features;
> the display objects of each respective set being perceptible as having spatial positions relative to each other when the respective workspace is presented on the display;

> *display object means* for generating *first and second display objects*;
>> the first workspace data structure being linked to the display object means
>> so that the first display object is in the respective set of display objects of
>> the first workspace;
>> the second workspace data structure being linked to the display object
>> means so that the second display object is in the respective set of display
>> objects of the second workspace; and
>
> control means for accessing the first workspace data structure to cause the display
> to present the first workspace including the first display object;
>> the control means further being for accessing the second workspace data
>> structure to cause the display to present the second workspace including
>> the second display object;
>> the display object means generating the first and second display objects so
>> that *the second display object is perceptible as the same tool as the first
>> display object* when the second workspace is presented after the first
>> workspace.

*Id.* col.45 ll.34-66 (emphases added).

Plaintiffs accuse the following software products of infringement: Red Hat Enterprise Linux versions 4 and 5 ("RHEL"); Red Hat's Fedora versions 7, 8, and 9; Novell SUSE Linux Enterprise versions 10, 10 SP1, and 10 SP2; and Novell openSUSE versions 10.2, 10.3, and 11. The accused products support multiple workspaces and allow users to switch among these workspaces.

II

On September 9, 2007, Plaintiffs filed this action against Defendants alleging infringement of the '412, '521, and '183 patents. Defendants answered the complaint on February 1, 2008, and asserted defenses and counterclaims of noninfringement and invalidity. On August 10, 2009, District Judge Leonard Davis issued a claim construction order. On December 22, 2009, District Judge Davis transferred the case to Circuit Judge Randall R. Rader, sitting in the United States District Court for the Eastern District of Texas by designation. This court denied Defendant's motion for summary judgment of invalidity for improper inventorship

4

under 35 U.S.C. § 116 after finding a genuine issue of material fact.  This court held a jury trial from April 26, 2010, to April 30, 2010.  On April 30, 2010, the jury returned a unanimous verdict in favor of Defendants and against Plaintiffs.  The jury found that Defendants did not infringe any of the asserted claims and that the asserted claims were invalid as anticipated and due to improper inventorship.  On May 14, 2010, Plaintiffs filed a motion for judgment as a matter of law ("JMOL") on infringement and validity.  Plaintiffs later renewed its JMOL motion and moved for a new trial.  Defendants oppose the motion.

III

JMOL is appropriate only if this court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  This court "draw[s] all reasonable inferences and resolve[s] all credibility determinations in the light most favorable to the nonmoving party."  *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 481 (5th Cir. 2008) (internal quotation marks and citation omitted).  This court should grant a JMOL motion "only if the facts and inferences point so strongly and overwhelmingly in favor of [the movant] that the [c]ourt believes that [a] reasonable [jury] could not arrive at a contrary verdict."  *McBeth v. Carpenter*, 565 F.3d 171, 176 (5th Cir. 2009) (citation omitted).  "A jury verdict must stand unless there is a lack of substantial evidence, in the light most favorable to the successful party, to support the verdict."  *Am. Home Assur. Co. v. United Space Alliance, LLC*, 378 F.3d 482, 487 (5th Cir. 2004).

This court grants a motion for a new trial only if "the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence."  *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838-39 (5th Cir. 2004).

5

IV

To prove infringement, a patentee must show that each and every element of the claimed invention is present in the accused device by a preponderance of the evidence. *Amgen Inc. v. F. Hoffmann-La Roche, Ltd.*, 580 F.3d 1340, 1374 (Fed. Cir. 2009). Plaintiffs contend that the jury erred by finding noninfringement because the accused products display infringing trash icons and infringing calendar windows across multiple workspaces.

Substantial evidence supports the jury's verdict that the trash icons do not infringe the asserted claims because they do not meet the "first and second display objects" limitation. A trash icon has a visually distinguishable display feature and thus is a display object. The accused products display a trash icon in each workspace. However, as Mr. Stephen Gray, Defendants' noninfringement expert, testified, a trash icon is "a single display object that shows in each of the workspaces." (Gray, 4/29/10 AM 131:21-132:19; Gray, 4/29/10 PM 14:19-15:10.) A trash icon that appears in one workspace and a trash icon that appears in another workspace are not two separate display objects. Instead, the same trash icon is visible across multiple workspaces. Therefore, the trash icons cannot infringe the asserted claims, which require the "first and second display objects."

Plaintiffs misconstrue this court's previous description of the patented invention to argue that a single display object that appears across multiple workspaces can infringe the asserted claims. Multiple workspaces can have display objects that are generated by the same display system object and these display objects may be "perceptible as the same tool." However, the asserted claims are clear that a display object shown in one workspace and a similarly-looking display object shown in another workspace must be two separate display objects for infringement to occur. Plaintiffs' infringement expert, Dr. Myron Zimmerman, conceded that a single display

6

object cannot infringe the asserted claims.  (Zimmerman, 4/27/10 PM, 26:16-19.)  Accordingly, Plaintiffs have not shown that no reasonable jury could have found that the trash icons are not infringing.

It is unclear as to why Plaintiffs believe that the calendar windows in the accused products meet each and every element of the asserted claims.  In their JMOL motion, Plaintiffs merely summarize Dr. Zimmerman's expert testimony and do not explain why the calendar windows infringe.  As Dr. Zimmerman testified, a user can open calendar windows in two different workspaces, and those calendar windows might be perceived to be the same tool. (Zimmerman, 4/27/10 PM 34:12-21.)  The user can carry over content from one calendar window to another under some circumstances.  (*Id.*; Gray, 4/29/10 PM 15:11-17.)  Also, unlike trash icons, two calendar windows in two different workspaces are separate display objects and thus meet the "first and second display objects" limitation.  However, the asserted claims require more than the capabilities listed in Plaintiffs' JMOL motion.  Plaintiffs do not discuss any other claim elements in their briefs.  Therefore, this court is not persuaded that JMOL of infringement is appropriate.

V

"To prove inducement, the patentee must show direct infringement, and that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."  *I4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010).  As noted, substantial evidence supports the jury's verdict that the accused products do not infringe the asserted claims.  Accordingly, it follows that substantial evidence supports the jury's verdict of no infringement by inducement.

7

VI

A patent is invalid as anticipated if "the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b).  The anticipation inquiry proceeds on a claim-by-claim basis.  *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 974 (Fed. Cir. 2010).  "Anticipation requires a showing that each element of the claim at issue, properly construed, is found in a single prior art reference."  *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1339 (Fed. Cir. 2010) (citation omitted).  At trial, the jury returned a general verdict of anticipation.  Plaintiffs claim that none of the three devices presented at trial anticipate the asserted claims.

Substantial evidence supports the jury's verdict that the "Chan system" anticipated the asserted claims.  Patrick Chan, a master's student at the University of Waterloo, created a system of virtual workspaces known as "The Room Model."  (Def. Exh. 535.)  The Chan system used a collection of rooms, where each room had a group of icons including a door icon.  '412 patent col.3 ll.61-64.  A user could click on the door icon to go to a different room.  *Id.*; (Wilson 4/29/10 PM 73:25-74:12.).  Plaintiffs do not dispute in their JMOL motion that the Chan system meets each and every element of the asserted claims.  Plaintiffs instead raise two procedural issues.

First, Plaintiffs argue that the "Chan system" cannot anticipate the asserted claims because it was a "blending of two separate articles by different authors."  Dr. David Wilson, Defendants' invalidity expert, relied on two separate references to describe the Chan system.  He used a republication of Chan's master's thesis entitled "Learning Considerations in User Interface Design: The Room Model."  (Def. Exh. 535.)  Dr. Wilson also used another paper entitled "Experience Designing the Waterloo Port User Interface" by Professor Michael A.

8

Malcolm, Chan's supervisor at the University of Waterloo, and Professor Doug Dyment, one of Chan's thesis readers.  (Def. Exh. 601.)  Dr. Wilson explained that the illustrated figures and technical details showed that the two papers described the same Chan system.  (Wilson, 4/29/10 PM 75:8-76:2.)  Therefore, he used the information in both papers to recreate the Chan system.  (Wilson, 4/29/10 PM 77:21-78:4.)

"[A]nticipation must be found in a single reference, device, or process." *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 726 F.2d 724, 726-27 (Fed. Cir. 1984). Dr. Wilson used a single device, the Chan system, to show anticipation.  Dr. Wilson did not rely on the articles as separate anticipatory references.  He only used the articles to understand how the Chan system functioned.  This court sees no error in using multiple references to describe a single prior art system for the purpose of showing anticipation.

Second, Plaintiffs argue that Defendants never proved that the Chan system existed prior to the section 102(b) bar date—March 25, 1986.  However, papers that Defendants relied upon at trial separately and individually establish that the Chan system was in public use prior to March 25, 1986.  Chan's thesis was published in July 1984, and his professors' paper was published in 1983.  Chan's thesis explains that his system was "used in a fourth year undergraduate course" and "approximately 100 students have been exposed to the system over the course of 8 months." (Def. Exh. 535.)  Therefore, the papers indicate that the Chan system existed and was in public use at least by 1984.  Accordingly, Defendants properly used the Chan system as a single anticipatory prior art system that was in use before the section 102(b) bar date.

VII

Because this court finds that substantial evidence supports the jury's verdict of noninfringement and invalidity, this court denies Plaintiff's JMOL motion on infringement and

9

validity.  Also, because the jury verdict is not against the great weight of the evidence, this court

denies Plaintiffs' motion for a new trial.


      It is SO ORDERED.

      SIGNED this 13th day of October 2010.


                                    *Randall Rader*

                           _____

                           RANDALL R. RADER
                           UNITED STATES CIRCUIT JUDGE
                           (sitting by designation)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically tendered on August 6, 2013 BRIEF OF

PLAINTIFF-APPELLANT GENERAC POWER SYSTEMS, INC. using the

Court's CM/ECF filing system.  The following counsel registered with the Court's

CM/ECF filing system have been served by operation of the electronic filing per

Fed. R. App. P. 25 and Rule ECF-6(A) of the Court's May 17, 2012

Administrative Order:

> Jonathan H. Margolies
> Katherine W. Schill
> Richard M. Marschall
> Melanie J. Reichenberger
> MICHAEL BEST & FRIEDRICH LLP
> 100 E. Wisconsin Ave., Ste. 3300
> Milwaukee, Wisconsin 53202
> jhmargolies@michaelbest.com
> kwschill@michaelbest.com
> rhmarschall@michaelbest.com
> mjreichenberger@michaelbest.com
> *Counsel for Defendant-Appellee,*
> *Kohler Company*
>
> Aaron T. Olejniczak
> George H. Solveson
> ANDRUS, SCEALES, STARKE & SAWALL, LLP
> 100 E. Wisconsin Ave., Ste. 1100
> Milwaukee, Wisconsin 53202
> aarono@andruslaw.com
> georges@andruslaw.com
> *Counsel for Defendant-Appellee,*
> *Total Energy Systems, LLC*

/s/ H. Michael Hartmann
H. Michael Hartmann
*Counsel for Plaintiff-Appellant,*
*Generac Power Systems, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, <u>AND TYPE STYLE REQUIREMENTS</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,822 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C)(i), the undersigned has relied upon the word count feature of Microsoft Word in preparing this certificate.


Dated:  August 6, 2013                    /s/ H. Michael Hartmann
                                          H. Michael Hartmann